UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

ADT LLC, and ADT US HOLDINGS, INC.,

Plaintiffs,

v.

VIVINT, INC.,

Defendant.

______________________________________/

# COMPLAINT

Plaintiffs ADT US HOLDINGS, INC., and ADT LLC (together, "ADT"), through undersigned counsel, bring this action for damages and injunctive relief against Defendant VIVINT INC., and in support allege:

## SUMMARY OF THE CASE

1. This is an action for damages, attorney fees and injunctive relief arising from Vivint's deceptive sales practices. Vivint competes with ADT, selling residential alarm systems door-to-door to ADT's customers. Vivint's sales agents use false sales pitches that mislead ADT's customers into believing that the agents represent ADT, or that they are otherwise affiliated with ADT, and that they are visiting to install new ADT alarm equipment when in fact they have no ADT affiliation. This deception confuses ADT's customers at their doorsteps, winning their interest and trust in a calculated effort to gain access to the customers' homes and install new Vivint equipment in the guise of an "upgrade." Once inside, the agents sign ADT's customers to new contracts with Vivint. These practices violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Florida Deceptive and Unfair Trade Practices Act, and ADT's

common-law rights against unfair competition. ADT seeks an injunction barring Vivint's further use of deceptive sales tactics, the recovery of ADT's damages, the recovery of Vivint's profits, punitive damages, and ADT's costs and attorney fees incurred in this lawsuit.

**PARTIES**

2. Plaintiff ADT US Holdings, Inc., is a Delaware corporation with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431. ADT US Holdings is a holding company that owns, *inter alia*, all ADT trademarks, including without limitation 21 ADT live word trademarks featuring the letters "A – D – T," registered in the United States Patent & Trademark Office that bear the registration numbers 3251836, 3352491, 710708, 710507, 3515266, 3511263, 3445423, 3909665, 3485321, 3421797, 1034716, 838956, 803247, 846966, 3348663, 3253804, 3445420, 3991449, 3335239, 3335298, and 3427081 ("ADT Trademarks"). ADT US Holdings is ultimately wholly owned by Apollo Global Management LLC, a public corporation traded on the New York Stock Exchange.

3. Plaintiff ADT LLC is a Delaware limited liability company with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431. ADT LLC is an operating company that runs the ADT alarm services business in the United States. ADT LLC uses the ADT Trademarks under license from ADT US Holdings. ADT LLC is owned by ADT US Holdings, Inc.

4. Defendant Vivint Inc., formerly known as APX Alarm Security Solutions Inc., is a corporation organized under the laws of the State of Utah, with its principal place of business located at 4931 N 300 W, Provo, Utah 84604. Vivint's registered agent for service of process in Florida is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to section 1331 of title 28 because it presents a Federal question under Section 43 of the Lanham Act.

6. This Court has supplemental jurisdiction over the state-law claims also asserted in this action pursuant to section 1367(a) of title 28, as well as diversity jurisdiction over the claims pursuant to section 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and they are between citizens of different States.

7. Venue lies in this District pursuant to section 1391(b) of title 28 because defendant is found in this District, and because a substantial number of the events giving rise to the claims asserted in this Complaint occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

8. ADT, founded in 1874, is the oldest, largest and best-known provider of electronic security services and equipment for homes and businesses in the United States.

9. ADT provides security services and equipment nationwide and is engaged in interstate commerce for the purposes of the Lanham Act.

10. ADT's name and trademarks are registered with the United States Patent and Trademark Office.

11. As a Florida resident, ADT is injured in Florida by Vivint's tortious activities.

12. Vivint began selling and installing alarm systems under the name APX Alarm Security Solutions in 1999. APX rebranded itself as Vivint in 2011.

13. Today, Vivint operates in most states, including Florida. Vivint is registered to do business in Florida with the Florida Department of State, Division of Corporations. A substantial fraction of the violations that form the basis of this complaint occurred in Florida. At all times

relevant to this Complaint, Vivint misled Florida consumers and engaged in the deceptive sales practices that are the subject of this civil action.

14. Vivint and ADT are direct competitors in the security systems markets. ADT and Vivint market and sell substantially similar goods made by the same suppliers through the same channels to the same target markets of residential consumers. The companies also provide substantially similar security monitoring services to their respective customers. ADT operates in each of the states in which Vivint sells and installs alarm systems.

15. Vivint's sales agents target ADT customers in various ways, often by seeking houses with the distinctive ADT sign that ADT's customers post on their premises to deter burglars and trespassers.

16. The complaints received by ADT show that Vivint's sales agents target retirees and older customers. One complaining ADT customer, Rose Leary, is 85 years old and legally blind. Vivint agent Brad Beard visited Ms. Leary at her home and told her that he was visiting to upgrade her ADT alarm system. Ms. Leary signed the contract Mr. Beard presented to her. The next day, Ms. Leary's neighbor told her that she had a new Vivint yard sign in place of her ADT sign. When Ms. Leary's daughter called Vivint to cancel the Vivint contract, the Vivint operator told her that most of Vivint's customers over the age of 70 "don't even know that Vivint is changing their alarm system." (Exhibit 1.)

17. Vivint's sales agents solicit ADT's customers in unannounced "cold" door-to-door sales visits to the customers' homes. At the beginning of these visits, the agents use deceptive sales pitches that are intended to mislead (and that do mislead) ADT's customers into believing that Vivint represents ADT, or that Vivint is affiliated with ADT, or that they are

visiting at ADT's direction, or that they work for the companies that made the ADT alarm equipment installed in the customers' homes.

18. Vivint's agents use these pitches to induce ADT customers to believe that they have an existing business relationship with the agents, to trust them, and to grant the agents entry into their homes. Once inside, having won the customers' trust by this deception, the agents lead the customers to sign Vivint contracts and install Vivint alarm systems in the mistaken belief that they are receiving new ADT equipment from ADT, an ADT affiliate, or an ADT successor.

19. Vivint's deceptive practices injure ADT by causing ADT's customers to listen to their deceptive sales pitches, allow Vivint's agents entry to their homes under false pretenses, sign Vivint contracts, uninstall their ADT alarm systems, replace them with Vivint's equipment, and terminate the customers' ADT contracts.

20. Vivint, by falsely claiming an affiliation with ADT in its sales to consumers, further injures ADT by taking for itself the essential benefit of being an ADT affiliate without paying any royalty or other consideration to ADT for the claim of affiliation.

21. Vivint's false sales pitches also injure ADT's goodwill and reputation. Some customers are left with the false belief that ADT is out of business, that ADT has been acquired, their ADT alarm systems are outdated and vulnerable to burglars. Others mistakenly assume that Vivint had access to the private data the customers had entrusted to ADT, leaving them to question ADT's ability to safeguard their interests. Yet others understand the false pitch for what it is, but reconsider their ADT service because ADT is a target of scammers. In many ways the Vivint agents' false sales pitches damage ADT's goodwill and reputation as a reliable provider of security services.

