# EXHIBIT C

*Confidential*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| ADT LLC, and ADT US HOLDINGS, INC.,<br><br>               Plaintiff,<br><br>    v.<br><br>VIVINT, INC.,<br><br>               Defendants. | Case No. 9:17-cv-80432-DMM<br><br><br><br><br><br>**EXPERT REPORT OF**<br>**MARK GUSTAFSON** |

**JULY 24, 2017**

# CONFIDENTIAL EXPERT REPORT

## Table of Contents

I.   **INTRODUCTION**.................................................................................................**1**

    A.   Assignment ..................................................................................... 1

    B.   Qualifications.................................................................................. 1

    C.   Documents Considered ................................................................... 2

II.  **SUMMARY OF OPINIONS** .............................................................**3**

III. **BACKGROUND** ..................................................................................**5**

    A.   ADT ................................................................................................ 5

    B.   Vivint .............................................................................................. 6

    C.   Plaintiffs' Allegations .................................................................... 7

IV.  **REBUTTAL OF MR. URBAN** ...........................................................**8**

    A.   Summary of Mr. Urban's Opinions ................................................ 8

    B.   Critique of Mr. Urban's Account Value Opinion ................................... 9

        1.   Mr. Urban Overstates the Appropriate Multiple Because He Fails to  Adjust His Market Multiples For the Fact They Are Based On Company Sales That Are Not Comparable to Account Only Transactions ................................................. 10

        2.   Mr. Urban's Multiples Exceed ADT's Historical Multiples for Account Transactions ........................................................................ 15

        3.   Mr. Urban's Addition of 15 Percent to the Account Value to Compensate ADT for the Risk of Ownership and Profit is Based on a Misunderstanding of Internal Rate of Return and Defies Economic Logic ............................................ 16

        4.   If Used as a Measure of Damage, Mr. Urban's Account Value Would Overstate ADT's Damages Because it Fails to Account for Revenue Received by ADT Such as Early Termination Fees or Chargebacks ........................................ 19

        5.   Application of Mr. Urban's Results to Additional ADT Customers.............. 21

    C.   Critique of Mr. Urban's Reinstallment Damages ................................. 21

    D.   Mr. Urban Includes Customers Who Were Not Subject to Deceptive Sales Practices in His Analysis ............................................. 23

V.   **REBUTTAL OF DR. MANGUM** .......................................................**25**

    A.   Summary of Dr. Mangum's Opinions .............................................. 25

    B.   Critique of Dr. Mangum's Opinions .................................................. 27

        1.   The ADT / ADT Authorized Dealer Relationship is Too Complex to Isolate the Value of ADT's Intangible Assets and Therefore Cannot Be Used to

Determine a Hypothetical Royalty for ADT's Allegedly Misused Intangible Assets ................................................................................................... 29

2.   Assuming in Arguendo That the ADT / ADT Authorized Dealer Relationship Can Be Used to Determine a Hypothetical Royalty for ADT's Allegedly Misused Intangible Assets, Dr. Mangum's Analysis Fails to Consider Needed Adjustments and Includes Two Errors .................................................................................. 36

3.   Dr. Mangum Fails to Obtain and Consider Facts Directly Relevant to His Opinion That Would Support or Disprove His Opinion ...................................... 43

4.   Dr. Mangum Does Not Precisely Define His Royalty Base ......................... 44

**VI.    Economic Basis for Focusing Marketing Efforts on Homes with Posted Alarm Signs ................................................................................................... 45**

*Confidential*

## I.    INTRODUCTION

### A.    Assignment

1.    I have been retained by Ausley McMullen and others on behalf of its client Vivint, Inc. ("Vivint") in the matter of *ADT LLC, and ADT US Holdings* Inc. *v. VIVINT,* Inc, pending in the United States District Court, Southern District of Florida Palm Beach Division.  I have been asked by counsel for Vivint to review, analyze, and comment upon the opinions expressed in the Expert Reports of William T. Urban and Russell W. Mangum III.[1]

### B.    Qualifications

2.    I am an economist and Vice President with Analysis Group with over 15 years of experience working on litigation and non-litigation engagements.  I have worked across numerous practice areas including, among others, commercial damages, intellectual property, employment, insurance, and class actions to analyze issues of liability and damages.  I have analyzed damages in numerous class action and non-class action cases.  In the context of class action cases, I have evaluated whether plaintiffs have satisfied class certification requirements and evaluated whether the proposed damage methodology can measure class wide damages without requiring individual inquiry.  In intellectual property cases, I have analyzed claims related to patent infringement and estimated damages using both reasonable royalty and lost profit frameworks.

3.    In non-ligation matters, I have assisted clients in patent portfolio negotiations by helping them understand the expected revenue for the products at issue and the associated royalty payments as well as preparing exposure analyses of lost profits and reasonable royalty damages assuming

---

[1] Expert Report of William T. Urban, June 23, 2017 ("Urban Report"); Expert Report of Russell W. Mangum III, Ph.D, June 26, 2017 ("Mangum Report").

the parties initiate litigation.  I have also consulted with organizations like the Washington State Hospital Association on public policy related engagements.

4.      I earned a Master of Public Policy with a concentration in economics from the Kennedy School of Government at Harvard University where I also taught graduate-level economics as a course assistant.  I hold a B.A. in business economics and political science-international relations from the University of California, Los Angeles where I graduated with honors.

5.      I have authored and co-authored numerous publications including "Expert Analysis of Class Certification Issues" and "The Use of Statistical Sampling in Litigation" both in the Fifth and Sixth Editions of the Litigation Services Handbook.

6.      A copy of my curriculum vitae summarizing my background and qualifications is attached as **Appendix A** to this report.

7.      Analysis Group is compensated at my hourly rate of $590 per hour for my time spent on this matter.  I have directed the work of other Analysis Group staff members with hourly billing rates ranging from $295 to $405.  Neither Analysis Group's nor my compensation is dependent on the outcome of this case.

### C.      Documents Considered

8.      In preparing this report, I and/or staff working at my direction reviewed the original complaint;[2] the Expert Reports of John Goodman, Joseph P. Dandurand, David Stewart, William Urban, and Russell W. Mangum III and the attached exhibits;[3] the documents produced by Mr. Urban and Dr. Mangum, including the dealer program guidelines, dealer agreement template,

---

[2]  ADT LLC, and ADT US HOLDINGS, INC., v. VIVINT INC., District Court, Southern District of Florida Palm Beach Division, April 4, 2017 (the "Complaint").
[3] Expert Report of John Goodman, June 26, 2017 ("Goodman Report"); Expert Report of Joseph P. Dandurand ("Dandurand Report"); Expert Report of David Stewart, Ph.D., June 26, 2017 ("Stewart Report"); Urban Report; Mangum Report.

trademark license agreement, Barnes-Buchanan Conference Security Alarm Industry Overview, and an email between William Urban and ADT employees;[4] and the phone calls and customer interactions logs for the 197 customers that Mr. Urban identified as having switched from ADT to Vivint. I also reviewed the public filings for ADT and Vivint, including their Form 10-Ks.[5]

9.     Dr. Mangum was not deposed before I submitted this report. Therefore, I have not considered his deposition testimony. In addition, ADT produced a copy of a license with the license fee redacted.[6] I understand Vivint has requested this document be produced without the redaction, but ADT did not produce it before I submitted my report. I believe that this license is relevant, but I have not considered the license fee.

10.     A list of documents and data sources that I relied on in this matter is given in **Appendix B** to this report and/or in the text of this report and its accompanying exhibits and appendices.

## II.     SUMMARY OF OPINIONS

11.     The opinions I have reached in this matter as of the date this report was submitted are as follows.

- Mr. Urban overstates the appropriate recurring monthly revenue ("RMR") multiple applicable to accounts at issue in this litigation. The sources that Mr. Urban cites contradict his opinion that customer accounts have a recurring monthly revenue multiple range of 41 to 44 and support a lower multiple. Mr. Urban's multiples also exceed ADT's historical multiples for account transactions.

---

[4] ADT DEALER PROGRAM GUIDELINES (MANGUM_VIVINT_000185-378) (hereafter "ADT Dealer Guidelines"); AUTHORIZED DEALER AGREEMENT by and between ADT LLC and (Dealer), Dated as of _____ (MANGUM_VIVINT_000379-425 at 387) (hereafter "ADT Dealer Agreement"); Trademark License Agreement by and between ADT US Holdings, Inc. and ADT LLC, effective October 1, 2012 (MANGUM_VIVINT_000426-435) (hereafter "ADT License"); Barnes Associates, "Security Alarm Industry Overview," February 2016, (URBAN_VIVINT_0000221-274); Email between William Urban and Jason Smith, "Subject: Confidential - Observations about Market Values of Alarm Accounts," November 9, 2016, (URBAN_VIVINT_000311-313).
[5] The ADT Corporation, Form 10-K for the fiscal year ended September 25, 2015; APX Group Holdings, Inc., Form 10-K for the fiscal year ended December 31, 2016.
[6] ADT License (MANGUM_VIVINT_000426-435 at 428).

- Mr. Urban's addition of 15 percent to the account values he determines using his 41 to 44 RMR multiples is unjustified and should be disregarded because it is based on a misunderstanding of the internal rate of return and defies economic logic.

- If used as a measure of damage, Mr. Urban's account value would overstate ADT's damages because it does not account for early termination fees and dealer chargebacks that ADT received for the customers who left ADT while still under contract and/or during the chargeback period.

- Mr. Urban's bases his analysis on the RMR for the 197 customers who were identified as allegedly leaving ADT for Vivint. If Mr. Urban's account value is applied to other accounts, which would have a different recurring monthly revenue, his calculations would need to be adjusted because the 197 customers in his analysis had recurring monthly revenues above that of the average ADT customer and thus the accounts have above average account values.

- Mr. Urban's model for calculating reinstallment damages is not based on the experience of the 159 customers that allegedly cancelled their ADT service and later had the service reconnected, but rather on the average reinstallment costs from three prior case that Mr. Urban worked on for ADT. The summary information he produced from the prior cases indicates that there was variation in the results of the prior analyses that would imply different results depending on which analysis one selected. Mr. Urban has no way to know which of the prior analyses would yield an accurate answer or whether the average is the correct answer. Querying ADT's systems to understand the costs incurred for the customer accounts at issue is important because it is possible that while ADT may have incurred costs to reinstall a system, it did not suffer any damage. For example, if an upgraded system was installed for a customer that needed a new system, then the costs of the upgraded system would not be damage to ADT.

- At least some of the customers whom Mr. Urban identified as having cancelled their service due to allegedly deceptive sales techniques appear to have not been the subject of deceptive sales techniques. Additionally, one of the customers was originally a Vivint customer and appears to be the subject of deceptive sales practices by ADT.

- The ADT / ADT Authorized Dealer relationship is too complex to isolate the value of ADT's intangible assets and therefore it cannot be used to determine a hypothetical royalty for ADT's allegedly misused intangible assets, as Dr. Mangum attempts to do.

- Assuming *in arguendo* that the ADT / ADT Authorized Dealer relationship can be used to determine a hypothetical royalty for ADT's allegedly misused intangible assets, Dr. Mangum's analysis fails to consider needed adjustments, which leads him to overestimate his hypothetical royalty rate. Specifically, Dr. Mangum does not account for the fact that Vivint did not receive most of the benefits received by an ADT Authorized Dealer nor did Vivint use all of the intangible assets licensed to ADT Authorized Dealers in the ADT / ADT Authorized Dealer relationship.

- Again assuming *in arguendo* that the ADT / ADT Authorized Dealer relationship can be used to determine a hypothetical royalty for ADT's allegedly misused intangible assets, Dr. Mangum's analysis contains two errors that cause him to overestimate his hypothetical royalty rate.  The first is that when he subtracts ADT's avoided costs for not needing to service an account that would be serviced by Vivint, he fails to add a profit margin on the cost adjustment.  He is effectively assuming that ADT would provide these services at cost, which results in the final royalty of 22 percent being too high.  The second is that the ADT model Dr. Mangum adopted overstates the recurring monthly revenue because it is based on an assumed billed revenue instead of actual revenue.

- The ADT License agreement between ADT US Holdings, Inc. and ADT LLC would provide a benchmark for whether Dr. Mangum's 22 percent royalty is a reasonable royalty.  However, the ADT License produced by Dr. Mangum was redacted so as to not include the license fee that ADT pays.

- There is a sound economic reason why Vivint sales representatives would focus on homes that have posted alarm signs indicating that they currently have an alarm system installed.

12.     My analysis and conclusions are based on the information available to me as of the date this report was submitted.  Should additional information become available to me as this matter proceeds, such as the deposition transcript of Dr. Mangum or the un-redacted license described above, I reserve the right to update my analysis and refine my opinions as appropriate.

## III.    BACKGROUND

### A.    ADT

13.     ADT is the largest provider of monitored security in the United States, with about 6.6 million active residential and commercial business customers as of 2015.  ADT was founded in 1874 as the American District Telegraph Company.[7]  In 1997 the company was acquired by Tyco International Ltd. and the resulting company was acquired by Apollo Global Management LLC in February 2016 and merged with its subsidiary Protection One.[8]  ADT primarily maintains multi-

---

[7] The ADT Corporation, Form 10-K for the fiscal year ended September 25, 2015, p. 1.
[8] The ADT Corporation, Form 10-K for the fiscal year ended September 25, 2015, p. 1; The ADT Corporation, Form 8-K Exhibit 99, February 16, 2016, p. 1.

*Confidential*

year contracts with its customers, who make monthly payments in addition to a one-time upfront equipment and installment fee.[9]   As of fiscal year 2015, ADT relied on its approximately 450 Authorized Dealers to generate approximately 40 percent of new customers, with the remaining 60 percent coming from direct sales.[10]   In 2010 ADT introduced ADT Pulse, which allows customers to remotely monitor their security systems using smart home technologies.[11]   Nearly half of ADT's customers still rely upon landline telephones to transmit their alarm signals.[12]

### B.    Vivint

14.    Vivint provides smart home and home security products and services to over 1.1 million customers as of 2016.  Founded in 1999, Vivint is a "vertically integrated smart home company," offering products and services to its customers using internet-connected devices that allow remote monitoring and control of their homes.[13]   In addition to home security, Vivint offers smart thermostats, lighting controls, and small appliance controls, which can all be integrated in one platform and connected with other third-party smart home products.[14]   In 2016, 86 percent of new Vivint customers purchased smart home services.[15]   Over 95 percent of Vivint's revenues are from contractual customer revenues, which consist of an upfront activation fee and recurring monthly payments.[16]   Vivint relies primarily on its own sales personnel to acquire new customers, with 64 percent of new customers generated by direct-to-home sales and the remaining 36 percent by inside sales, which includes advertising campaigns, email marketing, and third-party partners working

---

[9] The ADT Corporation, Form 10-K for the fiscal year ended September 25, 2015, p. 3.
[10] The ADT Corporation, Form 10-K for the fiscal year ended September 25, 2015, p. 4.
[11] The ADT Corporation, Form 10-K for the fiscal year ended September 25, 2015, p. 3.
[12] The ADT Corporation, Form 10-K for the fiscal year ended September 25, 2015, p. 3.
[13] APX Group Holdings, Inc., Form 10-K for the fiscal year ended December 31, 2016, pp. 6, 8.
[14] APX Group Holdings, Inc., Form 10-K for the fiscal year ended December 31, 2016, p. 7.
[15] APX Group Holdings, Inc., Form 10-K for the fiscal year ended December 31, 2016, p. 8.
[16] APX Group Holdings, Inc., Form 10-K for the fiscal year ended December 31, 2016, p. 6.