22. As a result of Vivint's deceptive practices, a number of ADT customers have confused Vivint's sales agents with ADT representatives, and as a result have unwittingly found themselves with Vivint's alarm systems installed in their homes, and with contractual obligations to both Vivint and ADT. In some instances, ADT has been required to send technicians to the deceived customers' houses to reinstall the removed ADT equipment at considerable expense to ADT. In others, the customers retained Vivint's systems and terminated their ADT contracts.

23. Such practices violate statutory and common-law prohibitions against the use of false and deceptive statements in commerce. They also violate the security systems industry's own Code of Ethics and Standards of Conduct, which requires that companies "truthfully and clearly identify themselves by name … at the initiation of a sales presentation, without request from the consumer," and which prohibits as common deceptive sales practices, *inter alia*, (a) any claim that a competitor is going out of business, (b) any claim that the company is taking over the competitor's accounts, or (c) any offer of an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

24. Vivint's predecessor APX employed these same deceptive sales practices. ADT asserted similar claims against APX and certain of its sales agents, and settled the claims in 2011. In the months immediately following the settlement, APX, then rebranded as Vivint, appeared to have curbed its agents' misconduct, based on the number of customers who called ADT to voice complaints about Vivint sales practices.

25. Vivint operates on a seasonal sales model. Each year, Vivint hires a fresh group of students and transports them to sales locations across the country. As a result, Vivint's sales occur mostly in the summer months.

26. In the summer of 2013, ADT experienced a spike in the number of customers calling to complain about visits by Vivint sales agents. In all, ADT received 121 complaints in 2013.

27. These numbers increased again in 2014 and 2015. ADT received 321 complaints about Vivint in 2014, and another 307 complaints in 2015.

28. Alarmed by these numbers, ADT engaged Vivint informally through counsel in early 2016 to express its concerns. Vivint assured ADT that Vivint was implementing new internal controls to detect agents' use of such false pitches and to stop them from recurring.

29. Nonetheless, ADT received 156 complaints about Vivint's deceptive sales practices in 2016 – an improvement from the two previous years, but still an atrocious number of reported instances of deceptive sales practices. ADT's several informal attempts in late 2016 and 2017 to engage Vivint in discussions have been largely disregarded.

30. These reports are but the tip of the iceberg. It is an accepted (and obvious) tenet of consumer complaint behavior, that Vivint has itself elsewhere asserted, that for every aggrieved customer who reports a deceptive sales practice, many more go uncounted. The 905 complaints that ADT received over the period discussed above are likely indicative of tens of thousands of other occurrences.

31. ADT has received reports of deceptive sales practices in most states in which Vivint sells alarm systems. The highest concentrations of reported incidents originated from consumers in California, Florida, Ohio and Texas.

32. The violations and torts alleged in this Complaint have been the subject of public enforcement actions by various state agencies. In January 2017, Vivint settled an enforcement proceeding with the Pennsylvania Attorney General that found that Vivint's sales agents had

violated the state's consumer protection laws by falsely stating in door-to-door solicitations that they were affiliated with the consumers' existing security companies, that the consumers' existing security providers had gone out of business, that they were purchased or taken over by Vivint, and that the consumers' alarm systems needed to be updated.[1]

33. ADT's customers report the same false solicitations. Below, ADT alleges 44 examples that occurred in 2013 and 2014 – about five percent of the over 900 complaints that ADT has received regarding Vivint's deceptive sales practices. ADT attaches sworn customer declarations to this Complaint to support each of these examples.

***2013 Complaints***

34. On May 4, 2013, Larry Curtis, a 76-year-old ADT customer, was visited at his home in Corpus Christi, Texas, by two Vivint agents, Kai Blakeley and Darin Door. Mr. Blakeley told Mr. Curtis that Vivint purchased ADT, and that he was visiting to upgrade Mr. Curtis's ADT alarm system. Mr. Blakeley signed the contract and accepted the Vivint equipment. A month later, Mr. Curtis learned that Vivint did not purchase ADT, and tried to cancel his Vivint contract, but Vivint refused to release him from it. Mr. Curtis wanted to return to ADT but could not afford the Vivint contract termination fee, so he acquiesced in Vivint's refusal and remained a Vivint customer. (Exhibit 2.)

35. On May 7, 2013, Beatrice Lauderdale, an 88-year-old ADT customer, was visited at her home in Kansas City, Kansas, by two Vivint agents, Josh Johnson and Travis Gale. The agents stated that they were visiting from "the security company" to upgrade her alarm equipment. Mr. Gale interviewed Ms. Lauderdale and had her sign a document while Mr. Gale

---

[1] *See* https://www.attorneygeneral.gov/Media_and_Resources/Press_Releases/Press_Release/?pid=2971 (accessed March 31, 2017).

installed a new Vivint alarm system. Ms. Lauderdale did not understand that she had changed alarm providers until she looked at her alarm panel and realized that it was a Vivint panel. Ms. Lauderdale remained a Vivint customer because she did not wish to pay the early termination fee required by the Vivint contract. (Exhibit 3.)

36. On June 4, 2013, John Loftus, an 84-year-old ADT customer, was visited in his home in Milton, Massachusetts by Vivint agent Richard Dale. Mr. Dale offered a "wireless upgrade" that included a free cell phone with unlimited minutes. Mr. Dale told Mr. Loftus that ADT would continue to be Mr. Loftus's alarm services provider, and that Vivint would be his wireless services provider. Mr. Loftus signed a contract and accepted the Vivint alarm system. After the Vivint installation, Mr. Loftus's daughter called ADT to test the alarm system and learned that her father's ADT alarm system was disconnected, and that Vivint was not affiliated with ADT. Mr. Loftus cancelled his Vivint contract, had ADT reinstall a new ADT alarm system, and reported Vivint to the Massachusetts Attorney General. (Exhibit 4.)

37. On June 5, 2013, Roxie Williams, a 72-year-old ADT customer, was visited at her home in Winston Salem, North Carolina, by a Vivint sales agent. The Vivint agent showed Ms. Williams a list of names on a tablet and said she was among the list of ADT customers entitled to free upgrades. When Ms. Williams asked the agent for identification, he declined to offer any. Ms. Williams refused the agent entry into her home, and the agent left after Ms. Williams told him that she would call ADT to confirm his affiliation. (Exhibit 5.)

38. On June 14, 2013, Phyllis Combs, a 73-year-old ADT customer, was visited at her home, in Morgantown, West Virginia, by Vivint agent Tanner Jardine. Mr. Jardine told Ms. Combs that Vivint had taken over all of ADT's accounts and required an equipment upgrade. Mr. Jardine said that Ms. Combs had to sign a Vivint contract to acknowledge and accept the

installation of the upgraded equipment. The Vivint technician who installed Ms. Combs's Vivint system also stated that the upgrade was required because Vivint took over ADT. Ms. Combs learned that ADT was still in business and had no Vivint affiliation a week later, when ADT called to learn why Ms. Combs's ADT alarm system was no longer generating a signal. Ms. Combs cancelled the Vivint contract and had ADT reconnect her ADT alarm system at her own expense. (Exhibit 6.)