*Confidential*

on Vivint's behalf.[17]  New customers are charged a $198 activation fee and a monthly services fee ranging from $49.99 to $69.99.[18]

### C.    Plaintiffs' Allegations

15.    ADT alleges that Vivint sales representatives used deceptive sales practices to mislead and confuse existing ADT customers in order to convince them to sign home security contracts with Vivint.  According the Complaint, Vivint "agents use deceptive sales pitches that are intended to mislead (and that do mislead) ADT's customers into believing that Vivint represents ADT, or that Vivint is affiliated with ADT, or that they are visiting at ADT's direction, or that they work for the companies that made the ADT alarm equipment installed in the customers' homes."[19]  ADT claims to have received 905 complaints from its customers regarding Vivint from 2013 through 2016 with the highest concentration of complaints in California, Florida, Ohio, and Texas.[20]  Some of these customers allegedly installed and retained Vivint's systems, while other customers installed a Vivint system and then reinstalled the ADT system, and others never cancelled service with ADT.[21]  Vivint's actions allegedly resulted in Vivint receiving the benefits of an ADT affiliate without paying any royalty.[22]  I understand after filing its complaint, ADT has removed a portion of the 905 complaints from dispute in this litigation.

---

[17] APX Group Holdings, Inc., Form 10-K for the fiscal year ended December 31, 2016, p. 11.
[18] APX Group Holdings, Inc., Form 10-K for the fiscal year ended December 31, 2016, p. 7.
[19] Complaint, ¶ 17.
[20] Complaint, ¶¶ 30-31.  Recurring monthly revenue is defined as the "total recurring regular monthly amounts due from Subscribers pursuant to their respective Alarm Services Agreements."  ADT Dealer Agreement, (MANGUM_VIVINT_000379-425 at 387).
[21] Complaint, ¶ 22.
[22] Complaint, ¶ 20.

*Confidential*

## IV.   REBUTTAL OF MR. URBAN

### A.   Summary of Mr. Urban's Opinions

16.   Mr. Urban purports to calculate the value of a lost ADT customer contract using a multiples valuation approach.  The value of each customer account is calculated using a "multiple of the Recurring Monthly Revenue."[23]

17.   Mr. Urban opines that the market RMR multiple for the accounts at issue is 41 to 44 times RMR.  Although Mr. Urban does not list the transactions that he analyzed to reach this conclusion, he cites his experience working on over 100 transactions "involving over $1B in purchase price for entire large firms or smaller, less complicated transactions for just customer accounts."[24]  In addition, he "obtained published alarm industry market information from Barnes and Associates…and reviewed the terms of the acquisition of ADT by an affiliate of Apollo Global Management."[25]

18.   Mr. Urban finds that 197 out of the 905 customers who ADT alleges complained about Vivint's deceptive sales practices left ADT for Vivint.[26]  For these customers, he claims the average RMR was $46.42.  Applying a multiple of 41 to 44 results in a "market price range of $1,903.00 to $2,042.00 per account."[27]  Mr. Urban then finds that the "company financial policy has required an investment internal rate of return of at least 15% to justify the purchase of alarm accounts."  As such, he multiplies the market value by 115 percent to determine what he believes is the value to ADT of each account, which is in the range of $2,189 to $2,349.[28]

---

[23] Urban Report, p. 3.
[24] Urban Report, p. 2.
[25] Urban Report, p. 3.
[26] Urban Report, "ADT Customers Cancelled and Not Reinstalled - Vivint Case" (URBAN_VIVINT_000191-195).
[27] Urban Report, p. 3.  The market value is calculated by multiplying the RMR and the RMR multiple.  Thus, a higher RMR multiple results in a higher market value.
[28] Urban Report, p. 3.

*Confidential*

19.     Mr. Urban finds that an additional 159 customers returned to ADT after leaving for Vivint and that for these customers ADT incurred costs to reinstall and reconnect the alarm systems. Mr. Urban calculated the average customer reinstall costs by using his analysis of the average reinstall costs from three of his prior cases for ADT.  Rather than calculate the average cost for the 159 customers who he identified in this case as reinstalling with ADT, Mr. Urban used the average cost from these prior three cases.  He found that for these cases the average gross installment cost was $250.51 and that that customers reimbursed ADT an average of $58.31 per account.[29] Therefore, ADT paid an average of $228.36 in installment costs for these accounts.  Mr. Urban claims that ADT's reinstallation damages are $36,309.71.[30]

### B.      Critique of Mr. Urban's Account Value Opinion

20.     Mr. Urban calculates the value of a customer contract by applying a market multiples approach using a multiple of the RMR.  I find that the multiples used by Mr. Urban are higher than the multiples generally used to value customer accounts and are inconsistent with the sources that he cites. One of the reasons Mr. Urban is overestimating his multiples is that he is using multiples based on the value of entire home security companies, rather than using multiples valuing only customer accounts. The value of a home security company derives not only from customer accounts, but also from goodwill, physical assets, and its ability to generate new streams of cash flows.  Thus, only a portion of a company's value should be allocated to its existing customer relationships. In fact, Dr. Mangum finds that in "2014 and 2015, the value of goodwill and net intangible assets had grown to be over 60 percent of the total assets for the ADT Corporation."[31]

---

[29] Urban Report, p. 4.
[30] Urban Report, p. 4.
[31] Mangum Report, p. 11.

*Confidential*

As such, lower RMR multiples should be used when valuing customer accounts than when valuing an entire company. The documents cited by Mr. Urban support this opinion. In this section, I show that the acquisitions made by ADT, the acquisition of ADT, the Barnes-Buchanan Security Industry Overview, the email cited by Mr. Urban, and the ADT Corporation Investor Day Presentation do not support a MRM multiple range of 41 to 44. In addition, Mr. Urban was incorrect in applying an additional 15 percent IRR to the customer account market value.

> 1. *Mr. Urban Overstates the Appropriate Multiple Because He Fails to Adjust His Market Multiples For the Fact They Are Based On Company Sales That Are Not Comparable to Account Only Transactions*

21.     When using a market-based approach to value an asset, which is what Mr. Urban is doing, one must account for differences between the market-based benchmark being used and the asset being valued. ADT's expert Dr. Mangum notes in his report that "[a]n important requirement for appropriate use of market measures is to properly account for any differences between the facts surrounding the market measure and those relating to the asset valuation task at issue."[32]   Mr. Urban, however, fails to do this. He relies on multiples drawn from transactions involving the sale of entire companies, and does not adjust them to reflect only the value of the accounts that were sold.

> (a)   *Acquisitions Made by ADT*

22.     When ADT acquired Protection One, it hired Goldman Sachs to perform a fairness opinion for which Goldman Sachs reviewed the enterprise value / RMR multiple for similar transactions.[33] Goldman Sachs found that the median enterprise value to RMR multiple for North American

---

[32] Mangum Report, p. 13.
[33] The ADT Corporation, Schedule 14A, March 7, 2016, pp. 55-56, Annex B.

*Confidential*

transactions of home security companies was 43.2 times.[34]  In other words, the value of the enterprise, which includes the physical assets, the intangible assets, customer accounts, and any other source of value for the company, as a multiple of RMR was 43.2.  However, much of this value for these transactions derives from intellectual property, goodwill and physical assets and does not just stem from the value of the customer accounts. Dr. Mangum demonstrates the value of firms unrelated to customer accounts when he notes that "in the mid-1970s, intangible assets were generally around 17 percent of corporate value, and by the mid-2000s, that number had grown to over 70 percent.  In 2014 and 2015, the value of goodwill and net intangible assets had grown to be over 60 percent of the total assets for The ADT Corporation."[35]

23.     Moreover, when ADT acquired Protection One and ASG only $985 million of the combined $2,034 million purchase price, or 48.4 percent of the total, was allocated to customer accounts.[36]  The remainder was allocated to categories including trade name and other intangibles, goodwill, and current assets.  If one were to use this percentage to calculate the implied multiple attributable to customer accounts, it would be approximately 21.[37]

24.     Similarly, ADT acquired Devcon Security Holdings in August 2013 for $146 million or a 41 RMR multiple.[38]  $84 million of the transaction price, or 57.5 percent of the total, was allocated to customer relationships, while $60 million was allocated to goodwill.[39]  This would suggest that the multiple paid for the customer relationships was 23.6.[40]

---

[34] The ADT Corporation, Schedule 14A, March 7, 2016, pp. 55-56.  The enterprise value measures the total value of a company and is calculated by adding the market value of equity and debt and then subtracting cash assets.
[35] Mangum Report, p. 11 citing Parr, R.L. (2007). Royalty Rates for Licensing Intellectual Property. Hoboken, NJ: John Wiley & Sons, Inc. and Form 10-K, The ADT Corporation, FYE 2015, p. 61.
[36] The ADT Corporation Form 8-K Exhibit 99.2, April 1, 2016.
[37] $20.91 = 43.2 * 48.5\%$.
[38] The ADT Corporation, "Investor Day Presentation," December 6, 2013, p. 71.
[39] The ADT Corporation, Form 10-K, fiscal year ending September 25, 2015, p. 72.
[40] $23.6 = 41 * 57.5\%$

*Confidential*

(b)      *Acquisition of ADT by Apollo Global Management*

25.      Mr. Urban also reviewed the acquisition of ADT by Apollo Global Management in April 2016.[41]  In his production, he included an article that identified the offer as being priced at 46 times RMR.[42]  However, this again captures the entire value of the company and not just the value of the customer contracts.  In Mr. Urban's exhibit "ADT Corp Valuation Calc WP V2" he shows that as of March 2016, ADT had $10.823 billion in assets out of which $3.687 billion was for goodwill.[43]  Intangible assets are $2.983 billion, or 27.6 percent of total assets, which is a category that includes customer accounts, as well as dealer relationships.[44]  Therefore, the 46 multiple would overestimate the value of only the customer accounts as much of the value of ADT derives from sources other than its existing customer contracts.  If one were to use the acquisition in multiples analysis, one must discount the transaction multiple to account for the other types of assets held by ADT, such as intellectual property, goodwill, physical assets, and dealer relationships.

(c)      *Barnes-Buchanan Security Industry Alarm Overview*

26.      One of the documents that Mr. Urban cites in support of his multiple range of 41 to 44 is a "Security Alarm Industry Overview" published by Barnes Associates.[45]  The document includes charts showing the multiples by the volume of RMR of the acquisition target as well as a chart showing the multiples paid over time for purchases of entire companies and for customer account only transactions.  Again, the question relevant to this litigation is the value of an account and not

---

[41] Urban Report, p. 3.
[42] Scally, Tim, "ADT to be Acquired by Apollo, Combined With Protection 1," February 16, 2016 (URBAN_VIVINT_000197-203 at 202).
[43] Urban Report, "ADT Corp Valuation: Reasonableness Test of RMR Multiple," (URBAN_VIVINT_000190); Urban Report, "The ADT Corporation, Form 10-Q," March 31, 2016 (URBAN_VIVINT_000275-310).
[44] Urban Report, "ADT Corp Valuation: Reasonableness Test of RMR Multiple," (URBAN_VIVINT_000190); The ADT Corporation, Form 10-K, fiscal year ending September 25, 2015, p. 68.
[45] Barnes Associates, "Security Alarm Industry Overview," February 2016 (URBAN_VIVINT_0000221-274).

*Confidential*

an entire company, Mr. Urban should be using the multiple for acquisitions of accounts only.  One chart in this presentation labelled "$100K to $10M RMR Transactions - 10 Year View" shows that transactions involving "accounts only" appear to have an average purchase price multiple of around 30, while transactions involving entire companies have higher multiples.[46]  The screenshot below is a similar chart for the 2016 Barnes presentation, but limited to the most recent five years.[47]  The green bubbles are the account only transactions.  This graph shows how biased Mr. Urban's multiples are.  He is using multiples based on all of the transactions below, when in reality he should only be relying on the green, accounts only transactions, which transacted at much lower multiples.

---

[46] Barnes Associates, "Security Alarm Industry Overview," February 2016 (URBAN_VIVINT_0000221-274 at 268).
[47] Stepanek, Laura, "Barnes Discusses Alarm Company Valuations at Conference," SDM Magazine, March 10, 2016, available at http://www.sdmmag.com/articles/92122-barnes-discusses-alarm-company-valuations-at-co, accessed July 17, 2017.

*Confidential*



 Source: SDM Magazine, "Barnes Discusses Alarm Company Valuations at Conference," March 10, 2016, available at http://www.sdmmag.com/articles/92122-barnes-discusses-alarm-company-valuations-at-co, accessed on July 17, 2017.

27.     Even if Mr. Urban were going to use the RMR multiple for an acquisition of a company, rather than an accounts only multiple, the Barnes presentation he relies on does not support a range of 41 to 44 given the facts of the case.  The presentation provides multiples by transaction RMR value.  Given the RMR at issue in this litigation, the Under $50K RMR Multiple Analysis and the $50K-$100K RMR Multiple Analysis are relevant.[48]  Mr. Urban identified 197 ADT accounts with an average RMR of $46.42, or a total RMR of $9,145.  Thus, it makes sense that if one were valuing the 197 accounts as a single company to use the multiples for transactions with RMR of

---

[48] Barnes & Associates, "Security Alarm Industry Overview," February 2016, (URBAN_VIVINT_0000221-274 at 264 and 265).

*Confidential*

under $50,000.  Indeed, Mr. Urban circled the multiples for 2013, 2014, and 2015 on this chart, which range from 34.4 to 36.0.  Again, this range of multiples captures not just the value of the customer accounts, but also any other assets that these companies may have had such as goodwill.  **Exhibit 1a** shows that the average RMR multiple for the entire 1995 to 2015 period for deals under $50,000 was 33.8.

28.     If one wanted to be conservative and use the $50K-$100K Multiple Analysis, even then the multiples do not exceed even the low end of Mr. Urban's range.  Over the entire period of 1995 through 2015 the highest multiple was 40.1 in 1998.  The next two highest multiples are 39.9 in 2007 and 39.8 in 2012.  **Exhibit 1b** shows that the average multiple for the entire period for deals with RMR between $50,000 and $100,000 was 36.9.