39. On June 22, 2013, Jorge Ruiz, a 46-year-old ADT customer, was visited at his home in Jacksonville, Florida, by a Vivint sales agent. The Vivint agent told Mr. Ruiz that Vivint worked with ADT, and that the neighborhood association had arranged with Vivint to update alarm systems in the neighborhood. Mr. Ruiz declined the agent's request to add equipment to his alarm system, and called ADT to report the visit. (Exhibit 7.)

40. On June 27, 2013, Eleanor Sulcer, a 72-year-old ADT customer, was visited in her home in Gary, Indiana, by a Vivint agent. The agent said he was from ADT and told Ms. Sulcer that he was visiting to inspect her alarm system for possible damage caused by a recent storm and to update the system. The Vivint agent had Ms. Sulcer sign a Vivint contract with the explanation that it was documentation confirming the update and system check. The next day, Ms. Sulcer read the "documentation," saw that it was a contract for alarm services with Vivint, cancelled the Vivint contract and reported the incident to ADT. (Exhibit 8.)

41. On June 27, 2013, Paul Davis, a 47-year-old ADT customer, was visited at his home in Neptune, New Jersey, by a Vivint sales agent. The agent told Mr. Davis that he was with ADT and was visiting to upgrade Mr. Davis's ADT alarm system. The agent also told Mr. Davis that he had just upgraded his neighbor's ADT system, which Mr. Davis knew to be false because his neighbor was out of town and did not have an ADT alarm system. When Mr. Davis

declined the offer, the Vivint agent entered the home uninvited and began to punch numbers into Mr. Davis's ADT alarm keypad. Mr. Davis insisted that the agent provide identification; the agent showed him a Vivint card; Mr. Davis told the agent to leave, and reported the incident to ADT. (Exhibit 9.)

42. On July 4, 2013, Carol Dotlich, a 63-year-old ADT customer, was visited at her home in Spanaway, Washington, by a Vivint sales agent. The agent said he was visiting to upgrade Ms. Dotlich's alarm panel keypad. When Ms. Dotlich asked the agent if he was sent by ADT, the agent replied that ADT monitors alarm systems, but Vivint provides the equipment. After the Viving agent refused to provide a business card or a brochure for the proposed upgrade, Ms. Dotlich told the agent to leave, and called ADT to report the incident. (Exhibit 10.)

43. On July 12, 2013, Therese Hebert, an 85-year-old ADT customer, was visited at her home in Lacey, Washington, by Vivint agent Kramer Holt. Mr. Holt told Ms. Lacey that he was visiting to upgrade her alarm system. When, in the course of their discussion, Ms. Hebert asked whether her ADT account would stay the same, Mr. Holt assured her that the account would stay the same, and the only change would be that her alarm panel would communicate wirelessly with the monitoring center. After signing a Vivint contract and receiving the Vivint system, Ms. Hebert realized that her system was no longer monitored by ADT. Vivint refused to allow Ms. Hebert to cancel without paying an early termination charge, so Ms. Hebert acquiesced in the change and terminated her ADT contract. (Exhibit 11.)

44. On July 13, 2013, Anna Hjorth, a 34-year-old ADT customer, was visited in her home in Pasadena, California, by a Vivint agent who identified herself as Anna. Anna told Ms. Hjorth that she "handled ADT's accounts" and was visiting to upgrade her ADT alarm equipment. Anna refused to provide identification, and insisted that Ms. Hjorth agree to the

upgrade "because burglars are getting smarter" and are disabling wired systems. Ms. Hjorth called ADT, learned that Vivint has no ADT affiliation, and declined the service. (Exhibit 12.)

45. On July 18, 2013, Cynthia Florio, a 52-year-old ADT customer, was visited at her home in Palm Coast, Florida, by a Vivint sales agent. The agent told Ms. Florio that Vivint was a former ADT authorized dealer, and that that Ms. Florio needed to update her ADT system to prevent burglars from disabling her alarm system. According to the agent, Ms. Florio's ADT yard sign would attract burglars because ADT alarm systems were known to be vulnerable to interference. When Ms. Florio said she was not interested, the agent banged on her door before leaving. Ms. Florio called ADT to report the incident. (Exhibit 13.)

46. On July 22, 2013, Gloria Seeman, a 67-year-old ADT customer, was visited at her home in Miami, Florida, by Vivint agent Matthew Gonzalez. Mr. Gonzalez told Ms. Seeman that her ADT alarm system was vulnerable to burglars because of "how easy it would be to clip your wires and cut off all contact with ADT." Mr. Gonzalez told Ms. Seeman that he and other Vivint agents were visiting all homes with ADT yard signs to upgrade their alarms to wireless service. In fact, Ms. Seeman had a wireless ADT alarm system that is not vulnerable to such attacks. Ms. Seeman turned down Mr. Gonzalez's offer. Later, Ms. Seeman's neighbor reported a visit by Mr. Gonzalez in which Mr. Gonzalez claimed to be an ADT agent, accompanied by another who falsely claimed to be an "insurance company inspector." Ms. Seeman reported both incidents to ADT, and also to the Miami-Dade Police Department. (Exhibit 14.)

47. On August 1, 2013, David Bernier, a 66-year-old ADT customer, was visited at his home in Farmingdale, Michigan, by a Vivint sales agent. The agent told Mr. Bernier that he was with Vivint and that Vivint had purchased ADT. When Mr. Bernier said he found it unlikely that an unknown company had purchased ADT, the agent said that Vivint was an ADT

subsidiary. Mr. Bernier said that the two explanations were inconsistent, and that he would call ADT to ask about Vivint's affiliation with ADT. The agent left the premises and Mr. Bernier called ADT to report the incident. (Exhibit 15.)

48. After leaving Mr. Bernier's house on August 1, the same Vivint sales agent visited Mr. Bernier's neighbor, Edward Olsen, a 79-year-old ADT customer in Farmingdale, Michigan. The agent told Mr. Olsen that Vivint had taken over ADT and he was visiting to upgrade Mr. Olsen's alarm system. Mr. Olsen agreed to the "upgrade," signed the Vivint contract and received a new Vivint system. When Mr. Bernier explained to Mr. Olsen that Vivint had not taken over ADT, Mr. Olsen asked Vivint to release him from his Vivint contract. Vivint refused to release him without charging a termination fee, so Mr. Olsen terminated his ADT service instead. (Exhibit 16; *see also* Exhibit 15 (Bernier decl.).)