29.     Contrary to Mr. Urban's claim that the Barnes report supports his opinion that the proper multiple range is 41 to 44, instead it shows that the proper multiple, which is for an accounts only transaction given the facts at issue, is much lower in the range of 30 times RMR.

2.      *Mr. Urban's Multiples Exceed ADT's Historical Multiples for Account Transactions*

30.     Not only are Mr. Urban's multiples higher than would be expected based on the documents he cites, they also exceed ADT's historical multiples for acquisitions and account creation.

31.     Mr. Urban included in the documents that he produced an email exchange between himself and Jason Smith, who is the SVP of Financial Planning & Analysis and Treasurer of ADT.  In these emails, Mr. Urban asks Mr. Smith for information for his analysis.  In response, Mr. Smith replies that "[w]e haven't been doing many bulks lately (other than in Canada), the historical

*Confidential*

multiple can range from the low 30s to 40."[49]  In forming his opinion that the RMR multiple ranges

from 41 to 44, Mr. Urban cites his "past experience in customer account purchases by ADT."

However, Mr. Smith, who works in financial planning at ADT, states that in his experience the

high end of the range of RMR multiples is less than the low end of Mr. Urban's multiple range.

Further, when Mr. Urban is asked in his deposition whether anyone at ADT is "more connected to

account acquisitions than Mr. Smith," he responds that "Mr. Smith would be the best source."[50]

32.     Mr. Urban also failed to consider ADT's acquisition cost for direct and dealer originated

accounts, which are well below his 41 to 44 multiple range.  ADT published an investor day

presentation on May 14, 2015, describing an overview of ADT, as well as the company's strategic

outlook.  The presentation includes the creation multiple of new ADT accounts for both the direct

and dealer sales channel.  For the direct channel, the multiple ranged from 27.4 to 32.1 between

2012 and 2014 and was projected to be 31.7 in the first half of 2015.[51]  For the dealer channel, the

multiple ranged from 29.6 to 30.4 between 2012 and 2014 and was projected to be 31.0 in the first

half of 2015.[52]  These multiples are all substantially below Mr. Urban's range of 41 to 44.

3.     *Mr. Urban's Addition of 15 Percent to the Account Value to Compensate ADT for the Risk of Ownership and Profit is Based on a Misunderstanding of Internal Rate of Return and Defies Economic Logic*

33.     After Mr. Urban calculates the market value of a customer contract as $1,903 to $2,042 per

account, he inflates the account values by 15 percent in order to "compensate [ADT] for the risks

of ownership and to ultimately generate a profit."[53]  In justifying this increase, Mr. Urban states

---

[49] Email between William Urban and Jason Smith, "Subject: Confidential - Observations about Market Values of Alarm Accounts," November 9, 2016, (URBAN_VIVINT_000311-313); Deposition of William Urban, July 20, 2017 (Rough), pp. 74-75 ("Urban Deposition (Rough)").
[50] Urban Deposition (Rough), p. 104.
[51] The ADT Corporation, "Investor Day Presentation," May 14, 2015, p. 32.
[52] The ADT Corporation, "Investor Day Presentation," May 14, 2015, p. 35.
[53] Urban Report, p. 3.

*Confidential*

"[t]he company financial policy has required an investment internal rate of return of at least 15% to justify the purchase of alarm accounts."[54]   While he does not provide a citation to justify his selection of 15 percent, Mr. Urban appears to obtain the 15 percent figure from the email from Mr. Smith in which Mr. Smith states "[h]istorical hurdle rate of 15% is fair."[55, 56]

34.     Mr. Urban's 15 percent increase should be disregarded for two reasons.  First, it is based on a misunderstanding of what an internal rate of return ("IRR") is and how it should be applied. Second, it defies economic logic because it assumes that ADT is able to buy assets in a competitive market at a discount to their true value.  An implication of Mr. Urban's flawed 15 percent increase is that it inflates his multiples to even higher levels from the already insupportably high levels he started with.

> (a)     *Mr. Urban's Addition of 15 Percent to the Account Value is Based on a Misunderstanding of What an IRR is and How it Should be Applied*

35.     Mr. Urban appears to believe that an IRR is an amount that is added on to the market value of an asset in order to compensate the buyer for the risk of purchasing the asset and to ensure the buyer earns a profit.  That is not what an IRR is, however.

36.     The IRR is the discount rate that when used to calculate the net present value of a stream of cash flows yields a net present value equal to the amount one must invest to receive those cash flows.[57]   Mathematically, this is represented in the following equation.

---

[54] Urban Report, p. 3.

[55] Email between William Urban and Jason Smith, "Subject: Confidential - Observations about Market Values of Alarm Accounts," November 9, 2016 (URBAN_VIVINT_000311-313).

[56] The term hurdle rate is used to describe a threshold above which a project's IRR must be in order for a firm to undertake the project.  (Michael W. Maher, Clyde P. Stickney, & Roman L. Weil, Managerial Accounting: An Introduction to Concepts, Methods, and Uses, 425 (5th ed. 1994)).

[57] Michael W. Maher, Clyde P. Stickney, & Roman L. Weil, Managerial Accounting: An Introduction to Concepts, Methods, and Uses, 424 (5th ed. 1994).

*Confidential*

$$Investment\ Required = \sum_{t=1}^{N} \frac{Cash\ Flow_t}{(1 + IRR)^t}$$

where  Cash Flow$_t$ is the cash flow in period t
N is the number of periods over which the stream of cash flows will be realized
IRR is the internal rate of return

37.     In the case of an asset purchased on the open market, the investment required would be the price one would pay for that asset.  In the context of this litigation and Mr. Urban's report, the investment required is the market value of the accounts, which is the value Mr. Urban estimated using his RMR and 41 to 44 RMR multiple *before* inflating those amounts by 15 percent.

38.     As the above equation shows, ADT will earn more on the accounts on an undiscounted basis.  After discounting by the IRR to adjust for the time value of money and the riskiness of the cash flows, however, the net present value of the stream of cash flows will equal the investment. Therefore, there is no need nor justification for increasing the account values by the IRR.

> (a)     *Mr. Urban's Addition of 15 Percent to the Account Value Defied Economic Logic*

39.     Not only is there no justification for the 15 percent increase, it violates economic logic. Mr. Urban's methodology implies that ADT is able to identify accounts that are selling at a discount to their value and is then able to buy them in a competitive market at a discount.  If Mr. Urban's logic is correct, ADT should be able to turn around and immediately sell the accounts at his higher value, which does not make sense since he claims to base his original 41 to 44 RMR on market prices.

40.     In a competitive market, the other market participants will not allow ADT to acquire the assets at a discount to their true value nor would the seller be willing to sell that at a depressed value.  Market competition will mean that the accounts will change hands at their market price.

*Confidential*

      (b)     *Mr. Urban's Addition of 15 Percent to the Account Value Inflates His Multiples to Higher Levels*

41.    As discussed above in Section IV.B.2, Mr. Urban's multiples are insupportably high before Mr. Urban's 15 percent adjustment.  Adding an additional 15 percent to the multiples compounds his error.  After the adjustment, Mr. Urban's multiples are not 41 to 44, but rather 47.2[58] to 50.6.[59]

      4.     *If Used as a Measure of Damage, Mr. Urban's Account Value Would Overstate ADT's Damages Because it Fails to Account for Revenue Received by ADT Such as Early Termination Fees or Chargebacks*

42.    Mr. Urban calculates what he believes is the value of a customer account.  Regardless of whether his amount is accurate, which it is not as described above, his amount would overstate the amount ADT lost for the allegedly cancelled accounts because it does not take into account early termination fees or whether ADT received chargeback revenues or a replacement account from the dealer.

      (a)    *Early Termination Fees*

43.    Some customers who cancelled contracts were still under contract with ADT, while other customers were on a month-to-month contract.  In some cases, a customer still under contract with ADT paid an early termination fee to cancel the contract.  This fee was either paid by the customer or I understand sometimes Vivint reimbursed the customer for the early termination fee.  Examples of customers who paid an early termination fee include the following.

- Robert B███ paid an early termination fee of $239.78 on November 20, 2014.[60]

- Donna D███ paid an early termination fee of $392.01 on October 13, 2015.[61]

---

[58] 47.2 = 41 x 1.15.
[59] 50.6 = 44 x 1.15.
[60] "Robert B███ Invoice Summary Report," June 7, 2014 (ADT_VIVINT_00005143).
[61] "Donna D███ Invoice Summary Report," June 8, 2017 (ADT_VIVINT_00005180).

*Confidential*

- Lilla Y█ paid an early termination fee of $493.24 on September 19, 2014.[62]

For each of these customers, I am unable to tell whether the customer or Vivint paid the cost of the early termination fee.  Regardless of who paid the fee, these amounts and revenue from other early termination fees would need to be subtracted from the market value of the customer accounts in any damage calculation.

(b)     *Dealer Chargebacks*

44.     The ADT 10-K states that during a chargeback period of generally 12 to 15 months the cancellation of monitoring services results in a chargeback to the dealer for the full amount of the contract purchase price, or the provision of an account of equivalent economic value.[63]  On Mr. Urban's list of customers that cancelled their ADT service, seven were originated through dealers and had contracts that were less than 12 months old.[64]  For these contracts, the dealer presumably would have reimbursed ADT a chargeback penalty equal to how much they paid the dealer for the contract or provided a substitute account.  Thus, for these accounts ADT would receive a chargeback penalty from the customer and in some cases an early termination fee from the customer.  In a damages calculation, any dealer chargeback fees that ADT received should be subtracted from the market value of the customer accounts.  In addition, if the dealer replaced the cancelled account with a new account, ADT was fully compensated.  In fact, it is possible that ADT profited if it also received an early termination fee.

---

[62] "Lilla Y█ Invoice Summary Report," June 7, 2017 (ADT_VIVINT_00005345).
[63] The ADT Corporation, Form 10-K, fiscal year ending September 25, 2015, pp. 5, 68.
[64] In addition, there were another six customers that cancelled contracts between months 12 and 15. Urban Report, "ADT Customers Cancelled and Not Reinstalled - Vivint Case," (URBAN_VIVINT_000191-195).

5.      *Application of Mr. Urban's Results to Additional ADT Customers*

45.      Mr. Urban calculates the value of an account by multiplying RMR with a multiple of 41 or 44. As the RMR is based on the 197 customers that he identified, the account value only applies for those customers. Thus, if the account value that Mr. Urban calculates is applied to other accounts, it would need to be adjusted to account for any difference in the RMR for the 197 accounts analyzed by Mr. Urban and the other accounts to which his account value is applied.

46.      The RMR that Mr. Urban calculated is $46.42, while the RMR for all ADT customers is lower. ADT's 10-K shows that the RMR was $42.65 in 2015, $41.54 in 2014, and $40.80 in 2013.[65] Additionally, these averages include both residential and business customers, while I understand the customers at issue were residential customers. Residential customers have lower RMR than business customers, so their monthly revenue would be even lower.[66] As such, it would be appropriate to use the average RMR for an ADT residential customer, rather than the higher $46.42 that Mr. Urban calculated.

### C.      Critique of Mr. Urban's Reinstallment Damages

47.      Mr. Urban does not calculate the average reinstallment cost for the 159 customers who he identifies as reinstalling with ADT in this case, but rather uses the average cost for his three prior ADT cases. When Mr. Urban was asked why he decided to take this approach in his deposition, he responded that he did so because "[t]hat's what ADT wanted and I am not exactly sure of all the reasons why but that's what they wanted."[67]  In the prior three cases, Mr. Urban looked at the

---

[65] The ADT Corporation, Form 10-K, fiscal year ending September 25, 2015, p. 37.
[66] The average small business RMR was forecasted to be $53 in 2015. The ADT Corporation, "Investor Day Presentation," May 14, 2015, p. 60.
[67] Urban Deposition ("Rough"), p. 17.

*Confidential*

reinstallment costs for a total of 231 accounts.[68]  It is thus unclear why he would not look at the reinstallment costs for the 159 customer accounts that he identified in this case.

48.     The results of Mr. Urban's three prior cases are summarized in **Table 1**.


**Table 1: Mr. Urban's Model of ADT Reinstallment Costs**

| Prior Cases | Parts Cost | Labor Cost | Per Account Average Labor Hours | Customer Payments | Gross Cost | Net Cost |
|---|---|---|---|---|---|---|
| Northstar | $79 | $127 | 2.31 | $13 | $206 | $193 |
| AP | $137 | $125 | 2.27 | $33 | $261 | $228 |
| Cap Connect | $105 | $145 | 2.63 | $13 | $250 | $238 |
| Total | $117 | $133 | 2.43 | $22 | $251 | $228 |
| | | | Number of Accounts - Vivint Case | | 159 | 159 |
| | | | Total - All Accounts | | $39,832 | $36,310 |


49.     As Mr. Urban did not look at the customer accounts for this case, he does not know the actual net installment cost for those 159 accounts.  He also does not demonstrate that the 159 customers in this case are similar to the customers he assessed in ADT's cases against Northstar, AP, and Cap Connect.  However, Mr. Urban's analysis does show that there is variability in the components of his calculation in the three prior cases.  **Table 1** shows that Parts Costs in the Northstar case were only $79, but were over 70 percent higher in the AP case.  Similarly, the customer payments ranged from a low of $13 on average in Northstar and Cap Connect to over 150 percent higher in the AP matter.  The average net installment cost varied nearly 25 percent between Northstar and AP.  Given the level of variability, Mr. Urban should have queried ADT's systems as he appears to have done in the prior cases to determine the true reinstallment costs.

---

[68] Urban Report, "ADT Customers Cancelled and Not Reinstall - Vivint Case," (URBAN_VIVINT_000191-195).

*Confidential*

50.     One reason it would be important to query ADT's systems is to understand the security systems that were reinstalled.  For example, if when the system was reinstalled it was reinstalled with a needed upgrade, then it is possible the cost of reinstallment (or some portion of it) cannot be categorized as damage because it would have been needed regardless of Vivint's alleged actions.

### D.     Mr. Urban Includes Customers Who Were Not Subject to Deceptive Sales Practices in His Analysis

51.     Mr. Urban found that 197 out of the 905 customers, who were identified by ADT as being subject to Vivint's alleged deceptive sales practices, left ADT.  However, I find that one of these customers was originally a Vivint customer whom ADT attempted to sign a contract with by using deceptive sales practices and that at least one other customer left ADT for reasons unrelated to Vivint's alleged deceptive practices.