49. On August 1, 2013, Yvette Crutcher, a blind 83-year-old ADT customer, was visited at her home in Colorado Springs, Colorado, by Vivint agent Austin Somers. Mr. Somers told Ms. Crutcher that he was visiting to upgrade her ADT alarm system. He explained to her that ADT would continue to monitor her system, but that Vivint would receive the first two months' installment payments to cover the upgraded equipment, and that all future payments would go to ADT. Ms. Crutcher asked Mr. Somers to read the contract terms to her, and she agreed to it in the belief that she was extending her ADT contract by three years. A week later, Ms. Somers learned that she had signed a contract for five years, not three. And a month later, Ms. Somers received bills from both companies, and learned from ADT that it had no affiliation with Vivint. Ms. Somers terminated her ADT contract because she could not cancel her Vivint contract without incurring a large early termination fee. (Exhibit 17.)

50. On August 7, 2013, Raymond Gardner, a 56-year-old ADT customer, was visited at his house in Oxnard, California, by Vivint agent Megan Deltoro. Ms. Deltoro told Mr. Gardner that she was with ADT and was visiting to inspect and upgrade Mr. Gardner's ADT alarm equipment. Ms. Deltoro said that the system could be disabled by a wire-cutting burglar; when Mr. Gardner disagreed, she asked to see other components of the system. Mr. Gardner refused to give her further access to the system and reported the incident to ADT. (Exhibit 18.)

51. On August 20, 2013, Claude Cain, a 76-year-old ADT customer, was visited at his home in Harrisburg, Pennsylvania, by a Vivint sales agent. The agent told Mr. Cain that Vivint had taken over ADT and that he was visiting to upgrade Mr. Cain's alarm system. Mr. Cain agreed, signed a Vivint contract, and accepted the Vivint system. A few weeks later, Mr. Cain received bills from both companies, called ADT to find out why, and learned that Vivint had not taken over ADT. Vivint refused to terminate the new Vivint contract, so Mr. Cain cancelled his ADT contract to avoid incurring Vivint contract termination charges. (Exhibit 19.)

52. On September 4, 2013, David Leonard, a 52-year-old ADT customer, was visited at his home in Perry, Georgia, by Vivint agent Brian Vogelsberg. Mr. Vogelsberg told Mr. Leonard that he was visiting to update Mr. Leonard's ADT alarm equipment. Mr. Leonard queried Mr. Vogelsberg on the nature of the update, and thought from the discussion that Mr. Vogelsberg was with ADT. When Mr. Leonard asked, Mr. Vogelsberg replied that he was with Vivint and that Vivint was the company that manufactured ADT's alarm equipment. When Mr. Leonard asked again, Mr. Vogelsberg admitted that he was not affiliated with ADT. Mr. Leonard asked Mr. Vogelsberg to leave, and then called ADT to report the incident. (Exhibit 20.)

53. On September 4, 2013, Edward Schubert, a 50-year-old ADT customer, was visited at his home in Vacaville, California, by Vivint agent Tyler McCallister. Mr. McCallister

told Mr. Schubert that he was visiting to upgrade Mr. Schubert's ADT alarm system. Mr. McCallister explained that ADT only monitors alarms, and contracts with third parties like Vivint to install its customers' alarm equipment. Mr. Schubert refused the upgrade and called ADT to report the incident. (Exhibit 21.)

54. On October 27, 2013, Genevieve Pearl, a 97-year-old ADT customer, was visited at her home in San Diego, California, by a vivint agent. The agent told Ms. Pearl that he represented ADT; that ADT was no longer servicing customers in California; that Vivint was a local company; and that Vivint was taking over all of ADT's accounts in California. Ms. Pearl signed a Vivint contract and received a Vivint alarm system. Two weeks later, Ms. Pearl learned from a friend that ADT was still in business, and called ADT to confirm that Vivint was not affiliated with ADT. Ms. Pearl reported the incident to ADT but stayed with Vivint. (Exhibit 22.)

***2014 Complaints***

55. On February 11, 2014, Bernice Kennedy, an 87-year-old ADT customer, was visited at her home in Denver, Colorado, by Vivint agent Alex Fotheringham. Mr. Fotheringham told Ms. Kennedy that he was visiting to upgrade her ADT alarm panel. Believing him to be from ADT, Ms. Kennedy invited Mr. Fotheringham into her home. Mr. Fotheringham told Ms. Kennedy that her ADT panel was outdated and prepared a contract for her to sign. When Ms. Kennedy saw the Vivint logo on the contract, she refused to sign it, called ADT to confirm that Mr. Fotheringham was not affiliated with ADT, and reported the visit to the police. (Exhibit 23.)

56. On February 12, 2014, Elizabeth P.,[2] a 98-year-old ADT customer, was visited in her home in Shafter, California, by Vivint agent Kolby Rawlings. Mr. Rawlings told Ms. P. that

[2] This ADT customer has agreed to allow ADT to disclose the details of her incident but has not consented to the disclosure of her full name or address. ADT is not attaching her declaration to this complaint to comply with her request.

he was visiting on behalf of ADT to upgrade her ADT alarm system. Ms. P. let Mr. Rawlings into her home, and Mr. Rawlings confirmed in a telephone call with Ms. P.'s daughter that he was with Vivint, acting on behalf of ADT. Ms. P. agreed to the upgrade and received a new Vivint system. When Ms. P. called ADT to confirm the upgrade, ADT told her that Vivint is not an ADT affiliate. Ms. P. cancelled her Vivint contract and ADT reinstalled an ADT alarm system in her home.

57. On March 8, 2014, Wesley Hay, an 83-year-old ADT customer, was visited at his home in Minot, North Dakota, by Vivint agent Aaron Doria. Mr. Doria told Mr. Hay that ADT did not have enough people to service customers in the area, so Vivint was taking over ADT's accounts in the area. Mr. Hay signed a Vivint contract and received a Vivint alarm system. Three months later, Mr. Hay realized he was being billed for alarm service by both ADT and Vivint. After calling ADT, the Hays realized that Vivint was not related to ADT. The Hays cancelled their ADT contract to avoid early termination charges for their Vivint contract. (Exhibit 24.)

58. On March 11, 2014, Kori Strickland, a 40-year-old ADT customer, was visited at her home in Orlando, Florida, by a Vivint sales agent. The agent told Ms. Strickland that Vivint was a "third party affiliate of Broadview," an ADT-owned company, and that he was visiting to upgrade her alarm system. Ms. Strickland declined the agent's offer after the agent refused to disclose his name, provide a business card, or provide any sales literature. (Exhibit 25.)

59. On March 11, 2014, Virginia Hess, an 87-year-old ADT customer, was visited in her home in Amarillo, Texas, by Vivint agent Michael Scott. Mr. Scott told Ms. Hess that Vivint and ADT had merged, and that Vivint was taking over her ADT account. Ms. Hess accepted the "upgrade" that Mr. Scott offered, and Mr. Scott replaced her ADT system with a Vivint system.

After Ms. Hess reported the visit to her daughter, Ginger Warner, Ms. Warner called ADT and learned that ADT had not merged with Vivint. Ms. Warner cancelled the new Vivint contract and reported the incident to the Amarillo police department. (Exhibit 26.)