52.     Mr. Urban lists Sherry C█████ as a customer who cancelled her ADT contract and did not reinstall.  However, Ms. C█████ became a Vivint customer on July 24, 2007, and remained so until December 29, 2016.[69]  According to Mr. Urban's analysis, Ms. C█████ first used ADT's services on April 30, 2015, and remained a customer until October 3, 2015.[70]  Furthermore, records from both Vivint and ADT indicate that Ms. C█████ was a victim of fraudulent sales services perpetuated by ADT sales representatives.  An ADT document shows that Ms. C████s called ADT to cancel her contract on May 5, 2015, exactly three business days after her ADT installation.[71]  The document includes notes from a phone call between Ms. C█████ and an ADT representative stating that an ADT affiliated sales representative told Ms. Co████ that Vivint had

---

[69] Contract between Charles and Sherry C████ and APX Alarms, July 24, 2007.
[70] Urban Report, "ADT Customer Cancelled and NOT Reinstalled - Vivint Case," (URBAN_VIVINT_000191-195 at 191).
[71] "Sherry C████ Accounts Receivable Collections," May 15, 2015 (ADT_VIVINT_00007612).

gone out of business, but that Ms. C█████ had found out this was not true and had already mailed a notice of cancellation to ADT. ADT then advised Ms. C████s that her cancellation would take seven days to process,[72] but apparently continued billing her for services until October.[73]  In a phone call with Vivint on May 29, 2015, Ms. C█████ confirmed that a representative from Safe Home Control, an ADT Authorized Dealer,[74] came to her home and misrepresented that Vivint had gone out of business and induced her to sign a contract with ADT.  She said, "ADT, they came in and said that you all had gone out of business and there was no home office anywhere in town."[75] Ms. C█████ indicates that she cancelled with ADT within the three day right of the rescission period and would maintain her contract with Vivint.[76]

53.     ADT also alleges that customer Harry S████ switched from ADT to Vivint due to deceptive sales practices.  According to audio recordings from ADT, Mr. S████ and his wife Valerie (both of whom can be heard on the recording) never reported being deceived by Vivint.[77]  While the customers did call to reinstate ADT service and complained about the quality of the Vivint installation, they do not report any deceptive sales practices.  Mr. and Mrs. S████ made it clear that when they were approached by a Vivint sales representative, they agreed to switch their home security system to Vivint because they were unhappy with ADT's service.[78]  The ADT phone

---

[72] The document states: "C██████, SHERRY CI TO CNCL SERVC/STTD AFFIL SALES REP ADVSD CUST PREVIOUS ALARM COMP WENT OUT OF BUS.  - CUST FOUND OUT THEY DID NOT.  STTD ALREADY MAILED NOC TO AURORA/ADVSD 7 DAYS TO PROCESS.  NO OFFER MADE/NO REC#." *See* "Sherry C████ Accounts Receivable Collections," May 15, 2015 (ADT_VIVINT_00007612).
[73] Urban Report, "ADT Customer Cancelled and NOT Reinstalled - Vivint Case," (URBAN_VIVINT_000191-195 at 191).
[74] Safe Home Control ADT Dealer website, available at http://www.besafehomesecurity.com/, accessed on July 21, 2017.
[75] Call between Sherry C████ and Vivint, May 29, 2015, "Sherry C████_599240 Customer Loyalty (Slams) 5-29-2015.mp3."
[76] Call between Sherry C████ and Vivint, May 29, 2015, "Sherry C████s_599240 Customer Loyalty (Slams) 5-29-2015.mp3."
[77] Call between Harry and Valerie S███ and ADT, ADT_VIVINT_00003850.
[78] Specifically, Mrs. S███ said to the ADT representative, "On the 3rd of June Vivint came into our community and since you guys weren't able to get our garage connected and stuff and they said they could do it all, we signed up with them."  Call between Harry and Valerie S███ and ADT, ADT_VIVINT_00003850.

operator then told the St███ that "Vivint is a fraudulent company" and that he was told this by the ADT legal department.[79]  The S███ did not respond with any details suggesting that the Vivint personnel who sold and installed the system misrepresented that they had a relationship with ADT.  The ADT operator later states "we can try to get [Vivint] shut down for doing this."[80] At the end of the same call, in a conversation between two ADT operators, the first operator confirmed that the customers switched to Vivint because they were unsatisfied with ADT's service.[81]

## V.   REBUTTAL OF DR. MANGUM

### A.   Summary of Dr. Mangum's Opinions

54.   Dr. Mangum opines that "[d]amages to Plaintiffs can be modeled in the form of a royalty" and that the royalty is "approximately 22 percent of revenues earned from home monitoring, security and automation products/services for accounts generated during the timeframe contemplated in the Complaint."[82]  Dr. Mangum also claims "any calculation of avoided royalty is also a calculation of lost royalties, and lost royalty-based profits, to ADT."[83]

55.   In order to calculate his 22 percent royalty, Dr. Mangum starts with "ADT's revenue sharing model in place with its own third-party dealers."[84]  Under the dealer revenue sharing model, a dealer is paid an upfront amount for each contract it sells to ADT, which is calculated as a multiple of RMR.  In addition to receiving an up-front payment from ADT, dealers receive four

---

[79] Call between Valerie S███ and ADT, ADT_VIVINT_00003850.  Additionally, the ADT representative states that "[y]ou need to immediately call your bank and let them know what's going on because they are a fraudulent company."
[80] Call between Harry and Valerie ███ and ADT, ADT_VIVINT_00003850.
[81] Call between Harry and Valerie S███ and ADT, ADT_VIVINT_00003850.
[82] Mangum Report, p. 5.
[83] Mangum Report, p. 21.
[84] Mangum Report, p. 13.

*Confidential*

percent of ADT's cost adjusted revenue.[85]  The ADT dealer revenue sharing model begins with total RMR collected and then subtracts the cost to service expenses, which include maintenance, customer service, bad debt, and billing and collection, and subtracts the recurring revenue share paid to the  dealer.  For large dealers, which are able to sell customer contracts for larger amounts to ADT, the "remaining contract revenue, factoring in attrition, charge-backs, incremental costs, and resales" results in a net present value of $290.20 for the account."[86]

56.     After calculating the net present value of a customer account, Dr. Mangum uses another part of the ADT dealer model in which the dealer receives all of its payments from revenue sharing to "model the royalty applicable in this case"[87]  The net present value is kept constant and the Authorized Dealer receives its entire payment in the form of revenue sharing, rather than receiving an up-front payment from ADT.  For a "top-level dealer account NPV constant at $290.20, converting to recurring revenue-only revenue sharing yields 62.4 percent retained by the dealer and 37.6 percent retained by ADT."[88]  Finally, the revenue sharing percentage is applied to the monthly contract revenue figures to determine the percentage of RMR that is retained by ADT. Dr. Mangum determines that for a high-level dealer, ADT would receive $18.66 in a revenue share royalty ($49.63 in RMR multiplied by the 37.6 percent of revenue retained by ADT).  Dr. Mangum also assumes that ADT would avoid $7.78 in costs from not having to service the contracts, which is subtracted from the $18.66 royalty, resulting in ADT's net revenue sharing income of $10.88, or 21.9 percent of the $49.63 RMR.  Dr. Mangum concludes that a "22 percent royalty, applicable to net sales, is appropriate for this case."[89]

---

[85] Mangum Report, p.  17; ADT Dealer Guidelines, Part 4 – Purchasing Programs, pp. 20 and 29 (MANGUM_VIVINT000185-378 at 233 and 242).
[86] Mangum Report, p. 17.
[87] Mangum Report, p. 18.
[88] Mangum Report, p. 18.
[89] Mangum Report, p. 19.

*Confidential*

### B.    Critique of Dr. Mangum's Opinions

57.    Dr. Mangum attempts to use financial terms of the ADT / ADT Authorized Dealer relationship to determine a royalty rate for Vivint's alleged misuse of certain ADT intangible assets.  In my opinion, the relationship between ADT and its Authorized Dealers is too complex to use the method proposed by Dr. Mangum to determine the implicit royalty rate that would be applicable in this case.  There are responsibilities of, benefit provided by, and costs incurred by both ADT and the ADT Authorized Dealers that would need to be accounted for in order to properly perform Dr. Mangum's analysis.  In concept, Dr. Mangum agrees with this point when he notes, "[a]n important requirement for appropriate use of market measures is to properly account for any differences between the facts surrounding the market measure and those relating to the assets valuation task at issue."[90]  While he attempts to account for one difference between the ADT / ADT Authorized Dealer relationship (*i.e.*, certain costs that ADT would not incur under the hypothetical Vivint license), Dr. Mangum does not account for the myriad of other aspects of the contract that also need to be considered.  Indeed, he identifies in his report a number of other factors that he believes need to be accounted for that would increase his estimated royalty rate, but states "I am not aware of a means to reasonably determine the amount by which the calculated royalty (the 22 percent) understates the royalty applicable to Defendant's actions in this case."[91]  Dr. Mangum does not, however, identify the many other factors that need to be accounted for that would suggest a lower royalty rate.  Given the numerous factors that need to be accounted for, I do not believe that the ADT / ADT Authorized Dealer relationship can be used to determine a reliable estimate of the value of ADT's intangible assets that were allegedly misused by Vivint.

---

[90] Mangum Report, p. 13.
[91] Mangum Report, p. 21.

58.     Even if one were to accept that the ADT / ADT Authorized Dealer relationship is a valid basis on which to determine a license for ADT's intangible assets that were allegedly misused by Vivint, Dr. Mangum's method would overstate the true value for at least three reasons.  First, he failed to include a profit margin on the costs that he claims ADT would avoid in his hypothetical license.  Second, he uses the Billed Revenue per User divided by Recurring Monthly Revenue, which does not account for any type of non-payment.  Third, the breadth of intangible assets licensed under the ADT / ADT Authorized Dealer relationship is far broader than that allegedly misused by Vivint.  Therefore, one would need to apportion the royalty between intangible assets allegedly misused and intangible assets not allegedly misused.  Obviously, it would be inappropriate to conclude that Vivint should pay a royalty on intangible assets it is not alleged to have used.

59.     Another problem with Dr. Mangum's analysis is that he failed to test whether his conclusion was reasonable.  ADT produced a Trademark License Agreement between ADT US Holdings, Inc. and ADT LLC ("ADT License")[92] that licensed far more intangible assets than Vivint is alleged to have used.  Therefore, Dr. Mangum's royalty rate should be less than the rate in the ADT License.  The license fee, however, is redacted in the ADT License.[93]  Therefore, it is not possible for me to use the license to test Dr. Mangum's analysis.  ADT, however, was his client and has access to the unredacted contract.  Dr. Mangum could and should have obtained a copy of the unredacted ADT License to test whether his conclusion is valid.

60.     A final problem with Dr. Mangum's analysis is that he does not precisely identify his royalty base in his report.  Dr. Mangum's report is unclear whether his royalty base should be

---

[92] ADT License (MANGUM_VIVINT_000426-435).
[93] ADT License, p. 3 (MANGUM_VIVINT_000426-435 at 428).

applied only to accounts obtained through allegedly deceptive sales techniques or to all accounts obtained during the damage period.

> 1. *The ADT / ADT Authorized Dealer Relationship is Too Complex to Isolate the Value of ADT's Intangible Assets and Therefore Cannot Be Used to Determine a Hypothetical Royalty for ADT's Allegedly Misused Intangible Assets*

61.    Dr. Mangum attempts to use the financial terms of the ADT / ADT Authorized Dealer relationship to determine a royalty rate for Vivint's alleged misuse of certain ADT's intangible assets.  In my opinion, however, the relationship between ADT and its Authorized Dealers is too complex to disentangle the value placed on the intangible assets licensed to Authorized Dealers from other aspects of the relationship.

62.    As an initial matter, Dr. Mangum did not clearly identify the terms of the ADT / ADT Authorized Dealer relationship he is analyzing.  He refers to a revenue sharing model,[94] but that model would be part of a broader legal and financial agreement between the parties.  It is not possible to analyze the revenue sharing model in isolation without reviewing the broader agreement.  It appears that the broader agreement is summarized, at least in part, in two documents produced by Dr. Mangum.  The first is a blank Authorized Dealer agreement that Dr. Mangum discusses[95] and the second is the ADT Dealer Program Guidelines.[96]  For purposes of my analysis, I have assumed that these documents provide information regarding the ADT / ADT Authorized Dealer relationship that forms the basis of Dr. Mangum's opinion.

63.    The ADT Dealer Agreement and the ADT Dealer Guidelines lay out a complex relationship between ADT and its Authorized Dealers with responsibilities assumed, benefit provided, and

---

[94] Mangum Report, p. 13.
[95] ADT Dealer Agreement (MANGUM_VIVINT_000379-425).
[96] ADT Dealer Guidelines (MANGUM_VIVINT_000185-378).

*Confidential*

costs incurred by both ADT and the Authorized Dealers.  While not definitive regarding the complexity of the relationship, the length of the two documents is telling.  The ADT Dealer Agreement is 41 pages plus eight exhibits and the ADT Dealer Guidelines are approximately 190 pages.  The following list includes examples of the many complexities of the agreement that would need to be considered.

- Access to programs, processes, and contracts
- Ready access to monitoring services and the ability to sell accounts
- Advertising, marketing, and promotion
- Inventory Purchasing Program
- Promissory notes and Loan agreements
- Affinity Program
- Sales and Training Program

(a)     *Access to Programs, Processes, and Contracts*

64.     ADT Authorized Dealers benefit from ADT developed processes, best practices, and established programs.  Authorized Dealers do not need to develop their own systems, but can adopt ADT's.  They can also rely on developed forms, contracts, and administrative processes. For example, dealers have access to ADT's installation standards that describe "placement of wiring, contacts, motion detectors, glass break units, sirens, keypads, and transformers."[97] These "standards must be met on every job to maximize customer satisfaction."[98]  While ADT benefits from ensuring that its dealers perform quality work, the Authorized Dealers also benefit from learning from ADT's best practices.

---

[97] ADT Dealer Guidelines, Part 10 – Installation Standards, p. 2 (MANGUM_VIVINT_000185-378 at 319).
[98] ADT Dealer Guidelines, Part 10 – Installation Standards, p. 2 (MANGUM_VIVINT_000185-378 at 319).

(b)     *Ready Access to Monitoring Services and the Ability to Sell Accounts*

65.     ADT dealers are able to sell Qualified Alarm Accounts to ADT as part of the Purchase Program.  This provides the dealer with access to the monitoring services that ADT offers without needing to provide those services in-house or to contract themselves with another party.  The Purchasing Program outlines the base alarm account fee and revenue sharing fee that Authorized Dealers receive for each customer account that passes the quality assurance process.[99]  ADT verifies, among other things, the Equifax Beacon score and that the customer paid an install fee, and notifies the dealer via the website if the account was approved.[100]  The dealer then receives a base fee multiple of RMR that depends on the average credit score and the number of accounts sold in that month.[101]  This provides the dealer revenue at the time of sale based on the future expected cash flow from the account contract.  Therefore, instead of having to wait for the revenue to be paid over time, the dealer receives funds immediately.