60. On April 16, 2014, Ross Loria, a 69-year-old ADT customer, was visited at his home in Kansas City, Missouri, by a Vivint sales agent. The agent told Mr. Loria that Vivint manufactures all of ADT's alarm equipment, that Mr. Loria's ADT equipment was "out-dated," that ADT's emergency response time was very slow, and that a Vivint alarm system would provide much faster response times. Mr. Loria refused the agent's several requests to enter his house to inspect his ADT alarm panel. When Mr. Loria called ADT to report the incident, ADT informed him that Vivint does not manufacture ADT's alarm equipment. (Exhibit 27.)

61. On April 19, 2014, Randolph Wurster, a 67-year-old ADT customer, was visited at his home in Pueblo, Colorado, by a Vivint sales agent. The Vivint agent told Mr. Wurster that he was visiting to upgrade Mr. Wurst's ADT alarm system. Mr. Wurst signed a Vivint contract but stopped the transaction when the agent asked Mr. Wurst to handwrite a cancellation letter to ADT, because the Vivint agent had led Mr. Wurst to believe that his visit was a service call for ADT, not a sales call for Vivint. (Exhibit 28.)

62. On May 13, 2014, Sarah Garrison, a 90-year-old ADT customer, was visited at her home in Colorado Springs, Colorado, by Vivint agent Victoria Surine. Ms. Surine told Ms. Garrison that Vivint was affiliated with ADT, and that she was visiting to upgrade her alarm system on behalf of ADT. On a return visit the following week, Ms. Surine stated that ADT had provided Vivint with a list of its elderly customers and that she was the Vivint agent assigned to upgrade Ms. Garrison's equipment. Ms. Surine further explained to Ms. Garrison that because ADT is such an old company, ADT does not have the latest technology and this was why ADT

had partnered with Vivint to replace ADT's older equipment with newer equipment. Ms. Garrison signed a Vivint contract and Ms. Surine again assured Ms. Garrison that Vivint was an ADT partner, not an ADT competitor. The next day, Ms. Garrison called ADT and learned that Vivint was not affiliated with ADT. Ms. Garrison cancelled her Vivint contract. Later, when a Vivint technician visited to deliver a medical alert pendent, Ms. Garrison told him that she had cancelled the contract because Ms. Surine had misled her. The technician, who identified himself as Cody, told Ms. Garrison that she was the third customer to complain to him about Vivint deceptive sales practices in two weeks, and that another consumer had reported Ms. Surine to the local police. (Exhibit 29.)

63. On May 20, 2014, Delores Root, a 74-year-old ADT customer, was visited at her home in Saint Louis Park, Minnesota, by Vivint agent Kramer Holt. Mr. Holt told Ms. Kramer that Vivint was merging with ADT and that Vivint was required to replace all ADT alarm systems with Vivint systems within the next four months. Ms. Root signed the contract Mr. Holt presented, and a technician installed a Vivint system the next day. Ms. Root, rethinking the series of events, came to realize that she had been "conned," and called ADT to report the incident and arrange for the reinstallation of a new ADT alarm system. (Exhibit 30.)

64. On May 26, 2014, Celeste Brooks, a 72-year-old ADT customer, was visited at her home in Florissant, Missouri, by Vivint agent Quinton Hogue. Mr. Hogue told Ms. Brooks that Vivint was merging with ADT, and he was visiting to upgrade her ADT alarm system. Ms. Brooks agreed to the upgrade and it was installed within the hour. The following week, Ms. Brooks called ADT to confirm that it was merging with Vivint, learned that Vivint was not affiliated with ADT, cancelled the Vivint contract, and had ADT reinstall an ADT system in her home. (Exhibit 31.)

65. On June 5, 2014, Clare Kreuser, an 81-year-old ADT customer, was visited at her home in Shakopee, Minnesota, by Vivint agent Kramer Holt. Mr. Holt told Ms. Kreuser that Vivint purchased ADT, and offered to convert her alarm service over to Vivint. Ms Kreuser agreed, signed a Vivint contract, and received a Vivint alarm system. Two weeks later, Ms. Kreuser saw an ADT commercial on television, called ADT and learned that Vivint had not bought ADT. Ms. Kreuser called Vivint to cancel her Vivint contract; the operator allowed her to cancel it because she was over 70 years of age. ADT reinstalled a new ADT alarm system at Ms. Kreuser's request. (Exhibit 32.)

66. On June 6, 2014, Amanda Crane, a 29-year-old ADT customer, was visited in her home in Canon City Colorado, by a Vivint agent. The Vivint agent told Ms. Crane that "Vivint was taking over ADT," that her ADT equipment was "outdated," and that he was visiting to update her ADT alarm system. Ms. Crane signed a Vivint contract and Vivint technicians installed a new Vivint alarm system. Several weeks later, Ms. Crane learned that the Vivint agent misled her and asked that Vivint remove its system and cancel her contract. (Exhibit 33.)

67. On July 9, 2014, Charlie Blanchard, a 70-year-old ADT customer, was visited at his home in Saint Louis, Missouri, by Vivint agent Charles Archuleta. Mr. Archuleta told Mr. Blanchard that ADT was going out of business, that Mr. Blanchard's alarm system was old and needed replacement, and that he needed to switch over to Vivint. Mr. Blanchard agreed, signed a contract and received the new system. A few days later, Mr. Blanchard noticed that his neighbors still had ADT signs in their yards, called ADT to confirm that it was still in business, and then called Vivint to consel the Vivint contract. When Vivint refused, Mr. Blanchard terminated his ADT contract. (Exhibit 34.)

68. On July 14, 2014, James Lynn, a 55-year-old ADT customer, was visited at his home in Clarksville, Tennessee, by Vivint agent Cory Anderson. Mr. Anderson told Mr. Lynn that ADT and Vivint were sister companies, and that Mr. Lynn could terminate his ADT contract and sign a new Vivint contract without penalty. Mr. Anderson had Mr. Lynn sign a Vivint contract without giving Mr. Anderson a chance to read or review it. A few days later, Mr. Lynn reviewed his ADT and Vivint contract, called ADT, and learned that ADT and Vivint are not sister companies. Mr. Anderson cancelled his Vivint contract and had ADT reinstall an ADT alarm system. (Exhibit 35.)

69. On July 16, 2014, Brian Delaney, a 60-year-old ADT customer, was visited at his home in Spring, Texas, by Vivint agent Jeremiah Lajoie. Mr. Lajoie told Mr. Delaney that Vivint is the equipment supplier for ADT; that ADT was upgrading the wireless networks on which the alarm systems operate; and that he was visiting to upgrade Mr. Delaney's ADT alarm panel. Mr. Lajoie said that Vivint supplies GE smoke detectors and other alarm equipment to ADT and stated that Vivint is a part of ADT. The Vivint agent told Mr. Delaney that there would be no charge for the upgrade if he agreed to it during his visit. Mr. Delaney agreed, signed a Vivint contract, and allowed Mr. Lajoie's technician to install a Vivint system. After Mr. Delaney called ADT and was informed that Vivint does not provide equipment for ADT, he tried to cancel the Vivint contract but Vivint refused the request because it was outside the contract's three-day rescission period. (Exhibit 36.)