(c)     *Advertising, Marketing, and Promotion*

66.     ADT dealers are able to utilize a range of marketing support materials and advertising programs.  This allows ADT dealers to "leverage ADT's multi-million dollar investment in national advertising, which helps to promote ADT as the leader in the security industry, while actively promoting themselves as an Authorized ADT Dealer within their local community."[102]  Dealers can purchase marketing support materials from ADT, such as presentation binders and brochures, as well as use ADT radio script, newspaper, and yellow page templates.  New dealers receive the *ADT Marketing Guidebook* that includes advertising program details, sample radio

---

[99] ADT Dealer Guidelines, Part 4 – Purchasing Programs, p. 23 (MANGUM_VIVINT_000185-378 at 236).
[100] ADT Dealer Guidelines, Part 4 – Purchasing Programs, p. 23 (MANGUM_VIVINT_000185-378 at 236).
[101] ADT Dealer Guidelines, Part 4 – Purchasing Programs, p. 26 (MANGUM_VIVINT_000185-378 at 239).
[102] ADT Dealer Guidelines, Part 6 – Marketing Program, p. 2 (MANGUM_VIVINT_000185-378 at 259).

*Confidential*

scripts, and camera-ready artwork of the ADT Authorized Dealer logo.[103]  While some of the marketing materials must be purchased, the purchase price would be more affordable than a dealer developing the same quality of materials in-house.

(d)     *Inventory Purchasing Program*

67.     The ADT Dealer Guidelines describe the Inventory Purchase Program, which is a program allowing Authorized Dealers to set up accounts with one of three manufacturers of alarms approved for use by ADT to directly purchase equipment from the manufacturer.  Under the program, the Authorized Dealer is able to benefit from "ADT's buying power and existing relationships with manufacturers and suppliers" in order to obtain "more favorable pricing" than the Authorized Dealer would likely be able to obtain on their own.[104]  Another benefit of the Inventory Purchasing Program is that "ADT will establish an account with the vendors of [the Authorized Dealers'] choice . . . with a specified credit limit."  This allows Authorized Dealers to purchase equipment, and the "[i]nvoices are sent from the vendor to ADT directly" and "ADT will pay these invoices on [the Authorized Dealer's] behalf on a 'net-30 payment term' from the date of purchase."[105]

68.     The Inventory Purchase Program has significant value to Authorized Dealers because they are able to acquire alarm equipment at rates below what they would likely pay without the program. This directly increases their profit margin since they bear the cost of the installed system.

---

[103] ADT Dealer Guidelines, Part 6 – Marketing Program, p. 3 (MANGUM_VIVINT_000185-378 at 260).
[104] ADT Dealer Guidelines, Part 5 – Inventory Program, p. 1 (MANGUM_VIVINT_000185-378 at 255).
[105] ADT Dealer Guidelines, Part 5 – Inventory Program, p. 2 (MANGUM_VIVINT_000185-378 at 256).

*Confidential*

(e)      *Promissory Notes and Loan Agreement*

69.      The ADT Dealer Agreement produced by Dr. Mangum contains a list of exhibits on page v, but the exhibits were not produced.  Two of the exhibits identified are titled Promissory Note (Exhibit G) and Loan Agreement (Exhibit H).  Because the exhibits were not produced, I do not know whether either the Promissory Note or Loan Agreement offered any benefits to Authorized Dealers that would need to be accounted for in order to determine an appropriate royalty rate for the hypothetical license.  The documents, however, raise the possibility that Authorized Dealers may receive access to capital at preferential rates and thus should be reviewed because access to capital at anything lower than market rates would be a benefit to Authorized Dealers.

(f)      *Affinity Program*

70.      ADT's 10-K notes that ADT "utilize[s] a variety of third-party referral providers who generate leads and sales referrals for both our direct sales team and our Authorized Dealers.  Our partner lead generation methods include agreements with affinity organizations and third-party referral companies."[106]   The ADT Dealer Guidelines provide more details about the Affinity Program.

71.      The ADT Dealer Affinity Department distributes customer leads to Authorized Dealers using the proprietary distribution and appointment system.[107]  Potential customers call into ADT after seeing ADT dealer yard signs or other marketing materials and the potential customer is then matched with a dealer in their region and a sales appointment is scheduled over email.  If the lead results in a sale, the dealer pays a fee to ADT that is passed to the marketing partner that generated the lead.  Dealers only pay if a lead is converted into a sale.  All Authorized Dealers that are in

---

[106] The ADT Corporation, Form 10-K for the fiscal year ended September 25, 2015, p. 4.
[107] ADT Dealer Guidelines, Part 7 – Affinity Program, p. 3 (MANGUM_VIVINT000185-378 at 300).

good standing, funding 25 accounts per month, and that submit the ADT Data Base Questionnaire are eligible to join the program.[108]   The Affinity Program is a benefit to Authorized Dealers because it is a source of leads that does not require any up front marketing expenditures.

(g)   *Sales and Training Program*

72.   According to a presentation by ADT to prospective dealers, ADT provides comprehensive training through the onboarding program and the dealer development group that is "simply superb in every respect."[109]   The training is both classroom based and on-location, and includes individualized attention from industry experts.[110]   The ADT 10-K also notes that ADT "provide[s] dealers with a full range of services designed to assist them in all aspects of their businesses."[111] Assuming ADT's representations regarding the quality of its training and services offered to dealers are accurate, these opportunities would have significant value to dealers.

73.   The ADT Dealer Guidelines note that ADT's Sales and Training Department provides sales training to assist Authorized Dealers grow their business that is "based upon proven methods and techniques used by other ADT dealers throughout the program."[112]   The training can occur at ADT Dealer Program Headquarters, regional central locations, or in individual dealers' offices. While the dealer is responsible for some fees, ADT generally pays for the expenses of the trainer and will pay all or part of the expense of holding training in a hotel room.[113]   ADT offers several types of training opportunities.  For the Opportunities Knocks program, the ADT trainer will accompany

---

[108] ADT Dealer Guidelines, Part 7 – Affinity Program, p. 1 (MANGUM_VIVINT000185-378 at 298).
[109] The presentation is embedded in the website https://join.adtdealer.com/.  It is also available on YouTube as https://www.youtube.com/watch?v=_ZEufBEtqOM.
[110] The presentation is embedded in the website https://join.adtdealer.com/.  It is also available on YouTube as https://www.youtube.com/watch?v=_ZEufBEtqOM.
[111] The ADT Corporation, Form 10-K, fiscal year ending September 25, 2015, p. 4.
[112] ADT Dealer Guidelines, Part 9 – Sales & Training Program, p. 2 (MANGUM_VIVINT_000185-378 at 306).
[113] ADT Dealer Guidelines, Part 9 – Sales & Training Program, p. 2 (MANGUM_VIVINT_000185-378 at 306).

*Confidential*

the sales representative for door-to-door sales.[114]   As part of Professional Sales and Marketing training, the ADT trainer will provide classroom training and assist the dealer with setting up referral partnerships with local businesses.[115]   In addition, ADT will assist dealers with arranging hiring sessions and recruiting sales representatives.[116]

74.     While there is a cost associated with the training, it is paid in part by ADT and the benefit of the training should exceed the cost of the training.  Therefore, the training represents yet another source of value for Authorized Dealers.

75.     Dr. Mangum recognizes the need to adjust the ADT / ADT Authorized Dealer relationship for the differences between it and his hypothetical license.  In fact, he states in his report that "[a]n important requirement for appropriate use of market measures is to properly account for any differences between the facts surrounding the market measure and those relating to the asset valuation task at issue." [117]   Dr. Mangum identifies two differences between the ADT / ADT Authorized Dealer relationship that he believes he needs to control for in order to determine a royalty applicable to Vivint's alleged misuse of ADT's intangible assets.  The first is to eliminate the costs incurred by ADT associated with services that it would normally perform, but would not need to perform in his hypothetical license. [118]   (As I discuss in Section V.B.2(a) below, I believe Dr. Mangum's adjustment is needed, but incomplete.)  The second is to account for factors that Dr. Mangum believes would increase his hypothetical royalty rate, but for which he does not have a method for quantifying.  Specifically, he notes that "I am not aware of a means to reasonably determine the amount by which the calculated royalty (the 22 percent) understates the royalty

---

[114] ADT Dealer Guidelines, Part 9 – Sales & Training Program, p. 5 (MANGUM_VIVINT_000185-378 at 309).
[115] ADT Dealer Guidelines, Part 9 – Sales & Training Program, p. 12 (MANGUM_VIVINT_000185-378 at 316).
[116] ADT Dealer Guidelines, Part 9 – Sales & Training Program, p. 1 (MANGUM_VIVINT_000185-378 at 313).
[117] Mangum Report, p. 13.
[118] See Mangum Report, pp. 18-19.

*Confidential*

applicable to Defendant's actions in this case." [119]  As I have shown above in this section, however, there are many other aspects of the relationship that Dr. Mangum has neither identified nor made any attempt to consider.  Many of the unaccounted for factors represent benefits received by the Authorized Dealers for which I would expect them to compensate ADT in some manner.  This compensation would be factored into ADT's determination of the revenue sharing percentage it offers to its Authorized Dealers.  Given the data available, I do not believe it is possible to adjust the ADT / ADT Authorized Dealer relationship for all the factors that need to be accounted for to make it comparable to Vivint's alleged misuse of ADT's intangible assets.

> 2.  *Assuming in Arguendo That the ADT / ADT Authorized Dealer Relationship Can Be Used to Determine a Hypothetical Royalty for ADT's Allegedly Misused Intangible Assets, Dr. Mangum's Analysis Fails to Consider Needed Adjustments and Includes Two Errors*

76.     As discussed above, I do not believe that the ADT / ADT Authorized Dealer relationship can be used to determine the value of the intangible assets that Vivint is alleged to have misused because it is too complex a relationship to identify the compensation associated with only one component of the entire relationship.  Assuming *in arguendo*, however, that it was possible, Dr. Mangum's method would overstate the value because he assumes that Vivint used all of the intangible assets licensed to Authorized Dealers as part of their relationship with ADT, which is not consistent with the facts of the case.  In addition, his method includes two errors that would cause him to overstate his hypothetical royalty rate.

---

[119] Mangum Report, p. 21.

*Confidential*

(a)     *Dr. Mangum Fails to Account for all Benefits Received by ADT Authorized Dealers*

77.     Dr. Mangum overestimates his royalty rate because he fails to adjust for benefits that would be received by dealers in a normal ADT dealer relationship, but would not be received by Vivint in his hypothetical license.  Many of these factors were articulated above in Section V.B.1.  For example, the benefit of the Inventory Purchase Program and access to premade marketing materials, ADT's training opportunities, and the Affinity Program are all of value to dealers and would not be utilized by Vivint in the hypothetical license.  Therefore, failing to account for them overstates the royalty rate for Dr. Mangum's hypothetical license.

78.     One issue not discussed above that Dr. Mangum fails to adjust for is intangible benefits that Vivint is not accused of having used even if one assumes that Vivint in fact engaged in deceptive sales techniques.  For example, I understand that Vivint sales representatives are not accused of wearing clothing or driving vehicles that display the ADT logo, trademarks, or service marks.  In fact, I understand that they wear Vivint uniforms[120] and in at least some circumstances drive Vivint branded vehicles.[121]  Nor is Vivint accused of using ADT's logo, trademark, or service mark on its websites, which is required of ADT Authorized Dealers.[122]  A review of Authorized ADT Dealers indicates that ADT branding plays a prominent role in the marketing of Authorized ADT Dealers.  For example, ADT features prominently on the home page of California Security Pro as shown in the following screenshot.

---

[120] See for example, rows 16, 29, 58, 60, 70, 75, 80, 85, 120, and 144 among others in column S of MANGUM_VIVINT_001018 Vivint DSP Report 04 03 2013 - 05 30 2017.xlsx.  The file appears to be a DSP Report compiled by ADT.  One of the attributes reported is Description of Clothing.  The rows identified indicate that the Vivint agent was wearing clothing branded with the Vivint logo and/or markings.

[121] See for example, rows 157, 188, 206, 325, 337, and 348 among others in column U of MANGUM_VIVINT_001018 Vivint DSP Report 04 03 2013 - 05 30 2017.xlsx.  One of the attributes reported on the report is Description of Vehicle.  The rows identified indicate that the vehicle of the Vivint agent was branded with the Vivint logo and/or markings.

[122] ADT Dealer Guidelines, Part 6 – Marketing Program, (MANGUM_VIVINT000_185-378 at 262).

*Confidential*



Source: http://www.californiasecuritypro.com/.

79. California Security Pro also has an entire portion of its website touting the benefits of ADT and why consumers would benefit from an ADT system. A screenshot of a portion of the webpage is below.

*Confidential*



Source: http://www.californiasecuritypro.com/why-adt/home-security-companies.

80.    Another use of ADT's intangible assets that Vivint is not accused of using is the use of ADT's brand in other aspects of authorized dealer marketing.  For example, many dealers identify themselves simply as an ADT Authorized Dealer in sources like the Yellow Pages.  Therefore, when someone searches for a term like "adt dealer" in the Yellow Pages or an online search engine, the contact information for the Authorized Dealers is more easily obtainable as demonstrated by the following screenshot.  This would drive customers to the Authorized Dealers, which would increase their ability to recruit new customers.

*Confidential*



Source: https://www.yellowpages.com/los-angeles-ca/adt-dealer.

81.    Dr. Mangum's analysis is premised on the assumption that ADT provides dealers the right to use all of its intangible assets in exchange for dealers installing ADT systems and then selling the accounts to ADT.  ADT and the dealers then split the revenue received by ADT and the amount

*Confidential*

retained by ADT represents the payment by the dealers to ADT to compensate ADT for the use of its intangible assets and for the cost of servicing the accounts.  As discussed in Section IV.A, Dr. Mangum deducts a portion of the revenue retained by ADT for avoided services and assumes the remaining portion is to compensate ADT for all its intangible assets.  By ignoring the many other tangible benefits that ADT Authorized Dealers receive, Dr. Mangum's analysis overstates damages because he assumes that Vivint sales agents would use all of the intangible assets for which ADT Authorized Dealers are granted a license, but in reality they would use only a portion of the licensed intangible assets.

(b)     *Failure to Include Profit Margin on Avoided Costs*

82.     A second problem with Dr. Mangum's analysis is that he fails to add a profit margin on the revenue he deducts in his avoided cost adjustment.  Dr. Mangum calculates an ADT Revenue Share Royalty amount of $18.66 for high-level dealers and $23.57 for low-level dealers.  He then deducts $7.78 for avoided service costs from those amounts because Vivint would be the company servicing the accounts instead of ADT.  In a normal transaction with an Authorized Dealer, ADT would be providing the avoided services and would need to be paid to provide the services.