70. On July 19, 2014, Brian Price, a 53-year-old ADT customer, was visited at his home in East Orange, New Jersey, by a Vivint sales agent who identified himself as Ty. Ty told Mr. Price that Vivint was affiliated with ADT and he was visiting to offer Mr. Price a new promotion that would give him two cameras and a smoke detector. When Mr. Price told Ty that

he still had an uncompleted ADT contract term, Ty replied that he would call ADT to cancel the old contract so Mr. Price could participate in the "new promotion." Mr. Price agreed. Mr. Price had to leave town to attend his brother's funeral. When he returned to New Jersey he called ADT to confirm that Vivint was affiliated with ADT and that Ty had canceled the old ADT contract. When told otherwise, Mr. Price asked Vivint to cancel his Vivint contract; Vivint refused but offered Mr. Price cash to pay for part of his remaining ADT contract term. (Exhibit 37.)

71. On July 28, 2014, Kathleen Rotondo, a 62-year-old ADT customer, was visited at her home in Babylon, New York, by a Vivint sales agent who identified himself as Jordan. Jordan told Ms. Rotondo that he worked for Vivint, that Vivint supplies equipment to ADT, and that Ms. Rotondo could upgrade her alarm equipment directly from him at no charge. Ms. Rotondo refused Jordan's upgrade offer after Jordan refused to give her a business card. Ms. Rotondo reported the visit to ADT and to the Town of Babylon. (Exhibit 38.)

72. On August 1, 2014, Janet Boria, a 65-year-old ADT customer, was visited at her home in La Mirada, California, by Vivint agent Elliot Smith. Mr. Smith told Ms. Boria that he was visiting to install an update to Ms. Boria's alarm system. Ms. Boria three times asked whether Mr. Smith was visiting to switch her to a new company. Each time Mr. Smith confirmed that he was not switching her to a new company, and that he was upgrading her system "because ADT is opening a new call center." Ms. Smith signed a Vivint contract but delayed installation of a Vivint system because she was leaving for vacation. Upon her return, she reviewed the contract, realized that it would switch her service to Vivint, and cancelled it. (Exhibit 39.)

73. On August 9, 2014, Henrick Leeloo, a 65-year-old ADT customer, was visited at his home in North Lauderdale, Florida, by a Vivint agent. The agent told Mr. Leeloo that he was

from ADT and was visiting to upgrade Mr. Leeloo's ADT alarm system. Mr. Leeloo signed a contract as he left to run errands. When he returned, a Vivint technician arrived to install the "upgrade." When Mr. Leeloo asked the technician why he was replacing his ADT yard sign with a Vivint yard sign, the technician explained that Vivint was not related to ADT. Mr. Leeloo cancelled the contract and reported the incident to ADT. (Exhibit 40.)

74. On August 16, 2014, Jerry Sullivan, a 71-year-old ADT customer, was visited at his home in Baltimore, Maryland, by a Vivint agent who identified himself as Gary. Gary told Mr. Sullivan that Vivint is an authorized dealer for ADT, and that he was visiting to install new equipment. Mr. Sullivan declined Gary's offer and called ADT to report the visit. (Exhibit 41.)

75. On August 25, 2014, Stuart Barton, a 55-year-old ADT customer, was visited at his home in Newport News, Virginia, by Vivint agent Daniel Brown. Mr. Brown told Mr. Barton that he was from Vivint, and that Vivint was connected with ADT. Mr. Brown carried a laminated sheet of paper bearing the ADT logo. Mr. Brown told Mr. Barton that ADT's alarm equipment was proven to have faults, and that they were susceptible to burglars who could cut the phone lines and enter the premises. When the agent could not identify the vulnerable lines on the house's exterior, Mr. Barton asked Mr. Brown for a business card and told him to come back the next day. Mr. Barton called ADT to report the visit. Mr. Brown did not return. (Exhibit 42.)

76. On December 5, 2014, Marion Long, a 68-year-old ADT customer, was visited at her home in Clearwater, Florida, by a Vivint sales agent. The Vivint agent told Ms. Long that he was fearful for people like Ms. Long who have ADT alarm systems because "teenagers" can cut her phone lines and rob her home. Ms. Long told the agent she was not interested. Her observation of the agent's movements after leaving her home revealed that the agent was only visiting homes with ADT yard signs. (Exhibit 43.)

***The Complaints In Their Context***

77. As alleged above, these reports are but a small sample of a much larger population of over nine hundred reported instances of misconduct by Vivint's sales agents, that have continued unabated from the 2013 summer sales season through each successive sales season, and that continues today. The population of reported instances is, in turn, but a small fraction of the likely number of overall numbers of occurrences in the market. It is an accepted (even by Vivint) and obvious tenet of consumer complaint behavior that for every aggrieved customer who reports a deceptive sales practice, many more go uncounted.

78. As the examples illustrate, Vivint's sales agents have tailored their sales pitches to confuse ADT's customers on their doorsteps. Vivint's agents make false representations of affiliation with ADT to win the customers' interest and trust.

79. ADT's customers allow Vivint's agents into their homes in the mistaken belief that they are speaking with a person affiliated somehow with ADT, visiting to provide the customers with goods and services that are related to their existing ADT alarm system. ADT's customers repeatedly confirm that but for this initial confusion, they would never have allowed Vivint's sales agents into their homes. (*E.g.,* Exhibit 18 (Gardner decl.) at 1, ¶ 12.)

80. This confusion at the outset of a sale harms ADT by allowing competitors like Vivint to freeride on ADT's goodwill with its customers to gain their attention and trust. Vivint's later efforts to clarify their lack of ADT affiliation do not cure the confusion that has already occurred at the outset of the transaction, even in those instances where a customer understands by the point of sale that she is contracting with Vivint. But in most instances the customer signs a contract with Vivint in the mistaken belief that she is signing only a work authorization for the installation of ADT equipment by ADT or its affiliate.

**COUNT I**
**UNFAIR COMPETITION IN VIOLATION**
**OF THE LANHAM ACT, 15 U.S.C. § 1125(a)**

81. Plaintiffs incorporate Paragraphs 1 through 80, as if set forth fully here.

82. ADT US Holdings owns the ADT Trademarks. ADT LLC uses the ADT Trademarks under license from ADT US Holdings. Both are injured by any effort by Vivint to confuse ADT's customers as to the affiliations of Vivint's sales agents with ADT.

83. Vivint's sales agents use false representations of affiliation with ADT to confuse ADT's customers as to the agents' true affiliation, to interest the customers in their pitches, to win the customers' trust, and to gain access to their homes.