83.     I agree with Dr. Mangum that he should deduct costs from his ADT Revenue Share Royalty amount, but Dr. Mangum's deduction is too small because it fails to account for the profit that ADT would realize on the services that ADT would normally perform.  By only deducting the incremental service costs, Dr. Mangum is assuming that ADT would provide these services at cost and all of the profit realized by ADT is associated with ADT's intangible assets.

84.     Failing to account for the profit that ADT would earn on the avoided services causes Dr. Mangum to deduct too little from the ADT Revenue Share Royalty, which results in his final royalty being too high.

*Confidential*

> (c)     *Use of Billed Revenue Instead of Funded Revenue and Failure to Tailor the Revenue to the Accounts Disputed in This Action*

85.     Dr. Mangum's analysis is based on a document provided by ADT that he produced as "MANGUM_VIVINT_001091 rev sh no upfront payment.pdf." He appears to have adopted the ADT document with no changes. While I have reviewed the document on its face, I have not had the benefit of discovery regarding the document nor has Dr. Mangum yet been deposed, so he has not been questioned regarding the document. I have not been able to replicate the calculations in the document. Based on my understanding of the document, it appears to be based on the billed revenue for an account, which is $49.63, and not the revenue actually realized, which is on average less due to different forms of non-payment and credits. In my opinion, the correct revenue to use is not the billed, but actual revenue. In addition, the billed revenue is based on certain take rate assumptions for Pulse and home automation. To the extent that the accounts in dispute in this action have different characteristics than assumed by ADT in the document used by Dr. Mangum, he will reach an incorrect conclusion. Based on Mr. Urban's opinion, the RMR for the 197 accounts allegedly lost by ADT and not reinstalled is $46.42. This would imply that the assumption adopted by Dr. Mangum is in fact wrong.

86.     Because I have not been able to replicate the calculations in the document cited by Dr. Mangum, I have not been able to adjust his analysis for a different RMR. Assuming he is able to articulate in his deposition the calculations in the ADT spreadsheet on which he relied, I will review his testimony and supplement my report as appropriate.

*Confidential*

3. *Dr. Mangum Fails to Obtain and Consider Facts Directly Relevant to His Opinion That Would Support or Disprove His Opinion*

87.    The ADT License allows ADT LLC to use certain trademarks and/or service marks owned by ADT US Holdings, Inc. in exchange for a license fee.[123]  The trademarks and/or service marks licensed are identified in Schedule "A" to the ADT License and includes trademarks and/or service marks such as 800.ADT.ASAP, 800.ADT.GOLD, ADT ALWAYS THERE, ADT ALWAYS THERE WHEN YOU CAN'T BE, the octagonal ADT yard sign, ADT BEL-AIR PATROL, PROVIDING RAPID RESPONSE AND PEAVE OF MIND 24 HOURS A DAY, among others. In total, there are 104 separate entries on Schedule "A."[124]

88.    The ADT License provides a reasonable benchmark for checking Dr. Mangum's 22 percent royalty.  It covers the intangible assets that he is attempting to license and relates to the provision of the same goods and services relevant to this action.  It also involves ADT US Holdings and ADT LLC, which are the plaintiffs in this action, and would provide what appears to be their arm's length valuation of the assets covered by the license.[125]  After accounting for relevant differences between the ADT License and Dr. Mangum's hypothetical license, such as the fact that the ADT License covers more trademarks and service marks than Vivint has allegedly misused, one would expect the license fee in the ADT License to be consistent with Dr. Mangum's opinion.  If the royalty rate in the ADT License is materially lower than Dr. Mangum's 22 percent royalty, it would call into question the reliability of Dr. Mangum's opinion.

89.    The ADT License produced by Dr. Mangum is redacted to hide the license fee.  Therefore, it is not possible to determine what rate ADT LLC agreed to pay ADT US Holdings for the use of

---

[123] ADT License, pp. 1 and 3 (MANGUM_VIVINT_000426-435 at 426 and 428).
[124] ADT License Schedule A, pp. 7-9 (MANGUM_VIVINT_000426-435 at 432-435).
[125] Section 4.(c) of the ADT License notes that the parties "may reexamine the royalty rate . . . to determine whether an adjustment to the royalty rate is necessary in order to reflect an arm's length compensation [sic]."

the licensed trademark and service marks.  The unredacted license would have been available from Dr. Mangum's client, however, and is directly relevant to his opinion.  I understand that counsel for Vivint has requested that ADT produce an unredacted copy of the ADT License.  When it is produced, I will review it and supplement my opinions as appropriate.

### 4.  *Dr. Mangum Does Not Precisely Define His Royalty Base*

90.    Dr. Mangum's opinion regarding the revenue to which his royalty should be applied (*i.e.*, the royalty base) is imprecise.  He claims the royalty should apply to "revenues earned from home monitoring, security and automation products/services *for accounts generated during the timeframe contemplated in the Complaint* (*i.e.*, 2013-2016)" (emphasis added).[126]  The phrase "for accounts generated during the timeframe contemplated in the Complaint" is vague and does not identify the accounts to which he is referring.  Presumably, he is intending to limit the accounts to only those ADT customers that changed to Vivint and for which the trier of fact determines but for a deceptive sales technique the customer would not have transitioned to Vivint.

91.    The language is vague enough, however, to cover a broader range of accounts.  If Dr. Mangum intended to use a broader definition, this would be inappropriate.

92.    As of the date I submit this report, Dr. Mangum has not been deposed so he has not had the opportunity to clarify his report.  I reserve the right to supplement my opinions based on his deposition testimony.

---

[126] Mangum Report, p. 5.

*Confidential*

## VI.   ECONOMIC BASIS FOR FOCUSING MARKETING EFFORTS ON HOMES WITH POSTED ALARM SIGNS

93.     I understand that ADT has alleged directly or indirectly that Vivint sales agents target ADT customers.  While I do not know whether this is true or not, there is a sound economic reason why a sales representative would prioritize approaching homes with posted alarm signs, instead of canvasing an entire neighborhood.

94.     Customers with alarm signs in their yard have revealed they are interested in having a home security system and are likely currently paying a monthly service fee.  In deciding where to focus their efforts, sales representatives will knock on doors of homes that appear more likely to result in a sale.  For example, Vivint recommends not knocking on doors of homes that appear empty.[127] As many people may not have an interest in having a home security system, a sales person may want to focus on those who already have a home security system.  Moreover, the first two requirements in Vivint's Sales Training Manual for qualifying for a Vivint home security system are that a customer owns their home and has a passing credit score.[128]  Homes with a security sign in the yard likely already meet these two requirements.  Therefore, it is economically rational for Vivint sales representatives to focus their efforts on homes with home security signs in the yard.

Signed in Los Angeles, CA on this 24th day of July, 2017

_____

---

[127] Vivint Sales Training Manual, 2016, p. 110.
[128] Vivint Sales Training Manual, 2016, p. 14.

**Appendix A**

**MARK A. GUSTAFSON**
**Vice President**

Phone:  (213) 

mgustafson@ , CA

Mr. Gustafson applies his expertise in economics, econometrics, and modeling to litigation, complex business issues, and the analysis of public policy issues. He has worked extensively in the areas of employment, class actions, health care, insurance, finance, intellectual property, and commercial damages.

He has provided deposition and trial testimony relating to retirement benefits, employment compensation, lost earnings, and whether a damages model in a class action could be implemented.  He has also critiqued plaintiffs' proposed damages formula in numerous class action, intellectual property, and commercial damages matters. In intellectual property cases, Mr. Gustafson has estimated reasonable royalty rates and quantified lost profits on a wide variety of patents across industries.  He has also assisted companies in license negotiations and to estimate potential exposure and damage awards that may be received based on initiating litigation.  His other casework has involved assessing claims of excessive investment fees in corporate 401(k) defined contribution plans, analyzing health insurance claims to identify instances of inappropriate billing by hospital providers, and auditing risk-pool reconciliations that set the level of at-risk payments to a hospital group and its physician partners. Mr. Gustafson has explored economic issues associated with a wide range of insurance products, including disability, health, life, product liability, and property insurance, as well as variable annuities. Additionally, he has extensive experience assembling and analyzing large, proprietary data sets common in insurance and health care engagements.

Mr. Gustafson is a coauthor of "Use of Statistical Sampling in Litigation" and "Expert Analysis of Class Certification Issues," in both the 5th and 6th Editions of the *Litigation Services Handbook*.  In the 4th Edition of the *Litigation Services Handbook* he coauthored "Economic Analysis of Reductions-in-Force and Pay Equity."

 Prior to joining Analysis Group, Mr. Gustafson was the business manager in Tokyo for an international nonprofit. He also taught economics as a course assistant at Harvard University's John F. Kennedy School of Government.

## EDUCATION

| | |
|---|---|
| M.P.P. | Kennedy School of Government, Harvard University |
| B.A. | Business Economics and Political Science, University of California, Los Angeles |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2000 – Present | Analysis Group, Los Angeles, CA and Boston, MA |
| 1999 – 2000 | Research Assistant, Harvard Institute for International Development, Harvard University, Cambridge, MA |
| 1998 – 1999 | Course Assistant, Kennedy School of Government, Harvard University, Cambridge, MA |

*Confidential*

## DESIGNATIONS AND TESTIFYING EXPERIENCE

▪ **Israel Perez v. The United States of America** (case no. 16CV1911 JAH MDD)
Designated to opine on lost earning capacity and the appropriate discount rate for Israel Perez's life care plan.

▪ **Jaxon Nichols v. The United States of America** (case no. 16CV1584 GPC WVG)
Designated to opine on lost earning capacity and the appropriate discount rate for Jaxon Nichols' life care plan.

▪ **Gastelum and Bryden et al. v. Verizon California, Inc.** (case no. CGC-11-511467)
Prepared declaration analyzing Verizon California's collection costs associated with the failure of putative class members to make timely payment.

▪ **Timothy Gendreau et al. v. California Physicians' Service, D.B.A Blue Shield of California**
Submitted declaration on behalf of Blue Shield regarding whether Blue Shield properly calculated deductible and out-of-pocket maximums for Mr. Gendreau and whether prescription benefits were properly paid.

▪ **Susan Chan DDS v. DeltaDental**
Submitted rebuttal expert report and provided deposition testimony on behalf of DeltaDental related to Dr. Chan's allegation that DeltaDental failed to properly administer its patient referral program causing Dr. Chan to lose business.

▪ **Duncan Roy et al. v. County of Los Angeles; Leroy D. Baca, Sheriff of Los Angeles County**
Submitted rebuttal expert report on behalf of the County of Los Angeles analyzing plaintiff's expert's calculation of the number of people in each putative class and of the alleged frequency of over-detentions related to enforcements of immigration detainers.

▪ **Hunters Run Apartments, LTD. et al. v. WCA Waste Corporation et al.**
Submitted rebuttal expert report and provided deposition testimony on behalf of the defendant evaluating the plaintiffs' expert's report opining on damages and the availability of required data.

▪ **Alexis Gurshin v. Bank of America Corporation**
Submitted expert report on behalf of the Bank of America analyzing plaintiff's damage claim.

▪ **David Couch v. Morgan Stanley & Co., Incorporated and Morgan Stanley Smith Barney, LLC**
Submitted rebuttal expert report on behalf of the defendant analyzing plaintiff's expert's damage claims and providing an alternative damage analysis related to plaintiff's alleged wrongful termination.

▪ **Stevenson v. The Bank of New York**
Provided deposition and trial testimony related to retirement benefits and employment compensation due to plaintiff resulted from the Bank's alleged failure to continue to accrue retirement benefits while the plaintiff was seconded to an affiliated bank and alleged failure to reemploy the plaintiff following the end of his service with the affiliated bank.

▪ **Guillory et al v. County of Los Angeles**
Submitted declaration analyzing plaintiffs' class wide damages due to alleged improper administration of the County's general relief welfare program.

▪ **Prime Healthcare Cases**
Submitted declaration related to Defendant's identification and analysis of Plaintiff's disputed hospital claims.

- **In re. Urethane Antitrust Litigation**
  Submitted three declarations analyzing plaintiffs' expert's damage model to demonstrate that portions of the class either had zero or negative damages.

- **Willingham v. Life Partners, Inc.**
  Authored rebuttal report analyzing plaintiff's proposed class wide damage model submitted in support of certification for a putative class of investors in life settlements.

- **Kaiser v. Vanguard**
  Designated to analyze health care claims data used by a statistical expert to estimate damages in a payer/provider dispute.

## SELECTED CASE ASSIGNMENTS

### Commercial Damages

- **Franchisee Lawsuits/Arbitrations v. United Parcel Service et al.** (July 2006 - January 2008)
  Investigated the reasons and information analyzed to support the decision to rebranding Mail Box Etc. as The UPS Store.

- **Caruso Affiliated Holdings, LLC v. General Growth Properties, Inc. and GGP/Homart II, LLC** (November 2005 - November 2007)
  Analyzed plaintiffs' damage claim for construction delay and lost income damages resulting from the alleged delay in construction of the Americana At Brand due to alleged misconduct by General Growth Properties, Inc. and GGP/Homart II, LLC.

- **Sargon Enterprises Inc., v. University of Southern California et al.** (January 2007 - August 2007)
  Analyzed plaintiffs' damage claim for lost profits in the dental implant business stemming from the defendants' failure to properly conduct a clinical trial.

- **Take It Away, Inc. v. Home Depot, Inc.** (October 2006 - January 2007)
  Reviewed and critiqued plaintiff's business model and profit forecasts that formed the basis of its damage claim.

- **Eldorado Stone, LLC and Eldorado Stone Operation, LLC v. Renaissance Stone, Inc. et al.** (August 2006 - July 2004)
  Assisted expert in rebutting plaintiff's statistical expert's testimony related to the probability that the defendant could have obtained certain stone colors by random chance.

- **Vought Aircraft Industries, Inc. v. Gulfstream Aerospace Corp.** (March 2006 - June 2006)
  Estimated the value of redesigning the manufacturing process for Gulfstream jets and the effect on the sale of Gulfstream jets.

**Intellectual Property**

- **Confidential  Cross License Negotiation** (February 2016 to date)
  Assisted an international company in its license negotiations with its main competitor related to a cross license.  Work included estimating royalty and lost profit exposure for both firms under different liability and infringement assumptions.

- **Confidential  Cross License Arbitration** (March 2013 to May 2015)
  Assisted an international company in an arbitration to set the appropriate FRAND rate for a cross license between it and another large market participant.

- **TracBeam LLC v. Google, Inc.** (May 2013 – May 2014)
  Supported expert analyzing the Google's alleged use of TracBeam's device location identification patent.

- **Capital Funding Group Inc. v. Walker & Dunlop LLC** (November 2010 - June 2012)
  Supported expert analyzing the defendant's use of Capital Funding Group's proprietary information.

- **Grunstein, et al. v. Silva, et al.** (September 2012 - January 2013)
  Supported expert analyzing the defendant's use of plaintiff's proprietary information.