84. In fact, the Vivint's sales agents do not represent ADT, nor is Vivint itself affiliated in any manner with ADT.

85. Vivint's sales agents make these false representations to ADT's customers with the intent of deceiving ADT's customers as to a relationship or affiliation with ADT that does not exist, and that has never existed.

86. These false and misleading statements are likely to confuse consumers regarding Vivint's apparent (but false) affiliation with ADT in the initial stages of a sale. In fact, as documented in the accompanying customer declarations, they already have created confusion among consumers, and will continue to do so if permitted to continue.

87. Some ADT customers, initially confused at their doorsteps, eventually realize by the point of sale that the sales agents represent Vivint, not ADT. But many do not, remain confused at the point of sale, and sign contracts with Vivint in the mistaken belief that they are contracting with ADT or one of its affiliates.

88. ADT has been and will continue to be damaged as a result of Vivint's false representations by the confusion of the market for ADT's goods and services, by the disruption of ADT's relationships with its customers, by the diversion of ADT's customers to Vivint, by ADT's lost royalties, by ADT's loss of control of the use of its brand in the market, and by damage to ADT's goodwill and reputation as a reliable provider of security systems.

89. ADT is entitled to an injunction pursuant to 15 U.S.C. § 1116(a) barring Vivint from further violations of 15 U.S.C. § 1125(a). Given Vivint's disregard of its sales agents' false sales pitches, Vivint is likely to continue to engage in such practices unless it is enjoined by this Court from further violations.

90. ADT is entitled to an award of compensatory damages, as well as Vivint's profits, attorney fees, and the costs of this action pursuant to 15 U.S.C. § 1117(a). The court, pursuant the discretion confided to it under this section of the Act, should also consider enhancing these damages to compensate ADT fully for its losses.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a. An order pursuant to 15 U.S.C. § 1116(a) permanently restraining and enjoining Vivint and its agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from falsely stating or representing, or training sales agents to state or represent, that:

(1) their agents are visiting from "the alarm company" or "the security company" without also specifying Vivint's name in the same sentence;

(2) ADT is going out of business or is in financial difficulty;

(3) ADT does not exist;

(4) ADT is changing or has changed its company name;

(5) Vivint has acquired, has merged with, has been taken over by, or is part of ADT;

(6) Vivint is acting on behalf of, or are otherwise acting with the consent or approval of ADT;

(7) Vivint is the "sister" company of ADT;

(8) Vivint manufactures the equipment used by ADT, or that Vivint represents or is visiting on behalf of an alarm equipment manufacturer, including but not limited to General Electric and Honeywell;

(9) Vivint is performing routine maintenance on the customer's ADT's equipment;

(10) any change proposed during a sales solicitation is an "update" or "upgrade" of the consumer's existing alarm system or alarm monitoring service agreement with ADT;

(11) an ADT customer's ADT security system is outdated or deficient;

(12) any enjoined party is "taking over" the monitoring of an ADT account or has purchased an ADT account from ADT;

(13) ADT is not, or has stopped, monitoring the alarm system for that person, residence, or business;

(14) ADT will no longer be able to monitor or service the alarm system for that person, residence, or business;

(15) any enjoined party is affiliated with, has the endorsement of, or is in any manner acting at the direction of any governmental or law enforcement agency without the prior approval of such governmental or law enforcement agency;

(16) statistics or other information is accurate which is known to be false or misleading, and which Vivint has not made a reasonable effort to objectively quantify or substantiate; or

(17) any other false or misleading representation to current or former customers of ADT in the marketing or sale of an alarm system that Vivint's sales agent knows to be false when made.

b. Compensatory damages, in an amount to be established at trial, but believed to be no less than $20,000,000;

c. An accounting of Vivint's profits resulting from its deceptive practices, and payment of such profits to ADT;

d. Attorney fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a); and

e. Such other and further relief as the Court may deem appropriate in the circumstances.

**COUNT II**
**UNFAIR COMPETITION**

91. Plaintiffs incorporate Paragraphs 1 through 80, as if set forth fully here.

92. ADT and Vivint compete for a common pool of customers. Both market alarm services to the same target market of residential customers.

93. Vivint has engaged in unfair and deceptive misconduct by fielding a staff of sales agents who prey on the elderly and who make false sales pitches to ADT's customers that are

designed to mislead them into believing that they are acting on ADT's behalf, when in fact they represent a competitor freeriding ADT's goodwill to interfere with ADT's contracts with its customers, and to sell and install new Vivint alarm systems.

94. Vivint's actions are contrary to honest practice in industrial or commercial matters. They are prohibited by the alarm industry's own code of conduct. They are independently actionable, *inter alia*, as tortious interferences with ADT's contractual relationships, as violations of the Florida Deceptive & Unfair Trade Practices Act, and as violations of the Lanham Act.

95. Vivint's actions are likely to cause confusion among consumers, and in fact already have caused confusion, as demonstrated by the attached declarations, not only in the initial stages of their agents' sales pitches, but also at the point of sale.

96. Vivint's actions are also contrary to law because they prey upon elderly customers, who are easy targets for their agents' false sales pitches.

97. ADT has been injured as a result of Vivint's actions.

98. Vivint's sales agents' false sales pitches at customer doorsteps are knowing and willful. Accordingly, the Court should award punitive damages in an amount sufficient to deter Vivint from continuing to engage in unfair competition in the market for electronic security services through their sales agents.

99. ADT is entitled to injunctive relief pursuant to common law for Vivint's ongoing use of false sales pitches. Given the ongoing nature of Vivint's misconduct, Vivint is likely to continue to engage in such practices unless this Court takes appropriate measures to enjoin further violations.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a. An order permanently restraining and enjoining Vivint and its agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from falsely stating or representing, or training sales agents to state or represent, that:

(1) their agents are visiting from "the alarm company" or "the security company" without also specifying Vivint's name in the same sentence;

(2) ADT is going out of business or is in financial difficulty;

(3) ADT does not exist;

(4) ADT is changing or has changed its company name;

(5) Vivint has acquired, has merged with, has been taken over by, or is part of ADT;

(6) Vivint is acting on behalf of, or are otherwise acting with the consent or approval of ADT;

(7) Vivint is the "sister" company of ADT;

(8) Vivint manufactures the equipment used by ADT, or that Vivint represents or is visiting on behalf of an alarm equipment manufacturer, including but not limited to General Electric and Honeywell;

(9) Vivint is performing routine maintenance on the customer's ADT's equipment;

(10) any change proposed during a sales solicitation is an "update" or "upgrade" of the consumer's existing alarm system or alarm monitoring service agreement with ADT;

(11) an ADT customer's ADT security system is outdated or deficient;

(12) any enjoined party is "taking over" the monitoring of an ADT account or has purchased an ADT account from ADT;

(13) ADT is not, or has stopped, monitoring the alarm system for that person, residence, or business;

(14) ADT will no longer be able to monitor or service the alarm system for that person, residence, or business;

(15) any enjoined party is affiliated with, has the endorsement of, or is in any manner acting at the direction of any governmental or law enforcement agency without the prior approval of such governmental or law enforcement agency;

(16) statistics or other information is accurate which is known to be false or misleading, and which Vivint has not made a reasonable effort to objectively quantify or substantiate; or

(17) any other false or misleading representation to current or former customers of ADT in the marketing or sale of an alarm system that Vivint's sales agent knows to be false when made.

b. Compensatory damages, in an amount to be established at trial, but believed to be no less than $20,000,000;

c. Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales tactics;

d. Attorney fees and costs incurred in the prosecution of this action; and

e. Such other and further relief as the Court may deem appropriate in the circumstances.