- **Konami Digital Entertainment, Inc. and Konami Corporation v. Vintage Sports Cards Inc; The Upper Deck Company, a California Corporation; and The Upper Deck Company, a Nevada Corporation** (July 2009 - March 2010)
  Calculated lost profit and disgorgement damages resulting from counterfeiting of Yu-Gi-Oh! trading card game cards by Upper Deck.

- **L-3 Communications Integrated Systems v. Lockheed Martin Corporation** (2008 - 2010)
  Reviewed and rebutted plaintiffs damages claim stemming from L-3's claim that Lockheed Martin violated the Sherman Act in claiming that only Lockheed Martin had the rights to perform refurbishment services for P-3 "Orion" military aircraft for foreign powers.  The analysis included examining the impact of Lockheed Martin's alleged actions on L-3's sales related to both loss of current revenue streams and future customers, and evaluating the damages estimates submitted by   L-3 Communications Integrated Systems' expert.

- **Candela Corporation v. Palomar Medical Technologies, Inc.** (December 2007 - September 2008)
  Estimated lost profits and reasonable royalty for the wrinkle reduction feature of medical lasers.

- **AllCare Health Management System Inc. v. Highmark, Inc.** (December 2007 - September 2008)
  Estimated reasonable royalty for a system allowing computerized adjudication and payment of physician claims.

- **Dial Industries, Inc. v. Lipper International, Inc.** (May 2006 - October 2006)
  Estimated reasonable royalty for the expandable feature of expandable drawer organizers.

- **Altnet, Inc. et al. vs. Recording Industry Association of America et al.** (March 2006 - April 2006)
  Estimated reasonable royalty for an internet file sharing protocol.

- **Rent Information Technology v. The Home Depot** (January 2006 - May 2006)
  Analyzed issues related to damages for alleged theft of trade secret.

- **Israeli Bio-Engineering Project v. Amgen** (2003 - December 2005)
  Determined reasonable royalty for Amgen's alleged infringement of Israeli Bio-Engineering Project's

patent related to tumor necrosis factor binding protein II.  Supported rebuttal of opponent's damages expert.

- **Confidential Patent Infringement Litigation** (September 2005 - November 2005)
  Analyzed issues related to reasonable royalty for alleged infringement of patent covering traffic cones.

- **Confidential Patent Infringement Litigation** (June 2005 - September 2005)
  Analyzed issues related to alleged infringement of patent in the biotechnology field.  Assisted counsel in successful settlement negotiations.

- **Confidential Negotiations** (April 2005 - May 2005)
  Estimated reasonable royalty for patent related to internet dating to support client in negotiation with alleged infringer.

- **Shell & Slate Software v. Adobe Systems** (November 2003 - December 2004)
  Calculated disgorgement of profits and reasonable royalty for alleged theft of trade secrets concerning digital photo manipulation.

## Class Certification

- **Gastelum and Bryden et al. v. Verizon California, Inc.**  (October 2012 to date)
  Prepared declaration analyzing Verizon California's collection costs associated with the failure of putative class members to make timely payment.

- **Looper et al. v. FCA US LLC, f/k/a Chrysler Group LLC**  (July 2016 – November 2016)
  Supported expert analyzing plaintiff's proposed method for proving class wide damages.

- **Duncan Roy et al. v. County of Los Angeles; Leroy D. Baca, Sheriff of Los Angeles County**
  Submitted rebuttal expert report on behalf of the County of Los Angeles analyzing plaintiff's expert's calculation of the number of people in each putative class and of the alleged frequency of over-detentions related to enforcements of immigration detainers.

- **Hunters Run Apartments, LTD. et al. v. WCA Waste Corporation et al.**
  Submitted rebuttal expert report and provided deposition testimony on behalf of the defendant evaluating the plaintiffs' expert's report opining on damages and the availability of required data.

- **Elkind and Rose et al. v. Revlon Consumer Products Corporation** (October 2015 to date)
  Supported expert rebutting plaintiff's claim that Revlon's use of the term DNA Advantage was false and misleading.

- **Yaeger et al. v. Subaru of America, Inc. and Fuji Heavy Industries, Ltd.**  (September 2014 to June 2015)
  Estimated exposure in support of settlement negotiations related to claims of excess oil consumption for certain Subaru vehicles.

- **Coba et al. v. Ford Motor Company** (May 2014 to date)
  Analyzed plaintiff's claim of excess depreciation related to F-series and E-series Ford vehicles related to fuel tank delamination.

- **Guillory et al. v. County of Los Angeles** (June 2013 to October 2014)
  Submitted declaration analyzing plaintiffs' class wide damages due to alleged improper administration of the County's general relief welfare program.

- **Margie Daniel, et al. v. Ford Motor Company** (November 2012 to May 2013)
  Estimated excess depreciation experienced by owners of the Ford Focus resulting from an allegedly defective suspension system and evaluated claims of premature tire wear.

- **Zakskorn, et al. v. American Honda Motor Co. Inc.** (July 2012 to February 2013)
  Estimated excess depreciation experienced by owners of accused Honda vehicles resulting from an allegedly defective braking system.

- **Charlotte Phillips, et al. v. WellPoint Inc.** (August 2011 - March 2012)
  Supported expert rebutting plaintiff's proposed damages model related to RightCHOICE's withdrawal from the Illinois insurance market.

- **Karen Herbert, et al. v. Endemol USA, Inc.** (June 2011)
  Estimated the response rate for proposed class action settlement.

- **Diaz v. First American Home Buyers Protection Corp.** (November 2010 - July 2011)
  Supported expert rebutting plaintiff's proposed damages model related to First American's alleged failure to honor its home warranties.

- **Multiple Class Actions v. KIA Motors America, Inc.** (March 2005 - July 2005)
  Estimated excess depreciation experienced by owners of the Kia Sephia resulting from an allegedly defective braking system.

- **Class Actions v. Monsanto Co. et al.** (2002)
  Analyzed the level of heterogeneity between members of a proposed class in price fixing case.

## Employment / Lost Earning Capacity

- **Israel Perez v. The United States of America** (ongoing)
  Designated to opine on lost earning capacity and the appropriate discount rate for Jaxon Nichols' life care plan.

- **Jaxon Nichols v. The United States of America** (ongoing)
  Designated to opine on lost earning capacity and the appropriate discount rate for Jaxon Nichols' life care plan.

- **Susan Chan DDS v. DeltaDental** (August 2016 – October 2016)
  Submitted rebuttal expert report and provided deposition testimony on behalf of DeltaDental related to Dr. Chan's allegation that DeltaDental failed to properly administer its patient referral program causing Dr. Chan to lose business.

- **Alexis Gurshin v. Bank of America Corporation** (September 2015 – to date)
  Submitted expert report on behalf of the Bank of America analyzing plaintiff's damage claim.

- **Rosario J. Lopez v. PVH Neckwear, Inc. at al.** (February 2016 – March 2016)
  Estimated damages and potential exposure related to claim of pregnancy discrimination and wrongful termination.

- **David Couch v. Morgan Stanley & Co., Incorporated and Morgan Stanley Smith Barney, LLC** (March 2015 – to date)
  Submitted expert report on behalf of the defendant analyzing plaintiff's expert's damage claims and providing an alternative damage analysis related to plaintiff's alleged wrongful termination.

- **Stevenson v. The Bank of New York** (August 2011 - January 2013)
  Provided deposition and trial testimony related to retirement benefits and employment compensation due to plaintiff.

- **Nancy Sweet v. United Parcel Service** (July 2010)
  Analyzed time records to determine whether the FLSA Motor Carrier Exemption applied in these wage and hour matters.

- **Confidential Criminal Investigation** (May 2006 - June 2006)
  Investigated claims by the United States government of illegal employment practices during a lockout.

- **Confidential Wrongful Termination Litigation** (June 2005)
  Investigated lost earnings damages related to an alleged wrongful termination of an employee and damages related to an alleged breach of contract and fiduciary duty.

- **Class Action v. McDonnell Douglas** (January 2003)
  Assisted in estimation of individual damages to approximately 1,100 terminated class members.

- **Confidential Executive Compensation Litigation** (2001)
  Estimated the value of a Parisian employee stock option using Monte Carlo simulation to evaluate the claim that executive compensation post-merger violated their pre-merger employment agreement.

- **Confidential Corporate Reorganization** (2001)
  Analyzed the impact of a reduction in force on protected classes in the utility industry.

<u>Healthcare</u> (litigation and non-litigation assignments)

- **Timothy Gendreau et al. v. California Physicians' Service, D.B.A Blue Shield of California** (October 2016 to date)
  Submitted declaration on behalf of Blue Shield regarding whether Blue Shield properly calculated deductible and out-of-pocket maximums for Mr. Gendreau and whether prescription benefits were properly paid.

- **Bodner and Felker et al. v. Blue Shield of California Life and Health Insurance Company** (October 2015 to date)
  Supported multiple experts addressing issues of class certification, damages, and availability of policies with certain plan designs during the period 2008 to 2012.

- **Prime Healthcare Cases** (November 2008 to date)
  Submitted declaration related to Defendant's identification and analysis of Plaintiff's disputed hospital claims.

- **Washington State Hospital Association** (July 2011 to date)
  Consulted with the Washington State Hospital Association related to the Hospital Safety Net Assessment.

- **Allegheny General Hospital v. UPMC Health Plan** (April 2009 to date)
  Supported damages expert in payer/provider dispute brought under Pennsylvania's Act 68.

- **Accountable Health Care IPA and Accountable Health Care MSO v. Memorial Hospital of Gardena et al.** (December 2012 - March 2013)
  Supported expert in replicating risk pool reconciliations that were the basis for at-risk payments to Accountable Health Care IPA and Memorial Hospital of Gardena.

- **Premera Blue Cross v. MultiCare Health System** (September 2012 - December 2012)
  Estimated actual change in reimbursements to MultiCare Health System following an allegedly revenue neutral transition to an APC payment methodology.

- **CareCentrix v. Apria Healthcare Group** (June 2012 - September 2012)
  Supported expert in benchmarking the rate of increase in Apria's billed charges for particular services against rates of increases for similar services offered by other providers.

- **Jane Kakkis, M.D. v. Breastlink Medical Group, Inc.** (January 2011 - May 2011)
  Reviewed and critiqued method used by employer health plan in setting employee health insurance compensation rates in support of expert rebutting plaintiffs' damages claim.

- **Ned-Sthran v. Methodist Hospitals of Dallas, et al.** (January - April 2009)
  Reviewed and critiqued method used by employer health plan in setting employee health insurance compensation rates in support of expert rebutting plaintiffs' damages claim.

- **Confidential White Paper** (April - October 2008)
  Assisted academic affiliate in drafting white paper on the level of competition in a specific hospital market to assist hospital in obtaining a certificate of need from state regulators.

- **Kimberly Gandy-Quinn vs. Blue Shield of California et al.** (May - June 2008)
  **Twilla and Martin Willey vs. Blue Shield of California et al.** (May - June 2008)
  Supported three defense experts opining on damages, National Committee for Quality Assurance standards, and the appropriateness of capitation, respectively.  Both cases resulted in favorable settlements for Blue Shield.

- **Confidential Pharmaceutical Engagement** (September 2007)
  Estimated the impact of possible regulatory changes on the profitability of a large pharmaceutical company for use in its long-range planning.

- **Confidential White Paper** (April 2006 - April 2007)
  Estimated the extent to which underpayment of Medicaid claims affects the cost of commercial insurance in California and the subsequent number of people who are therefore unable to afford coverage.

- **Thu-Hang Tran, Pharm.D., et al. vs. Orange County Health Authority, et al.** (2006)
  **Guy Nguyen, R.Ph., et al. vs. Orange County Health Authority, et al.** (2006)
  Consulted on alleged damages resulting from the temporary suspension of plaintiff pharmacies from Cal-Optima's Medi-Cal drug reimbursement program.

- **John Muir Medical Center v. Health Net, Inc.** (July 2005 - May 2006)
  Evaluated whether inflation in hospital charges exceeded the amount allowed in a provider services contract.

- **U.S. Department of Justice v. Tenet Healthcare Corporation** (July 2003 - January 2005)
  Assisted the Department of Justice in investigating billing irregularities by select Tenet hospitals. Implemented sampling plan developed by sampling expert to determine the rate of billing errors from a random sample of hospital detailed bills.  Managed audit of selected detailed bills.  Tenet settled with the Department of Justice for more than $900 million.

- **In Re: Managed Care Litigation** (August 2003 - January 2005)
  Supported health insurance company in litigation involving allegations of improper claim adjudication and late payment.  Analyzed over 500 million records for more than 100 million unique claims.

- **Drug Cost Effectiveness Paper** (2001)
  Drafted paper on the cost effectiveness of rHu-EPO in the treatment of anemia.

- **Drug Study of rHu-EPO** (2001)
  Analyzed results of drug study to assess the effectiveness of rHu-EPO to alleviate anemia.

## Insurance

- **Willingham v. Life Partners, Inc.** (July 2012 to February 2014)
  Authored rebuttal report analyzing plaintiff's proposed class wide damage model submitted in support of certification.

- **Redwood Health Services, v. Anthem Blue Cross Life and Health Insurance Company** (November 2012 - February 2013)
  Critiqued plaintiff's lost profit damage model resulting from Anthem's allegedly improper termination of a high deductible insurance product and its prohibition of wrapping in the mid-sized group market.

- **Best Buy Co., Inc. v. Developers Diversified Realty** (November 2006 - July 2010)
  Supported testifying expert in analysis of insurance costs applicable to common areas of retail developments.

- **Confidential Insurance Remediation** (March 2005 - January 2010)
  Consulted with international insurance company related to remediation of alleged failure to annuitize variable annuity products according to the contract.

- **Barnes & Noble v. DDR** (May 2005 - April 2006)
  Supported testifying expert in analysis of insurance costs applicable to common areas of retail developments.

- **Confidential Asbestos Litigation** (September 2001 - June 2003)
  Consulted with a large property insurance company to assist them in determining their potential asbestos exposure to support arbitration negotiations with asbestos manufacturers. Designed and implemented detailed review of over 500 individual asbestos case files.

- **Confidential Regulatory Investigation** (August 2001 - May 2003)
  Worked with insurance company and outside actuaries to quantify the number of affected policies and financial implications of alleged violation of IRS rules related to whole life insurance products. Aggregated data for both active and legacy systems containing over 80 million records.

- **Class Action v. Knights of Columbus** (2001 - June 2004)
  Assisted economic expert for the Knights of Columbus in a major sales practices litigation involving over 500,000 policyholders. Estimated the damage to policyholders under alternative theories of liability, including development of computer-based policy performance models.