**COUNT III**
**VIOLATION OF THE FLORIDA DECEPTIVE & UNFAIR**
**TRADE PRACTICES ACT, FLA. STAT. §§ 501.201 ET SEQ.**

100. Plaintiffs incorporate Paragraphs 1 through 80, as if set forth fully here.

101. ADT is a Florida resident, entitled to the protections of the Act.

102. Vivint, by selling security systems and services, is engaged in "trade or commerce" in Florida as defined in Section 501.203(8) of the Florida Statutes.

103. Vivint has intentionally engaged in deceptive and unfair trade practices in violation of Section 501.204(1) of the Florida Statutes by engaging its sales agents to represent to ADT's customers that their ADT security systems are outdated and unsafe; that ADT's security systems are incapable of protecting ADT's customers from burglaries without "upgrades"; that Vivint's sales agents are from ADT, or are in some manner affiliated with ADT; and that they will provide free "upgrades" to their ADT security systems without disclosing that they are competitors of ADT, seeking to replace ADT's equipment and services, not upgrade them.

104. These practices are commonly recognized by industry members as deceptive and unfair trade practices that are intended to confuse and mislead consumers. These practices have specifically been barred as such by the security systems industry's code of ethics.

105. Vivint's agents' false sales pitches were likely to, and did, mislead ADT's customers into believing that they were continuing and "upgrading" their ADT security services, when in fact the agents were obliging them to new contracts for new services from Vivint.

106. ADT is entitled to injunctive relief pursuant to Section 501.211(1), Florida Statutes, as a Floridian aggrieved by Vivint's violation of the Act. Given Vivint's *laissez-faire* disregard of its sales agents' deceptive trade practices, which persists today, Vivint is likely to continue to engage in such practices unless enjoined by this Court from further violations.

107. ADT has been aggrieved by Vivint's violations of the Act, and is entitled to its actual damages suffered as a result of those violations, plus its attorney fees and costs as provided in Section 501.211(2) of the Florida Statutes.

108. ADT contends that the Florida Deceptive and Unfair Trade Practices Act was enacted to protect Floridians; that ADT is a Floridian; and that all of AP's acts alleged in this Complaint may therefore be addressed under the Florida Act. If, however, the Court concludes that the Act does not reach Vivint's sales to consumers outside Florida, ADT pleads in the alternate that Vivint's false sales pitches violate the corresponding unfair and deceptive trade practices statutes of the various states in which the sales occurred.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a. An order pursuant to Fla. Stat. § 501.211(1) permanently restraining and enjoining Vivint and its agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from falsely stating or representing, or training sales agents to state or represent, that:

(1) their agents are visiting from "the alarm company" or "the security company" without also specifying Vivint's name in the same sentence;

(2) ADT is going out of business or is in financial difficulty;

(3) ADT does not exist;

(4) ADT is changing or has changed its company name;

(5) Vivint has acquired, has merged with, has been taken over by, or is part of ADT;

(6) Vivint is acting on behalf of, or are otherwise acting with the consent or approval of ADT;

(7) Vivint is the "sister" company of ADT;

(8) Vivint manufactures the equipment used by ADT, or that Vivint represents or is visiting on behalf of an alarm equipment manufacturer, including but not limited to General Electric and Honeywell;

(9) Vivint is performing routine maintenance on the customer's ADT's equipment;

(10) any change proposed during a sales solicitation is an "update" or "upgrade" of the consumer's existing alarm system or alarm monitoring service agreement with ADT;

(11) an ADT customer's ADT security system is outdated or deficient;

(12) any enjoined party is "taking over" the monitoring of an ADT account or has purchased an ADT account from ADT;

(13) ADT is not, or has stopped, monitoring the alarm system for that person, residence, or business;

(14) ADT will no longer be able to monitor or service the alarm system for that person, residence, or business;

(15) any enjoined party is affiliated with, has the endorsement of, or is in any manner acting at the direction of any governmental or law enforcement agency without the prior approval of such governmental or law enforcement agency;

(16) statistics or other information is accurate which is known to be false or misleading, and which Vivint has not made a reasonable effort to objectively quantify or substantiate; or

(17) any other false or misleading representation to current or former customers of ADT in the marketing or sale of an alarm system that Vivint's sales agent knows to be false when made.

b. Actual damages as provided by Fla. Stat. § 501.211(2), in an amount to be established at trial, but believed to exceed $20,000,000;

c. Attorney fees and costs incurred in the prosecution of this action, as provided by Fla. Stat. § 501.211(2); and

d. Such other and further relief as the Court may deem appropriate in the circumstances.

**COUNT IV**
**TRADE SLANDER/COMMERCIAL DISPARAGEMENT**

109. Plaintiffs incorporate Paragraphs 1 through 80, as if set forth fully here.

110. Vivint, through its sales agents, has intentionally made false and misleading statements about ADT, and about ADT's products and services, in their sales pitches to ADT's customers as alleged herein.

111. Vivint's false and misleading statements demean the quality of ADT's goods and services.

112. At the time the statements were made, Vivint knew the statements to be false.

113. The statements are defamatory *per se* in that the statements suggest conduct incompatible with the lawful exercise of business.

114. The statements are injurious and damage ADT in its industry and marketplace by causing ADT to lose sales and good will, and to suffer injury to its reputation.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a. Compensatory damages, in an amount to be established at trial, but believed to be no less than $20,000,000;

b. Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales tactics; and

c. Such other and further relief as the Court may deem appropriate in the circumstances.

Dated: April 3, 2017

Respectfully submitted,

/s/ C. Sanders McNew

C. Sanders McNew
mcnew@mcnew.net
Florida Bar No. 0090561
McNEW P.A.
2385 NW Executive Center Drive, Suite 100
Boca Raton, Florida 33431
Tel: (561) 299-0257
Fax: (561) 299-3705

-and-

Richard G. Sander
rsander@shb.com
Kali R. Backer
kbacker@shb.com
Eric J. Hobbs
ehobbs@shb.com
SHOOK, HARDY & BACON LLP
1660 17th Street, Suite 450
Denver, Colorado 80202
Tel: (303) 285-5300

*Counsel for the Plaintiffs, ADT LLC -and- ADT US Holdings, Inc.*