- **Confidential Disability Insurance Sales Practices Litigation** (September 2000 - December 2002)
  Supported consulting expert for issues related to the sale and product performance of individual disability insurance policies. Designed and implemented large data abstracting effort involving almost 1.5 million claim and policy records and 17 million accounting records for the insurance company defendant and assisted in the development of a settlement for tens of thousands of policyholders.

## Valuation

- **Marshall Hospital v. Eliot R. Drell, M.D. et al.** (July 2006 - December 2006)
  Valued a single specialty, gastroenterology ambulatory surgery center for an arbitration between the general and limited partners.

- **Peter Vagenas vs. Demeterios Kefallinos et al.** (September 2006 - December 2006)
  Valued two-location hamburger restaurant for a lawsuit between business partners.

**Securities/Finance**

- **City of Burlington, VT v. Morgan Stanley** (February 2011 - March 2011)
  Supported expert who evaluated whether Morgan Stanley execution costs were excessive and rebutted plaintiffs' damage claim.

- **Robin E. Figas v. Wells Fargo & Company et al.** (August 2010 - March 2011)
  Supported expert who evaluated allegations that the fees for certain investment options available in the Wells Fargo 401(k) Plan were excessive and rebutted plaintiffs' damage claim.

- **David v. Alphin** (January 2010 - August 2010)
  Supported expert who evaluated allegations that the fees for certain investment options available in the Bank of America 401(k) Plan were excessive and rebutted plaintiffs' damage claim.

- **Compudyne Corp., et al. vs. Hilary L. Shane et al.** (May 2006 - November 2006)
  Investigated defendant's profit from short selling in advance of a PIPE placement.

- **Securities & Exchange Commission v. Henry Yuen et al.** (November 2004 - December 2005)
  Provided consulting support on liability issues related to revenue recognition and market acceptance of a new interactive programming guide offered by Gemstar-T.V. Guide International.

- **Internet Law Library v. Southbridge Capital, LLC** (2003)
  Investigated claims of alleged stock price manipulation by a hedge fund.

**Government / Public Policy**

- **City of Los Angeles** (January 2006 - July 2006)
  Analyzed factors influencing post-stop sanctions by the Los Angeles Police Department to determine if observed officer behavior was consistent with racial profiling.

- **California State Auditor** (October 2003 - February 2004)
  Consulted with the California State Auditor's office to support their review of a decision by CalPERS to limit the hospital network available to health plan enrollees.

- **Review of California Proposition 79** (September 2005)
  Analyzed the impact of Proposition 79 on the California economy and coauthored final report.

- **Economic Impact of Federal Participation in Terrorism Risk** (May 2004 - September 2004)
  Contributed to study with Professor Glenn Hubbard, former Chair of the Council of Economic Advisers.  Study focused on the economic impact of the Federal TRIA terrorism legislation and the economic impact of failing to renew the legislation.  Study commissioned by numerous insurance trade organizations.

**Utilities**

- **Federal Energy Regulatory Commission Assistance** (October 2003)
  Simulated the California electricity generation market to identify generator profits under different assumptions.

## PUBLICATIONS AND PRESENTATIONS

"Expert Analysis of Class Certification Issues" (with Chris Chorba, Lee Heavner, and Peter Simon), in *Litigation Services Handbook: The Role of the Financial Expert, 6th Edition*, Roman L. Weil (Ed.), Wiley New York.

"Use of Statistical Sampling in Litigation" (with Peter Simon), in *Litigation Services Handbook: The Role of the Financial Expert, 6th Edition*, Roman L. Weil (Ed.), Wiley New York.

American Health Lawyers Association Class Actions in the Health Care Spare, Part IV: Use of Experts and ADR in Class Actions Webinar, February 5, 2016.

"Economic Analysis of Reductions-in-Force and Pay Equity" (with Flavia Bainbridge and Debo Sarkar), in *Litigation Services Handbook: The Role of the Financial Expert, 2011 Cumulative Supplement, 4th Edition*, Roman L. Weil (Ed.), Wiley New York, 2011.

"Use of Statistical Sampling in Litigation" (with Peter Simon), in *Litigation Services Handbook: The Role of the Financial Expert, 2011 Cumulative Supplement, 4th Edition*, Roman L. Weil (Ed.), Wiley New York, 2011.

"Combating STAT Abuse," *Law360*, March 23, 2010.

"Use of Statistical Sampling in Litigation" (with Peter Simon), in *Litigation Services Handbook: The Role of the Financial Expert, 2009 Cumulative Supplement, 4th Edition*, Roman L. Weil (Ed.), Wiley New York, 2009.

"Challenges in RIF Analyses," (with Debo Sarkar), *Law360*, March 29, 2009.

"How to Analyze Terabytes of Data with a Word," presented at the *Western Users of SAS Software Conference*, September 2006.

"Dynamic Code Creation Using Call Symput and the SAS Macro Language," presented at the *Western Users of SAS Software Conference*, September 2006.

"Pedestrian and Motor Vehicle Post-Stop Data Analysis Report," (with Geoffrey Alpert, Elizabeth Becker, Alan Meister, Michael Smith, and Bruce Strombom) presented to the City of Los Angeles, July 2006.

"A Hybrid Approach to Valuing American Barrier and Parisian Options," (with Gaurav Jetley) presented at the *Conference on Computational Finance & Its Applications*, April 2004.

"Cost Effectiveness of rHuEPO in Oncology," (with Pierre-Yves Cremieux, Ellison Dial, Brenda Sarokhan, and Mitch Slavin), in *Recombinant Human Erythropoietin (rhEPO) in Clinical Oncology: Scientific and Clinical Aspects of Anemia in Cancer*, M.R. Nowrousian (Ed.), SpringerWien New York, 2002.

Contributed to "California Public Employees' Retirement System: It Relies Heavily on Blue Shield of California's Exclusive Provider Network Analysis, an Analysis That is Reasonable in Approach but Includes Some Questionable Elements and Possibly Overstates Estimated Savings," California State Auditor, March 2005.

## PROFESSIONAL MEMBERSHIPS

American Economic Association

American Bar Association

American Society of Health Economists

International Health Economics Association

Society of Labor Economists

American Risk and Insurance Association

American Health Lawyers Association

*Confidential*

**Appendix B**
**Documents Relied Upon**

**Legal Documents**

- Complaint, ADT LLC, and ADT US Holdings, Inc., v. Vivint Inc., District Court, Southern District of Florida, April 4, 2017

**Depositions**

- Deposition of William Urban, July 20, 2017 (Rough)

**Expert Reports**

- Expert Report of David Stewart, Ph.D., June 26, 2017
- Expert Report of John Goodman, June 26, 2017
- Expert Report of Joseph P. Dandurand, June 26, 2017
- Expert Report of Russell W. Mangum III, Ph.D., June 26, 2017
- Expert Report of William T. Urban, June 23, 2017

**Bates Stamped Documents**

| | |
|---|---|
| • "Robert B▮▮ Invoice Summary Report," June 7, 2014 | ADT_VIVINT_00005143 |
| • "Donna D▮▮ Invoice Summary Report," June 8, 2017 | ADT_VIVINT_00005180 |
| • "Lilla Y▮ Invoice Summary Report," June 7, 2017 | ADT_VIVINT_00005345 |
| • "Sherry C▮▮ Accounts Receivable Collections Report," May 5, 2015 | ADT_VIVINT_00007612 |
| • Call between Valerie S▮▮ and ADT | ADT_VIVINT_00003850 |
| • Complaint, ADT LLC, and ADT US Holdings, Inc., v. Vivint Inc., District Court, Southern District of Florida, April 4, 2017, with Exhibits and Summons | MANGUM_VIVINT_000001-184 |
| • ADT, "Dealer Program Guidelines," September 2013 | MANGUM_VIVINT_000185-378 |
| • ADT, "Authorized Dealer Agreement by and between ADT LLC and (Dealer), Dated as of _____," Revised September 2006 | MANGUM_VIVINT_000379-425 |
| • ADT, "Trademark License Agreement by and between ADT US Holdings, Inc. and ADT LLC," Effective October 1, 2012 | MANGUM_VIVINT_000426-435 |
| • Vivint and APX Group, Inc., Offer to Exchange, April 3, 2017 | MANGUM_VIVINT_000436-710 |
| • APX Group Holdings, Inc., and APX Group, Inc., Form S-4, March 27, 2017 | MANGUM_VIVINT_000711-1017 |
| • "MANGUM_VIVINT_001018 Vivint DSP Report 04 03 2013 - 05 30 2017.xlsx" | MANGUM_VIVINT_001018 |
| • "MANGUM_VIVINT_001019 Vivint DSP Report 04 03 2013 - 06 21 2017.xlsx" | MANGUM_VIVINT_001019 |
| • ADT, "Authorized Dealer Agreement by and between ADT Security Services, Inc., and RS&I Security, Inc.," Effective May 24, 2000 | MANGUM_VIVINT_001020-053 |
| • RS&I Dealer Agreement by and between RS&I Security, Inc. and Apex Alarm LLC, December 14, 2000 | MANGUM_VIVINT_001054-088 |
| • Parr, Russell L., "Royalty Rates for Licensing Intellectual Property," p. 1 | MANGUM_VIVINT_001089-090 |
| • ADT, "Revenue Sharing Equivalent (No Upfront Payment)" | MANGUM_VIVINT_001091 |
| • Goolsbee, Levitt and Syverson, "Microeconomics," pp. 536-537 | MANGUM_VIVINT_001092-094 |
| • The ADT Corporation, Form 10-K for the Fiscal Year Ended September 27, 2013 | MANGUM_VIVINT_001095-199 |
| • The ADT Corporation, Form 10-K for the Fiscal Year Ended September 26, 2014 | MANGUM_VIVINT_001200-297 |
| • The ADT Corporation, Form 10-K for the Fiscal Year Ended September 25, 2015 | MANGUM_VIVINT_001298-401 |
| • Complaint, ADT LLC, and ADT US Holdings, Inc., v. Vivint Inc., District Court, Southern District of Florida, April 4, 2017, with Exhibits and Summons | URBAN_VIVINT_000001-184 |
| • "URBAN_VIVINT_000185-189 - Vivint Cancelled Reinstalled List Updated 6 8 ….pdf" | URBAN_VIVINT_000185-189 |
| • Urban Report, "ADT Corp Valuation: Reasonableness Test of RMR Multiple" | URBAN_VIVINT_000190 |
| • Urban Report, "ADT Customers Cancelled and Not Reinstall - Vivint Case" | URBAN_VIVINT_000191-195 |

ANALYSIS GROUP, INC.

*Confidential*

**Appendix B**
**Documents Relied Upon**

| | |
|---|---|
| • "URBAN_VIVINT_000196 - Vivint- Re-install cost Estimate 6-22.pdf" | URBAN_VIVINT_000196 |
| • Scally, Tim, "ADT to be Acquired by Apollo, Combined With Protection 1," February 16, 2016 | URBAN_VIVINT_000197-203 |
| • Stepanek, Laura, "Barnes Discusses Alarm Company Valuations at Conference," SDM Magazine, March 10, 2016; and Barnes Associates, "Security Alarm Industry Overview," February 2016 | URBAN_VIVINT_000204-220 |
| • Barnes Associates, "Security Alarm Industry Overview," February 2016 | URBAN_VIVINT_000221-274 |
| • The ADT Corporation, Form 10-Q for the Quarterly Period Ended March 31, 2016 | URBAN_VIVINT_000275-310 |
| • Email between William Urban and Jason Smith, "Subject: Confidential - Observations about Market Values of Alarm Accounts," November 9, 2016 | URBAN_VIVINT_000311-313 |

**Previous Urban Report Materials**

| | |
|---|---|
| • ADT's Second Revised Initial Disclosures, ADT LLC, et al., v. Alarm Protection LLC, et al., August 4, 2016, and Associated Exhibits | ADT_U_000001-000315 |
| • Expert Report of William T. Urban, ADT LLC v. Alarm Protection LLC, et al., December 9, 2016 and Exhibits | ADT_U_000001-000238; ADT00005375-5401 |
| • Expert Report of William T. Urban, ADT LLC v. Capital Connect, Inc. et al., December 9, 2016, and Associated Exhibits | ADTL.234918_GEN_00000017-215 |
| • Deposition of William T. Urban, ADT LLC and ADT US Holdings, Inc., v. Alarm Protection LLC, et al., December 14, 2016 | |
| • Expert Report of William T. Urban, ADT LLC v. Security Networks, November 9, 2016 | |

**Vivint Customer Files**

- APX Alarm Security Solutions, "Alarm System Purchase and Services Agreement" with Charles and Sherry C███, July 24, 2007 (psa_378ad62a-5e15-458e-bfcf-c7484014eb4d_tiff-r.tif)
- "Sherry C███_599240 Customer Loyalty (Slams) 5-29-2015.mp3"

**Public Filings**

- The ADT Corporation, Form 8-K Exhibit 99, February 16, 2016
- The ADT Corporation, Form 8-K, Exhibit 99.2, April 1, 2016
- The ADT Corporation, Form 10-K for the Fiscal Year Ended September 25, 2015
- The ADT Corporation, Schedule 14A, March 7, 2016
- APX Group Holdings, Inc., Form 10-K for the Fiscal Year Ended December 31, 2016

**Publicly Available Documents**

- The ADT Corporation, "Investor Day Presentation," December 6, 2013
- The ADT Corporation, "Investor Day Presentation," May 14, 2015
- The ADT Corporation, "Learn about ADT's Authorized Dealer Program," July 10, 2017, available at https://www.youtube.com/watch?v=_ZEufBEtqOM, accessed July 20, 2017
- California Security Pro, "Why ADT?" available at http://www.californiasecuritypro.com/why-adt/home-security-companies, accessed July 20, 2017
- California Security Pro Website,  available at http://www.californiasecuritypro.com, accessed July 20, 2017
- Safe Home Control, available at http://www.besafehomesecurity.com, accessed July 21, 2017
- Stepanek, Laura, "Barnes Discusses Alarm Company Valuations at Conference," SDM Magazine, March 10, 2016, available at http://www.sdmmag.com/articles/92122-barnes-discusses-alarm-company-valuations-at-co, accessed July 17, 2017
- Vivint Sales Training Manual, 2016
- Yellow Pages Search for "adt dealer" in Los Angeles, CA, available at https://www.yellowpages.com/los-angeles-ca/adt-dealer, accessed July 20, 2017

ANALYSIS GROUP, INC.

*Confidential*



**Exhibit 1a**
**RMR Multiple for Deals Under $50,000**

**Source:** Barnes Associates, "Security Alarm Industry Overview," February 2016 (URBAN_VIVINT_0000221-274 at 264).

ANALYSIS GROUP, INC.

*Confidential*

**Exhibit 1b**
**RMR Multiple for Deals $50,000 to $100,000**



**Source:** Barnes Associates, "Security Alarm Industry Overview," February 2016 (URBAN_VIVINT_0000221-274 at 265).

ANALYSIS GROUP, INC.