# EXHIBIT G

# Tyco International

## Section 482 Analysis

Transfer of ADT North American Marks to ADT US

August 24, 2012



ATTORNEYS' EYES ONLY

**CETERIS**

## Table of Contents

1. Executive Summary ...................................................................................1
   1.1   Introduction ....................................................................................1
   1.2   Summary of Analysis .....................................................................2
   1.3   Results and Recommendations .....................................................4
   1.4   Scope and Use ...............................................................................5
2. Company Overview and Business Description ......................................6
   2.1   Tyco International Ltd. ....................................................................6
         2.1.1   Corporate History .............................................................6
   2.2   ADT History and Structure .............................................................7
         2.2.1   History ...............................................................................7
         2.2.2   ADT Security Services, Inc. ..............................................7
         2.2.3   ADT Services GmbH ..........................................................8
         2.2.4   The ADT Corporation ........................................................8
3. Functional Analysis ................................................................................9
   3.1   Introduction ....................................................................................9
   3.2   North American Residential Security Business ..............................9
         3.2.1   Products and Services .......................................................9
         3.2.2   Customers .......................................................................10
         3.2.3   Competition .....................................................................10
   3.3   ADT NA Marks ..............................................................................11
         3.3.1   Ownership of ADT Brand Name, Trademarks and Service Marks .11
   3.4   Functions ......................................................................................12
         3.4.1   Brand Development and Maintenance ............................12
         3.4.2   Brand Protection .............................................................13
         3.4.3   Marketing ........................................................................14
   3.5   Intercompany Transaction ...........................................................14
4. Economic Analysis ................................................................................16
   4.1   Introduction ..................................................................................16
   4.2   Selection of Best Method .............................................................16
         4.2.1   Methods for Transfers of Intangible Property ................16
         4.2.2   Valuation Methods ..........................................................17
         4.2.3   Selection of the Best Method .........................................18

ATTORNEYS' EYES ONLY

**4.3   Application of the Income Method Using a Relief from Royalty Approach** ....................................................................**19**

**4.3.1   Step 1: Development of Financial Forecasts** ...................................**20**

**4.3.2   Step 2: Identification of Comparable Royalty Rates** .......................**22**

**4.3.3   Step 3: Selection of a Discount Rate** ..................................**30**

**4.3.4   Step 4: Calculation of Intangible Value** ..............................**31**

**5.   Conclusion and Recommendations** ......................................................**33**

## List of Appendices

**Appendix 1:   Summary of US Transfer Pricing Regulations** ....................................**36**

**Appendix 2:   List of Relevant Trademarks and Service Marks**................................**43**

**Appendix 3:   Search for Comparable External Agreements**....................................**50**

**Appendix 4:   Summary of Accepted Agreements** ....................................................**53**

**Appendix 5:   Determination of the WACC Prepared by Duff & Phelps** ..................**54**

**Appendix 6:   Summary of Trademark Ownership Agreement between ADT GmbH and ADT US**..........................................................................**59**

# 1. Executive Summary

## 1.1 Introduction

Duff & Phelps, LLC ("Duff & Phelps") engaged Ceteris US, LLC ("Ceteris") to perform a transfer pricing analysis for Tyco International Management Company ("the Company"). Specifically, Ceteris was engaged to determine an appropriate arm's length payment for the exclusive North American rights to the ADT brand name, trademarks and service marks. This report was prepared in accordance with Section 482 of the United States ("US") Internal Revenue Code and its associated Regulations[1] ("Section 482 Regulations") as summarized in **Appendix 1**.

ADT is the key brand within the Company's North American residential security business. (Throughout this report, "North America" refers to the US, Canada and Puerto Rico.) ADT's security solutions include intrusion detection, fire and carbon monoxide detection, critical condition monitoring such as temperature and flood, and health and elder care monitoring. ADT Services GmbH[2] ("ADT GmbH"), a Swiss company, currently owns, develops and maintains the ADT brand name as well as a number of related trademarks and service marks used globally. ADT Security Services, Inc. ("ADT SS"), a US company, and ADT Security Services Canada, Inc. ("ADT Canada"), a Canadian company, currently license the rights to use the ADT brand name, primary and secondary trademarks and service marks in their respective markets, while ADT Security Services Puerto Rico, Inc. ("ADT PR") licenses the rights to use the ADT brand name, primary trademarks and service marks in Puerto Rico.[3]

In September 2011, Tyco International announced its intent to separate the company into three publicly-traded companies. The separation will create a company focused on the flow control businesses, a company composed of the North American residential and small business security activities ("The ADT Corporation"), and a company with the remaining fire and security businesses globally. Tyco International is expected to spin-off The ADT Corporation and the flow

---

[1]   References in this report to the "Regulations," "Section 482," "Treas. Reg.," or "Treas. Reg. §1.482" refer to US Treasury Regulation Section 1.482, as in effect during the period covered by this analysis.

[2]   ADT Services GmbH was previously ADT Services AG; both names may be used interchangeably throughout the report.

[3]   ADT SS and ADT Canada currently pay a royalty of 1.65 percent for the rights to the ADT brand name, *primary and secondary* trademarks, and service marks. ADT PR pays a 1.25 percent royalty for the rights to the ADT brand name, *primary* marks, and service marks.

control business by October 1, 2012. As part of the proposed distribution of Tyco's North American residential security business, the US residential business will be transferred from ADT SS to a newly-formed entity, ADT US Holdings, Inc. ("ADT US"), and the exclusive North American rights to the ADT brand name, trademarks and service marks will be sold to ADT US.[4,5,6] (Throughout this report, the exclusive North American rights to the ADT brand name, trademarks and service marks are referred to as the "ADT NA Marks".) The transfer of the ADT NA Marks to ADT US is scheduled to take place on August 31, 2012. The purpose of this transfer pricing analysis is to determine an arm's length payment for the ADT NA Marks.

## 1.2   Summary of Analysis

An unspecified method, applying an income approach method to valuation and specifically a relief from royalty analysis, was selected as the best method.[7] The relief from royalty approach assumes that ADT GmbH will transfer the ADT NA Marks to ADT US and, consequently, ADT GmbH will not need to license these rights for use in the North American market. Accordingly, ADT US will not have to make royalty payments to ADT GmbH, but will become responsible for all of the costs ADT GmbH currently bears related to protecting, enhancing and maintaining the ADT brand in North America. The resulting income savings that accrues to ADT US is then estimated over the useful life of the ADT NA Marks and discounted to present value to determine an arm's length payment for the ADT NA Marks.

To apply the income method to determine an arm's length payment for the ADT NA Marks, Ceteris undertook a four-step process consisting of:

- • Development of Financial Forecasts;

---

[4]   Prior to the sale of the IP to ADT US, ADT Services GmbH will distribute the IP to Tyco International Services Holding GmbH and then further to Tyco International Holding S.a.r.l. Tyco International Holding S.a.r.l will then sell the ADT NA Marks to ADT US. For the purposes of this report, ADT GmbH refers to both ADT Services AG and Tyco International Holding S.a.r.l (when selling the ADT NA Marks to ADT US).

[5]   It is anticipated that ADT Canada and ADT PR will subsequently enter into agreements with ADT US to license the rights to exploit the ADT NA Marks in their respective markets.  ADT US is also a wholly-owned subsidiary of ADT US Holdings, Inc. (post separation).

[6]   Prior to or contemporaneous with the transfer of the ADT NA Marks, ADT GmbH and ADT US will enter into a Trademark Ownership Agreement as summarized in Appendix 6.

[7]   The Comparable Uncontrolled Transaction Method, described later in this report, was used to determine the royalty amount in the relief from royalty analysis.

- Identification of Comparable Royalty Rates;
- Selection of a Discount Rate; and
- Calculation of Intangible Value.

In the first step, financial forecasts were constructed from data provided by Tyco and its advisors. It included two primary components: (1) revenue projections for the North American residential security business; and (2) costs associated with maintaining the ADT NA Marks.[8] The next step included identifying arm's length royalty rates comparable to a rate ADT GmbH would be expected to charge if it licensed the brand name, trademarks and service marks to ADT US at arm's length (i.e., the "royalty scenario"). To identify potentially comparable arm's length royalty rates, Ceteris performed a search for comparable internal and external transactions. A total of three comparable transactions (two internal and one external) were identified. The applicable royalty rates specified in each comparable transaction were then used to construct a range of arm's length royalty rates. The range of comparable royalty rates extends from 1.25 percent to 2.50 percent.

Next, Ceteris selected an appropriate discount rate to be applied to the range of projected "net royalty payments" (defined as expected royalty payments for the continued license of the ADT NA Marks less costs incurred in maintaining the underlying intangible property) to establish an arm's-length range of values for the ADT NA Marks based on the estimated income ADT GmbH will forego by selling the ADT NA Marks to ADT US. Ceteris used ADT's estimated weighted average cost of capital ("WACC") of 8.9 percent as the discount rate, as determined by Duff & Phelps.

The present value of the net royalty payments established using this methodology represents both the value of expected net cash flows that will be lost by virtue of the transfer of the ADT NA Marks to ADT US, as well as the value of the savings that ADT US will realize by not having to make future royalty payments. Conceptually, if the price of the ADT NA Marks was established at a point outside the range of present values established using this methodology, at least one of the parties would be unwilling to participate in the transaction. Therefore, this range of present values represents the arm's length range of prices for the ADT NA Marks to ADT US under the Section 482 Regulations.

---

[8]   The revenue projections were provided to Ceteris by Duff & Phelps who developed the projections in conjunction with Tyco management. The cost data were provided by Tyco.

### 1.3   Results and Recommendations

Through the application of an unspecified method using an income approach method to valuation, and specifically a relief from royalty analysis, the arm's length range of royalties ADT GmbH would be expected to earn (and ADT US would be expected to pay) under the royalty scenario is 1.25 percent to 2.5 percent.[9]

Under the Section 482 Regulations, any royalty rate within this range would be considered arm's-length; however, Tyco management has requested guidance from Ceteris on the price ADT US should pay for the ADT NA Marks. Since none of the comparable agreements represents an "exact" comparable (and it was not possible to narrow the range through the use of an interquartile range), it would be prudent for Tyco to refer to a mid-point within the range when setting an arm's-length price. More specifically, although each of the agreements provides a meaningful data point with which to calculate an arm's-length range of royalty rates, none of the agreements represent an exact match to the royalty scenario.

For instance, all three of the agreements relate to geographic regions with different profit potential than the North American market. Specifically, the first two agreements license marks for use in Puerto Rico and the British Virgin islands which are much smaller and less developed regions than the North American territory. The third agreement involves the license of marks for use throughout the world and, as such, covers the territories specified in the royalty scenario but has a broader reach.

In addition, the scope of the intangible property being licensed in the comparable agreements is different than the scope of intangible property being licensed in the royalty scenario. While the first two agreements license a subset of the NA ADT Marks conveyed under the royalty scenario, they do not include the license of the secondary marks. The third agreement licenses marks that are similar but not identical to the marks being licensed under the royalty scenario.

Given the differences between the controlled and uncontrolled transactions, it would be reasonable to look to the mean of the range, which provides equal weighting to all three comparable

---

[9]   This range was established using data points from three comparable transactions with specified royalty rates of 1.25 percent, 1.25 percent, and 2.50 percent. Additional detail on the comparable transactions are provided in Section 4.3.2 of this report.

observations. Further, under ADT's transfer pricing policy, the ADT North American operating entities (i.e., the US and Canada) have licensed the rights to use the ADT primary and secondary trademarks, trade names, and service marks in their respective markets for a royalty of 1.65 percent of net sales (net sales includes product and service revenue). Given that this royalty rate is virtually identical to the mean of 1.67 percent established by the three comparable transactions (i.e., the average of 1.25 percent, 1.25 percent and 2.50 percent), it would be reasonable to set a price for the ADT NA Marks that is equal to the present value of the future payments ADT US would make at the 1.65 percent royalty rate (less additional costs incurred) which is consistent with its historic policy. This payment would be equal to **$987.349 million**.

## 1.4   Scope and Use

Ceteris' understanding of the facts for this analysis is based upon discussions with Tyco personnel as well as Duff & Phelps regarding the Company's operations. In addition, this analysis is based on information received from Tyco and Duff & Phelps, which was sourced from Tyco's records. Ceteris relied upon the information supplied, and assumed it to be accurate and complete. Any changes to the information that Tyco or Duff & Phelps supplied to Ceteris could result in changes to Ceteris' analysis and conclusions. This analysis has been prepared for transfer pricing purposes, and should not be used for any other purpose without the express written consent of Ceteris.

## 2.  Company Overview and Business Description

### 2.1  Tyco International Ltd.[10]

Tyco International Ltd. ("Tyco") is a leading provider of a diverse range of products and services used in security, fire protection and detection, and other industrial applications. Tyco maintains its global headquarters in Switzerland, and with approximately 102,000 employees worldwide, services customers in more than 60 countries. As of the fiscal year ended September 30, 2011 ("FY2011"), Tyco reported net revenue of approximately $17.4 billion, of which approximately 48 percent was generated in the US, 23 percent in Europe, the Middle East and Africa ("EMEA"), 19 percent in Asia Pacific, and 10 percent in Other Americas. During FY2011, Tyco operated in three primary segments, each of which is discussed in further detail below: (1) Tyco Security Solutions; (2) Tyco Fire Protection; and (3) Tyco Flow Control. The transaction under review pertains to the Tyco Security Solutions segment.

The Tyco Security Solutions ("TSS") segment designs, manufactures, sells, installs, services and monitors electronic security systems used in residential, commercial, and governmental markets. This segment also includes other security products, such as intrusion, access control and video management systems. Key brands within the TSS segment include ADT, Sensormatic, Software House, American Dynamics, DSC, and Bentel. During FY2011, TSS generated approximately $8.6 billion in net revenue, or 49 percent of Tyco's total revenue. Through TSS, Tyco operates as one of the world's largest providers of electronic security systems and services and enjoys a significant market presence in North and South America, Europe and the Asia-Pacific region. Approximately 62 percent of TSS' FY2011 net revenue was generated within North America, 21 percent was generated within EMEA, and the remaining 17 percent throughout the rest of the world.

### 2.1.1  Corporate History

Tyco traces its history to 1960 when Arthur J. Rosenburg, Ph.D. opened a research laboratory to conduct experimental work for the US government. Tyco Laboratories was incorporated in 1962, and the business began to focus on technologically advanced materials science and energy conversion products for the commercial sector. In 1964, Tyco Laboratories became publicly traded,

---

[10]    Tyco International Ltd., Form 10-K, September 30, 2011.

and in 1965, started acquiring other companies, a practice that has largely defined the company's strategy of diversified growth.

In July 1997, ADT Ltd., a Bermuda company, acquired Tyco International Ltd., a US company. The resultant company assumed the name Tyco International Ltd. and operated as a Bermuda-based organization until March 17, 2009, at which time Tyco became a Swiss corporation.

On September 19, 2011, Tyco announced a plan to form three separate, publicly-traded companies consisting of (1) the North American residential security business, (2) the flow control business segment, and (3) the commercial fire and security business. It was subsequently announced on March 28, 2012, that immediately following this separation, Tyco's flow control business segment will merge with Pentair, Inc., a global diversified industrial company and leading provider of water and fluid processing products.

## 2.2   ADT History and Structure

### 2.2.1   History[11]

ADT began as the American District Telegraph Company, created in 1874 through the merger of 57 regional telegraph delivery companies, and soon expanded into the monitoring business through the operation of Call Boxes. Call Boxes allowed business watchmen to send a specific signal to the ADT office, at designated times, to let the monitoring office know that all was well. If a district office did not receive a scheduled signal, trouble was assumed, and help was dispatched.

The ADT name became synonymous with emergency call systems, and the former signal operations have evolved to become the present-day ADT.

### 2.2.2   ADT Security Services, Inc.

Currently, ADT SS is the primary operating company within the US and is the largest single provider of electronic security services, with more than six million residential customers throughout North America. ADT SS maintains five Customer Monitoring Centers ("CMCs") strategically located throughout the US. The CMCs are linked to create one virtual nationwide monitoring platform. If one CMC receives excessive alarm signal traffic, for example, all

---

[11]   www.adt.com

subsequent alarm signals are automatically rerouted to another CMC to prevent any interruption of service. The CMCs interact with approximately 38,000 law enforcement, medical, and fire agencies across the US.[12]

### 2.2.3   ADT Services GmbH

ADT GmbH, a Swiss company, currently owns, develops and maintains the ADT brand name as well as a number of related trademarks and service marks used globally. As described, ADT SS and ADT Canada currently license the right to use the ADT brand name and related primary and secondary trademarks and service marks from ADT GmbH for use in the promotion, distribution, and/or sale of products and services in the US and Canada, respectively. ADT PR licenses the Puerto Rican rights to the ADT brand name and related primary trademarks and service marks from ADT GmbH.

### 2.2.4   The ADT Corporation

As part of the restructuring, Tyco intends to form The ADT Corporation, a separate publicly-traded company, which will encompass the ADT North American residential security business. It is anticipated that ADT US will be the primary operating entity within The ADT Corporation, with ADT Canada and ADT PR continuing to operate in their local markets.

---

[12]   ADT Security Services, Inc. Fast Facts.
http://www.adt.com/wps/wcm/connect/16d51e00473d77d5ada4fdac70f5db81/ADTFastFacts.pdf?MOD
=AJPERES Accessed on April 13, 2012.

## 3.  Functional Analysis

### 3.1   Introduction

A description of the business operations and the relevant intangible property provides the necessary first step in evaluating the intercompany transaction under review. It also provides the basis for determining how to analyze the transaction. As such, the following sections provide a detailed description of the functions of ADT's North American businesses and the intangible property as they relate to the intercompany transaction analyzed in this report.

### 3.2   North American Residential Security Business

The ADT residential business designs, sells, installs, services and monitors electronic security systems for residential customers in North America. This business primarily operates under the ADT brand name. Through this business, Tyco has been the leading provider of electronic security systems and services in North America. In 2010, Tyco strengthened its market position by acquiring Broadview Security, a provider of security alarm monitoring services for residential and small commercial properties in North America.

Revenues from ADT's residential business can be classified into the following major categories: product sales and service revenue. Product sales include sales and installation of electronic security systems, as well as products related to anti-theft systems and other safety solutions. Service revenue, which is primarily recurring in nature, is generated from contractual monitoring and maintenance agreements that are often long-term in nature.

### 3.2.1   Products and Services

ADT's residential business supplies and installs electronic security systems for use in residential markets in North America. In addition, it provides electronic security services, including monitoring of burglar alarms, fire alarms and other life safety conditions, as well as maintenance services of installed systems.

ADT's security systems are designed to detect intrusion, control access, and respond to movement, fire, smoke, flooding, environmental conditions, and other hazards. Customers who install an intrusion system typically enter into a contract for ongoing security system monitoring and maintenance at the time of initial equipment installation. Systems installed at a customer site may

be owned by Tyco or by the customer. In either case, detection devices within the electronic security system are typically connected to a monitoring center, which receives and records alarm signals. Security monitoring specialists verify alarm conditions and initiate a range of response scenarios, as appropriate. For example, monitoring center personnel may respond to alarms by relaying relevant information to local fire or police departments or by notifying the customer directly. Control panels typically identify the nature of the alarm and the areas where a sensor was triggered.

ADT's North American residential business recently launched Pulse Interactive Solutions ("Pulse") for residential customers. Pulse offers home automation features in addition to interactive remote security capability. For example, customers can remotely access information regarding the security of their home, arm and disarm their security system, adjust lighting or thermostat levels, or view real-time video from cameras that may be installed on the premises, all via secure access from web-enabled devices. Pulse also allows customers to create customized schedules for operating lights, thermostats and appliances, and can be programmed to perform certain functions, such as recording video or sending text messages.

### 3.2.2   Customers

The residential market typically includes owners of single-family homes or renters in multi-family apartment complexes. Many residential customers purchase security systems as a requirement of, or incentive provided by, homeowner insurance carriers. For example, lower insurance premiums may be offered if a security system is installed, or in some instances, the insurance carrier may require that a system be installed as a condition of coverage.

A key performance indicator for ADT's residential business is the extent to which existing customers renew their monitoring and maintenance contracts. There are inherent switching costs incurred by residential customers when changing providers. For example, a new system may need to be installed. As such, service contract revenue is critical for maintaining a high margin ongoing revenue stream.

### 3.2.3   Competition

The electronic security services business can be characterized as highly competitive and fragmented, with a number of major firms and thousands of smaller regional and local companies.

Competition is based primarily on price in relation to the quality of service. The ADT residential security business relies on the quality of offered electronic security services, brand strength and reputation, and industry expertise of customers' security needs to maintain its strong market position.

## 3.3   ADT NA Marks

The ADT NA Marks consist of the exclusive North American rights to the ADT brand name, the primary and secondary trademarks and service marks. The ADT brand name and primary trademark is widely known by consumers in the North American market. It consists of a blue octagon with overlapping capitalized "ADT" in white, as depicted below.



The ADT trademark is extensively used and is displayed on the exterior of all components of the security system and on signage at residential premises (e.g., window decals, yard signs, etc.). Such signage advertises the existence of an ADT security system, which in and of itself is believed to deter intruders. Additionally, the trademark appears on service vehicles, employee uniforms, marketing collateral, promotional materials, and signage.

The ADT NA Marks also include key phone numbers and slogans incorporating the ADT name, such as "1-800-ADT-ASAP", "1-800-ADT-GOLD", "ADT Always There", and "ADT Always There Even When You Can't Be", as well as trademarks and service marks related to ADT product lines. Such marks include Pulse, Select, Safewatch, Vitalhealth and Wellhealth, and are often used in conjunction with the ADT name (e.g., "ADT Pulse", "ADT Select", etc.). A list of the relevant ADT trademarks and service marks subject to this analysis is presented in **Appendix 2**.

### 3.3.1   Ownership of ADT Brand Name, Trademarks and Service Marks

Currently, the worldwide rights to the ADT brand name, trademarks and service marks are legally owned by ADT GmbH.[13] As such, ADT GmbH licenses the right to use the ADT brand name,

---

[13]   While this is true for the primary marks, and virtually all of the remaining marks, a few secondary marks used in North America are registered by U.S. companies.

trademarks, and service marks to ADT SS, ADT Canada, and ADT PR for their use in the promotion, distribution, and/or sale of products and services in their respective markets. It is anticipated that the rights to the ADT NA Marks will be sold to ADT US on August 31, 2012. As a result of the transfer, ADT US will own the ADT NA Marks and there will no longer be a licensing arrangement with ADT GmbH for the use of the ADT NA Marks.[14]

## 3.4   Functions

The following subsections present the key functions that relate to the development, maintenance and use of the ADT NA Marks. Within each function, there is a discussion of the activities currently being performed by each relevant legal entity, as well as the functions anticipated to be performed by each legal entity following the transfer of the ADT NA Marks.

### 3.4.1   Brand Development and Maintenance

ADT's recognition and reputation in the marketplace has developed over time through the execution of brand promotion and marketing strategies, as well as through the consistent provision of reliable and high quality services. To maintain and enhance the brand, the ADT Brand Committee, comprised of a multi-disciplinary group of representatives from marketing, finance, legal, and tax functions, is charged with providing overall strategic direction for and maintenance of the ADT brand, trademarks and service marks. The Brand Committee reviews standards and provides guidelines for the use of the ADT brand. Specific guidance and examples are provided with respect to the appropriate use of the ADT logo on products, stationery and service vehicles. The ADT Brand Committee is also responsible for maintaining registrations for the ADT trademarks and service marks, including the brand name and blue octagon symbol. To this end, the ADT Brand Committee directs the strategy for filing of applications for new trademarks, service marks, and logos associated with the ADT brand. The Brand Committee also develops and oversees specific initiatives. For instance, in 2010, the Brand Committee was responsible for providing guidelines and funding the redesign of the ADT website and a review of the protection process of ADT domain names.

Under the current organizational structure, ADT GmbH has assumed primary responsibility for global brand development and maintenance. The ADT Brand Committee currently reports to the

---

[14] Following the transfer, it is anticipated that ADT Canada and ADT PR will enter into separate licensing arrangements with ADT US for the rights to exploit the ADT NA Marks in their respective territories.

ADT GmbH Board of Directors, and global branding initiatives are funded by ADT GmbH. ADT SS, ADT Canada, and ADT PR, however, have been responsible for implementing global initiatives at the local level and have borne the costs associated with these efforts. For example, ADT GmbH funded the global website redesign. This initiative included the development of a global website template and an accompanying Web Guide for use by local entities in structuring each local website, with the objective to maintain consistent content and messaging in support of the global ADT brand. ADT SS then developed the local website per the guidance provided by ADT GmbH.

It is anticipated that with the transfer of the ADT NA Marks to ADT US, ADT US will assume sole responsibility for the development and maintenance of the ADT NA Marks. ADT US will oversee all branding activities, and will fund and implement all related initiatives for the North American market.

### 3.4.2   Brand Protection

Historically, ADT has aggressively protected the ADT brand and has closely monitored potential infringement, pursuing legal action as warranted. Brand protection activities include monitoring and preventing unauthorized use of the ADT name and trademarks, such as counterfeiting and the unauthorized use of "ADT" in domain names or of the blue octagon mark. Appropriate legal actions are pursued when infringement is suspected, ranging from cease and desist letters to litigation. For example, during the fiscal year ended September 30, 2010, two domain names were recovered in the US and action was taken against companies using the primary blue octagon mark in the US market. During FY2011, approximately 135 infringement cases were reviewed, resulting in the issuance of many "Cease and Desist" letters and the initiation of at least one lawsuit and three domain name enforcement proceedings. Management at ADT believes there is an ongoing need for enforcement to protect the ADT brand in North America, as competitors increasingly attempt to use ADT's yard signs and falsely claim affiliation with ADT.

ADT GmbH, as the legal owner of the ADT NA Marks, has assumed primary responsibility for brand protection functions and has funded efforts to monitor, pursue and litigate potential infringement on a global basis. It is anticipated that ADT US will perform this function for the North American market upon transfer of the ADT NA Marks and will bear all associated costs.

### 3.4.3   Marketing

The maintenance of the ADT brand, trademarks and service marks is an integral component of ADT's overall marketing strategy. The ADT brand is heavily relied upon in the sales process for its residential security business since ADT has a strong reputation for delivering high quality and reliable services. ADT's products and services are marketed through advertising, direct mailings, and the Internet. Television and print advertisements promote local product offerings and packages, and direct mail campaigns are used to target residential addresses. Digital web-based marketing is also employed, particularly in the US, to target local residential customers through key word searches. ADT's electronic security systems and services are also marketed to customers through a direct sales force and an authorized dealer network.

Marketing has also historically been performed at the local level, under the direction and guidance of ADT GmbH. That is, ADT SS, ADT Canada, and ADT PR have actively pursued sales opportunities in their markets using the ADT brand name and trademarks licensed from ADT GmbH. In addition, these entities have been responsible for advertising and promotion in their local markets, subject to the parameters and guidelines provided by ADT GmbH. ADT SS, ADT Canada, and ADT PR have historically borne all of the costs associated with these local marketing efforts. Following the transfer of the ADT NA Marks, it is anticipated that ADT US, ADT Canada, and ADT PR will continue to be responsible for their own local marketing activities and will continue to bear the associated costs.

### 3.5   Intercompany Transaction

Under the current organizational structure, ADT GmbH owns the ADT brand name and the ADT trademarks, trade names and service marks that are used globally. The ADT NA Marks are currently licensed to ADT SS, ADT Canada, and ADT PR by ADT GmbH for use in the promotion, distribution, and/or sale of products and services in their local markets. It is anticipated that upon completion of the reorganization, the ADT NA Marks will be used solely by The ADT Corporation and will not be used by any other legacy Tyco businesses or entities in the North American market. Accordingly, the business decision was made to sell the ADT NA Marks to ADT US (i.e., the US operating entity under the new structure) prior to the reorganization. The transfer to ADT US is scheduled to take place on August 31, 2012.

The scope of this transfer pricing analysis is therefore to determine an arm's length payment for the ADT NA Marks as of the transaction date.

## 4. Economic Analysis

### 4.1 Introduction

The following sections present the economic analysis performed to determine the value of the ADT NA Marks. This section begins with the selection of the best method of analysis as discussed within the Section 482 Regulations. A detailed summary of the Section 482 Regulations is provided in **Appendix 1**.

### 4.2 Selection of Best Method

The Section 482 Regulations do not prescribe to a hierarchical approach in selecting a transfer pricing method. Instead, substantial flexibility is provided through the "best method rule," which requires that the method selected provide the most reliable measure of an arm's length result. Moreover, the best method rule states that "…there is no strict priority of methods, and no method will invariably be considered to be more reliable than others."[15] In evaluating the reliability of methods, certain factors must be considered, including the degree of comparability between controlled and uncontrolled transactions, and the quality of the data and assumptions relied upon.

#### 4.2.1 Methods for Transfers of Intangible Property

For intercompany transactions involving the transfer of intangible property, the methods available include:[16]

- The comparable uncontrolled transaction ("CUT") method;
- The comparable profits method ("CPM");
- The profit split method; and
- Unspecified methods.

As previously discussed, the ADT NA Marks are scheduled to be sold to ADT US on August 31, 2012. Therefore, the objective of this analysis is to determine an arm's-length purchase price for these rights.

---

[15] Treas. Reg. §1.482-1(c)(1).

[16] Treas. Reg. §1.482-4(a).

Neither internal nor external CUTs that provide for the *sale* of comparable intangible property under comparable circumstances were identified. Therefore, the CUT method could not be applied. The remaining specified methods under Treas. Reg. §1.482-4 are not sufficient on their own to determine the value of the ADT NA Marks. While the CUT, CPM, and the profit split methods could possibly be applied to determine royalty rates or payments for the *use* of comparable intangible property, these rates would comprise only one of several components required to value the ADT NA Marks. This is because the North American rights to the ADT brand name, trademarks and service marks are being permanently transferred and not simply used by another in exchange for periodic royalty payments. Thus, the determination of value must also take into account expected future earnings discounted at an appropriate rate. Since the specified methods under Treas. Reg. §1.482-4 are inadequate to determine the value of the ADT NA Marks that will be transferred from ADT GmbH to ADT US, unspecified methods must be examined.

### 4.2.2   Valuation Methods

Given that the specified methods under the Section 482 Regulations cannot be applied to reliably determine an arm's length price for the ADT NA Marks, one approach to identifying an unspecified method is to look to broader valuation frameworks focused on determining "fair market value."[17] In this case, since the full value of the ADT NA Marks is being transferred, the concept of fair market value is similar (if not identical) to the concept of an arm's length price. As such, standard valuation approaches used to measure fair market value provide reasonable alternatives for estimating arm's length prices. There are three common valuation approaches used to estimate fair market value. These methods are the market approach, the cost approach, and the income approach.

The market approach is based on the principle of substitution, or the premise that an informed investor would pay no more for an asset than would otherwise be paid for another asset of equal utility. Under the market approach, the fair value of an asset reflects the price at which comparable assets are purchased under similar circumstances. Similar to the CUT method under the Section 482 Regulations for intangible property, application of the market approach thus requires that comparable transactions be available, which may include the recent transfer of the same or a

---

[17]   "Fair market value" generally means the highest price, expressed in dollars, that a property would sell for in an open and unrestricted market between a willing buyer and a willing seller who are knowledgeable, informed, and prudent, and who are acting independently of one another.

similar asset in an arm's length transaction. As previously discussed, neither internal nor external comparable uncontrolled transactions that provide for the permanent transfer of intangible assets comparable to the ADT NA Marks under comparable circumstances were identified. Thus, the market approach could not be applied.

The cost approach to valuation is based on the concept that an informed purchaser could determine the value of an asset by assessing the cost to replace the asset with another asset providing comparable utility. The replacement cost may be calculated as the cost to reproduce the asset or the cost of purchasing a comparable asset, less allowances for economic obsolescence. This approach is most applicable when the intangible asset is relatively new (i.e., when replacement cost can be estimated using capitalized investment cost). A cost approach cannot be reliably applied to value the ADT NA Marks. Due to the longevity of the ADT brand, a reliable estimation of replacement costs would be prohibitively difficult, and an analysis of the total costs incurred in developing the brand in North America would be impractical. In addition, it is unlikely that the costs incurred in developing the ADT NA Marks would provide a reasonable proxy for their value.

The income approach is based on the premise that the value of an intangible asset is the present value of future net economic benefits expected to be generated by the intangible over its remaining useful life. There are several methods available under the income approach to quantify the fair market value of an intangible asset. As discussed below, the income approach utilizing a relief from royalty analysis was selected as the Best Method.

### 4.2.3   Selection of the Best Method

The relief from royalty approach quantifies the fair market value of the intangible asset by first determining the royalty rate ADT US would have paid for the use of the asset if it did not own it. Under this method, the royalty rate is determined by identifying third-party agreements that involve the transfer of comparable intangible assets under circumstances comparable to the royalty scenario. In this instance, it was possible to identify third-party agreements that involve the license of comparable intangible assets to the ADT NA Marks.

While it would be theoretically possible to compute the arm's-length value of the ADT NA Marks by subtracting the present value of underlying routine returns determined using the CPM from the present value of the overall business operating profits, this type of application of the income method would be less reliable than the application of the income method using the CUT method.

More specifically, it would be difficult, if not impossible, to identify reliable benchmark companies that perform the same functions and face the same risks as ADT US, but do not own or license trademarks, trade names, and service marks comparable to the ADT NA Marks. The direct pricing that results from the application of the relief from royalty method provides a more reliable indication of the ADT NA Marks' value. Thus, an income method using a CPM was not selected as the best method.

Finally, the value of the ADT NA Marks could theoretically be determined by applying the residual profit split method. The residual profit split method is typically used when both parties to the transaction have made non-routine contributions to the transaction. In such cases, a residual profit split analysis allows for the division of residual profits amongst the relevant parties after profits have been assigned to the parties to remunerate them for their functions, other IP ownership, and business risks. In this case, ADT US will perform a variety of functions and will bear significant market risk associated with its on-going North American business. In addition, ADT US will continue to own other valuable intangibles. These intangibles would also need to be valued and accounted for in isolating the residual profit associated with the use of the NA ADT Marks. Given these facts, reliable proxies for the value of ADT's contributions do not exist. Therefore, the relief from royalty approach provides a more reliable measure of the arm's length value than anything that could be obtained from a residual profit split analysis. Consequently, the profit split method was not applied.

Given that it was possible to directly benchmark the royalty rate using the CUT method, the income approach method to valuation, specifically a relief from royalty analysis, was selected as the best method of analysis.

## 4.3   Application of the Income Method Using a Relief from Royalty Approach

The relief from royalty approach is based on the following premise: a property's value can be measured by determining what the owner of the property would pay in royalties over the remaining useful life of the property if it did not own the property and had to license it from a third party (i.e., the licensing costs avoided by virtue of owning the property). Since, post-transaction, the ADT NA Marks will be owned by ADT US and will not be licensed, ADT US will not have to make future royalty payments. After the transfer, ADT US will also receive royalty payments from ADT Canada and ADT PR and become responsible for all costs associated with protecting, enhancing and maintaining the ADT NA Marks.

The net cash flows inuring to ADT US post transaction are estimated over the useful life of the ADT NA Marks and discounted to present value.[18] The seller would not be willing to sell the ADT NA Marks to ADT US for an amount that is less than the present value of its foregone profits associated with the future income stream it could earn by licensing the ADT NA Marks to ADT US, ADT Canada, and ADT PR. Similarly, ADT US would not be willing to pay more than the present value of the royalties it would need to pay for the rights to the ADT NA Marks (less maintenance and other costs). Therefore, the value calculated using this approach represents an arm's length price for the ADT NA Marks.

The value under the income method is determined in four steps:

1. Development of Financial Forecasts;
2. Identification of Comparable Royalty Rates;
3. Selection of a Discount Rate; and
4. Calculation of Intangible Value.

### 4.3.1   Step 1: Development of Financial Forecasts

To determine the value of the ADT NA Marks, a financial forecast related to the income ADT GmbH would reasonably anticipate generating through the continued license of the ADT NA Marks is required. The financial forecasts consist of two primary components:

1. Revenue projections for The ADT Corporation; and
2. Costs associated with maintaining the ADT NA Marks (e.g., brand maintenance, brand protection, promotion, etc.)

Duff & Phelps worked with Tyco Personnel to develop revenue projections for The ADT Corporation by territory (i.e., the US, Canada and Puerto Rico) beginning January 1, 2012, through September 30, 2024 and provided them to Ceteris.[19] Ceteris adjusted these revenue projections for

---

[18]   Of note, a valuation analysis under the income method using a relief from royalty approach is consistent with an application of the income method utilizing a comparable uncontrolled transaction discussed under the cost sharing regulations in Treas. Reg. §1.482-7(g)(4) to value initial contributions of intangible property in a cost sharing arrangement.

[19]   Projections for Puerto Rico and Canada were provided for the time period starting October 1, 2011, through September 30, 2024.

the first time period to estimate the revenues expected to be earned by The ADT Corporation starting August 31, 2012.[20] Additionally, Tyco personnel provided Ceteris with the anticipated costs related to the maintenance of the ADT NA Marks for the fiscal year ending September 30, 2012. In developing the projected financials, Ceteris assumed these expenses would grow at an inflationary rate for each period.[21]

Since the financial forecasts extend 12 years and since the ADT NA Marks are expected to retain their value into perpetuity, Ceteris calculated the terminal value of royalty relief beyond the year 2024. This was done by assuming a growth rate of 1.9 percent, a proxy for expected inflation. This rate is equal to the IHS Global Insight long-term (2015-2041) forecasted consumer price index for the United States as of December 2011.[22] The use of a perpetual life when determining the value of a trademark is a typical assumption when applying the income method.[23] In addition, the ADT NA Marks represent a set of long-lived intangibles, providing further support for the determination of a value based on a perpetual life.

Tables 1 and 2 display the forecasted revenues for The ADT Corporation and the forecasted maintenance costs related to the ADT NA Marks (including terminal value), respectively.

### Table 1: Forecasted Revenues – The ADT Corporation by Territory (USD 000s)

| Date | 08/31/12 - 9/30/2012 | 09/30/13 | 09/30/14 | 09/30/15 | 09/30/16 | 09/30/17 | 09/30/18 |
|---|---|---|---|---|---|---|---|
| US Residential Revenue | 257,090 | 3,174,330 | 3,367,497 | 3,543,196 | 3,715,043 | 3,884,735 | 4,060,083 |
| Canada Residential Revenue | 18,012 | 204,176 | 207,165 | 210,289 | 213,551 | 216,957 | 220,512 |
| Puerto Rico Residential Revenue | 961 | 13,108 | 14,887 | 16,735 | 18,616 | 20,492 | 22,317 |
| **Total Revenue** | 276,063 | 3,391,613 | 3,589,549 | 3,770,220 | 3,947,210 | 4,122,184 | 4,302,912 |
| **Date** | 09/30/19 | 09/30/20 | 09/30/21 | 09/30/22 | 09/30/23 | 09/30/24 | Terminal |
| US Residential Revenue | 4,239,093 | 4,421,840 | 4,599,407 | 4,769,189 | 4,928,186 | 5,021,822 | 73,103,380 |
| Canada Residential Revenue | 224,222 | 228,091 | 232,127 | 236,335 | 240,722 | 245,296 | 3,570,809 |
| Puerto Rico Residential Revenue | 24,045 | 25,625 | 27,009 | 28,153 | 29,017 | 29,568 | 430,426 |
| **Total Revenue** | 4,487,360 | 4,675,556 | 4,858,543 | 5,033,677 | 5,197,925 | 5,296,686 | 77,104,615 |

---

[20]   Estimates for the first period (8/31/12-9/30/12) were based on a pro-rata share of days assuming a similar expense ratios incurred.

[21]   Estimates for the first period (8/31/12-9/30/12) were based on a pro-rata share days assuming similar expenses ratios incurred each month.

[22]   IHS: "Global Insight Quarterly Review Outlook United States," dated December 9, 2011. Page10.

[23]   Reilly, Robert and Robert Schweihs. Valuing Intangible Assets. McGraw-Hill, 1999. Page 428.

**Table 2: Forecasted Maintenance Costs – The ADT Corporation (USD 000s)**

| Date | 08/31/12 - 9/30/2012 | 09/30/13 | 09/30/14 | 09/30/15 | 09/30/16 | 09/30/17 | 09/30/18 |
|---|---|---|---|---|---|---|---|
| Salaries | 13 | 153 | 156 | 159 | 162 | 165 | 168 |
| Advice/Counsel | 15 | 178 | 182 | 185 | 189 | 192 | 196 |
| Promotion | 13 | 160 | 164 | 167 | 170 | 173 | 176 |
| Maintenance | 2 | 20 | 21 | 21 | 22 | 22 | 22 |
| Procurement | 2 | 20 | 21 | 21 | 22 | 22 | 22 |
| Litigation | 6 | 76 | 78 | 79 | 81 | 82 | 84 |
| **Total Trademark Maintenance Costs** | 51 | 609 | 620 | 632 | 644 | 656 | 669 |

| Date | 09/30/19 | 09/30/20 | 09/30/21 | 09/30/22 | 09/30/23 | 09/30/24 | Terminal |
|---|---|---|---|---|---|---|---|
| Salaries | 171 | 174 | 178 | 181 | 185 | 188 | 2,737 |
| Advice/Counsel | 200 | 203 | 207 | 211 | 215 | 219 | 3,193 |
| Promotion | 180 | 183 | 187 | 190 | 194 | 197 | 2,874 |
| Maintenance | 23 | 23 | 24 | 24 | 25 | 25 | 365 |
| Procurement | 23 | 23 | 24 | 24 | 25 | 25 | 365 |
| Litigation | 86 | 87 | 89 | 91 | 92 | 94 | 1,368 |
| **Total Trademark Maintenance Costs** | 682 | 695 | 708 | 721 | 735 | 749 | 10,902 |

### 4.3.2   Step 2: Identification of Comparable Royalty Rates

### 4.3.2.1   Overview

The next step in applying the income method is the identification of a royalty rate comparable to a rate that ADT US, ADT PR and ADT Canada would be expected to pay if they continued to license the brand name, trademarks and service marks at arm's length (i.e., the "royalty scenario"). To determine an arm's length royalty rate, Ceteris analyzed potential comparable agreements under the CUT method, which "evaluates whether the amount charged for a controlled transfer of intangible property was arm's length by reference to the amount charged in a comparable uncontrolled transaction."[24] If an uncontrolled transaction involves the transfer of the same intangible under the same (or substantially the same) circumstances and profit potential as the controlled transaction, then this method will ordinarily provide the most reliable measure of an arm's length charge.

As such, Ceteris sought to identify comparable transactions that license the right to use similar trademarks under similar circumstances as those currently licensed to ADT SS, ADT Canada, and ADT PR by ADT GmbH in the royalty scenario. This involved a search for both internal and external comparable transactions. Specifically, in performing this analysis, Ceteris set out to identify the following:

- Any internal transactions involving ADT (or related parties) and unrelated parties involving the license of intangibles similar to the ADT NA Marks; and

---

[24]   Treas. Reg. § 1.482-4(c)(1).

- Any external transactions between unrelated parties involving the license of intangibles similar to the ADT NA Marks.

The following subsections present the details of the searches conducted for internal and external transactions, including a comparability analysis, summary of the selected comparable agreements, and the construction of an arm's length range of royalty rates for the license of ADT NA Marks under the royalty scenario.

### 4.3.2.2  Internal Transaction Search

To search for comparable internal transactions, Ceteris requested the following information from Tyco personnel:

- Licensing transactions whereby ADT licenses the right to use the ADT brand name, trademarks and service marks to an unrelated third-party;
- Licensing transactions whereby Tyco or any of its subsidiaries licenses the right to use intangibles similar to the ADT brand name, trademarks and service marks to an unrelated third-party; and
- Licensing transactions whereby ADT (or any Tyco subsidiary) licenses the right to use intangibles similar to the ADT brand name, trademarks and service marks from an unrelated third-party.

This search resulted in the identification of two comparable agreements. Table 3 identifies the licensor and licensee of the potentially comparable agreements.

**Table 3: Comparable Internal Transactions**

| # | Tyco Entity / Licensor | Unrelated Party / Licensee |
|---|---|---|
| 1 | ADT Services AG | ADT Security Systems, Puerto Rico, Inc. |
| 2 | ADT Services AG | ADT Security Systems, Virgin Islands, Inc. |

Each of these agreements was evaluated based on the comparability criteria described in Section 4.3.2.4 below.

### 4.3.2.3  External Transaction Search

Ceteris conducted a supplemental search for external transactions involving the license of intangibles comparable to the ADT NA Marks between unrelated third-parties and licensed under similar circumstances as in the royalty scenario. Specifically, Ceteris set out to identify potentially comparable external agreements in the ktMINE agreement database using a filtered search. The details of these searches are discussed below.

ktMINE provides access to over 10,000 intellectual property documents. These intellectual property agreements include arrangements for the license of software, trademarks, technology, patents, processes, know-how and other types of intangible property. The database can be searched using the following key indicators:

- Filing company;
- Licensee or licensor;
- Effective date;
- Standard Industrial Classification Code of the filing company;
- Agreement Type;
- Industry;
- Royalty Rate;
- Exclusivity;
- Territory; and
- Keywords.

Ceteris screened ktMINE for license agreements using the agreement type, industry, and royalty rate filters.

First, Ceteris screened the database for agreement type. Specifically, Ceteris limited the scope of the search to the "Marketing Intangible" agreement type and eliminated agreements that were also classified as "Asset Purchase," "Cross License," "Distribution," "Joint Development," "Manufacturing/Process Intangible," "Other" and "Software." This initial screen was intended to focus the search results on the license of marketing intangibles in isolation and eliminate any agreements with significant collateral transactions that could potentially affect the reliability of the results.

Second, Ceteris used the royalty rate filter to screen the agreements for a consideration that is based on a percentage of sales.[25] This screen allows for the removal of agreements that specify royalty payments based on per unit prices, profits, assets or other non-comparable consideration bases for which reliable adjustments cannot be performed.

Finally, Ceteris searched for agreements classified as relating to the following industries:

- Public Safety;
- Consumer Services;
- Business Services;
- Financial Services;
- Telecommunications; and
- Broadcast and Cable.[26]

These industries were determined to contain the most likely sources of potentially comparable agreements when considering the nature of the ADT NA Marks and application within the electronic security services market.

This search methodology identified 164 potentially comparable external agreements. For these agreements (and the identified internal transactions), Ceteris obtained copies of the actual license agreements and reviewed them to determine comparability. The comparability criteria used to evaluate the agreements and the results of this analysis are discussed in the following sections.

### 4.3.2.4  Comparability Analysis

Ceteris analyzed the 166 internal and external transactions based on the comparability factors discussed in Treas. Reg. §1.482-1(d)(3) and §1.482-4(c)(2)(iii)(B)(2) to determine their similarity to the royalty scenario. These factors of comparability include:

---

[25]   Ceteris screened the database for considerations based on gross or net sales between 0% and 100,000%. Setting the upper limit to 100,000% ensured that all possible agreements with any royalty were identified.

[26]   Additionally, agreements with industries classified as Foods and Nonalcoholic Beverages, Travel and Recreation, Alcoholic Beverages and Tobacco, Publishing and Entertainment were excluded from the search results.

- Functions – A comparison of the functions performed and associated resources employed in each transaction. An agreement with the following attributes would have higher comparability to the royalty scenario:
  - License grants the right to use brand names, trademarks and service marks in connection with the furtherance of the licensee's business or operations; and
  - Licensee assumes responsibility for developing the brand names, trademarks and service marks within its respective territory.
- Contractual Terms – A comparison of the significant contractual terms that could affect the consideration for the transaction. These terms include the form of consideration charged, sales or purchase volume, rights to updates, revisions or modifications, and the duration of the relevant license. An agreement with the following attribute would have higher comparability to the royalty scenario:
  - Form of consideration is a royalty paid on total revenues associated with product, installation and related services.
- Risks – A comparison of the significant risks that could affect the prices that would be charged or paid in a transaction. These risks include market risks, research and development risks, financial risks, credit and collection risk, product liability risk and general business risks. An agreement with the following attribute would have higher comparability to the royalty scenario:
  - Risks are primarily borne by the licensee as the entrepreneurial entity developing a brand name within its respective territory.
- Economic Conditions – A comparison of the significant economic conditions that could affect the prices charged or paid, or the profit that would be earned. These factors include the similarity of geographic markets, the relative size of the market, level of marketing, level of relevant marketing shares, economic conditions within a particular industry, competition within each market with regard to the property or services under review, and the alternatives realistically available to the licensee and licensor. An agreement with the following attributes would have higher comparability to the royalty scenario:
  - Primary customers of licensee are residential consumers (i.e., not business or retail customers);
  - Licensee's business operates within the security industry; and
  - The territories covered by the license grant include the United States, Canada and Puerto Rico.

- Property or services – A comparison of the property or services transferred in the transaction. This comparison may include identification of embedded intangibles and comparability of the product or services offered. An agreement with the following attribute would have higher comparability to the royalty scenario:
  - Licensed use for intangible property includes the sale, installation and provision of services in the following areas: fire detection; fire suppression; personal safety equipment; intrusion; access/video; electronic article surveillance; nursecall systems; public address systems; traffic and transportation management; and commercial, industrial, and governmental security.

The aforementioned comparability criteria were used as a guide for identifying comparable agreements. Agreements were not rejected if they failed to meet all of the criteria listed above; rather, agreements were rejected if they varied significantly from several of the primary factors listed above. Ceteris reviewed each agreement in detail and eliminated agreements for reasons including:

- The agreement is not a comparable agreement (e.g., did not provide for the licensee of the right to use brand names, trademarks or service marks);
- The consideration is not in the form of a royalty on sales (e.g., consideration for the rights associated with the use of brand names, trademarks or service marks is in the form of a lump sum payment);
- The sales base defined in the agreement includes only product revenue and does not include service revenue; and/or
- The transaction is between related parties (i.e., through independent research it was determined that the licensor and licensee were related parties through partial or complete ownership of one of the parties by the other).

This analysis eliminated 163 agreements based upon the rejection criteria described above. The remaining three agreements (two internal and one external) were accepted as comparable to the license under the royalty scenario.

**Appendix 3** provides a list of the external agreements that were reviewed in detail and the reason for their acceptance or rejection.

### 4.3.2.5  Selected Comparable Companies

The licensors and licensees that are parties to the comparable agreements are listed in Table 4.

**Table 4:  Selected Comparable Agreements**

| # | Licensor | Licensee |
|---|----------|----------|
| 1 | ADT Services AG | ADT Security Systems, Puerto Rico, Inc. |
| 2 | ADT Services AG | ADT Security Systems, Virgin Islands, Inc. |
| 3 | Smith & Wesson Corp. | Canadian Security Agency, Inc. |

The comparable agreements grant the right to use trademarks to market and sell home security (or related) products and provide related services. In general, the licensee is responsible for developing the licensed trademarks within its territory. These agreements represent the most reliable and best available transactional data for establishing an arm's length payment under the royalty scenario. A brief description of each comparable agreement is provided below, and **Appendix 4** provides additional information on each agreement.

#### 4.3.2.5.1    Summary of Selected Comparable Agreements

##### 4.3.2.5.1.1    Agreement between ADT Services AG and ADT Security Systems Puerto Rico, Inc.

On December 27, 1994, ADT Services AG licensed the right to use ADT trademarks in association with the sale of electronic security equipment and related services, and the right to use ADT as a trade name and within its corporate name to ADT Security Systems Puerto Rico, Inc., an unrelated party. As consideration for these rights, ADT Security Systems Puerto Rico, Inc. paid ADT Services AG a royalty of 1.25 percent. This agreement licenses only a subset of the trademarks (i.e., it excludes secondary marks) to be licensed to ADT US under the royalty scenario for use in offering similar products and services to a third-party licensee performing similar functions as ADT US. As such, this agreement provides almost exact comparability with respect to many of the aforementioned factors of comparability. Furthermore, ADT Puerto Rico, Inc. assumed the primary risks of an entrepreneurial entity developing a brand name within Puerto Rico. However, the

territory for the agreement is exclusive to Puerto Rico and there may be a difference in profit potential when compared to the broader North American territory covered in the royalty scenario.[27]

### 4.3.2.5.1.2    Agreement between ADT Services AG and ADT Security Systems Virgin Islands, Inc.

On October 1, 2008, ADT Services AG renewed its license to use ADT trademarks in association with the sale of electronic security equipment and related services, and the right to use ADT as a trade name to ADT Security Systems Virgin Islands, Inc., an unrelated party. This agreement was an update of a license agreement that was originally entered into on December 27, 1994, prior to Tyco's acquisition of ADT. As consideration for these rights, ADT Security Systems Virgin Islands, Inc. pays ADT Services AG a royalty of 1.25 percent. This agreement licenses only a subset of the trademarks (i.e., it excludes secondary marks) to be licensed to ADT US under the royalty scenario for use in offering similar products and services to a third-party licensee performing similar functions as ADT US. As such, this agreement provides almost exact comparability with respect to many of the aforementioned factors of comparability. Furthermore, the agreement was entered into in 2008 with the same compensation rate for the use of the intangibles as the agreement signed in 1994 as well as the agreement between ADT Services AG and ADT Security Systems Puerto Rico, Inc. which was also executed 14 years earlier, indicating the stability of the value of the ADT trademarks. However, the territory for the agreement is exclusive to the US Virgin Islands, St. Maarten and Saint Martin, and there may be a difference in profit potential when compared to the broader North American territory covered in the royalty scenario.

### 4.3.2.5.1.3    Agreement between Smith & Wesson Corp. and Canadian Security Agency, Inc.

On May 31, 1996, Smith & Wesson Corp. licensed the right to use trademarks in association with the sale of electronic security products, systems and services to Canada Security Agency, Inc. As consideration for these rights, Canada Security Agency pays Smith & Wesson Corp. a royalty of 2.50 percent. This agreement licenses similar trademarks for use in selling similar products and services (although not exact) as under the royalty scenario to a licensee performing similar functions as ADT US. As such, this agreement provides a high degree of comparability with respect to many of the aforementioned factors of comparability. Additionally, the initial term for the agreement is ten years with an option to extend an additional seven years, further lending

---

[27]    ADT Security Systems Puerto Rico, Inc. was subsequently acquired by Tyco. However, at the time the license agreement was entered into, it was an unrelated party.

support for the long-lived nature of trademarks in the security market. However, although the worldwide territory covered by the exclusive license includes the same territories as the royalty scenario (i.e., United States, Canada and Puerto Rico), this agreement has a broader territorial reach than under the royalty scenario.

### 4.3.2.6  Construction of Arm's Length Range of Royalty Rates

Although all of the accepted agreements can be considered comparable to the royalty scenario, certain components of each selected comparable agreement did not match the exact facts and circumstances of the royalty scenario. As such, Ceteris determined that the use of a range, rather than a single point, was appropriate in determining acceptable arm's-length prices under the 482 Regulations. The use of such a range acknowledges that while all of the accepted agreements meet appropriate comparability criteria, none is an exact match. Table 5 provides the range of results derived from the selected comparable agreements.

**Table 5: Construction of Arm's Length Range of Royalty Rates**

| Statistics | Royalty Rate |
|---|---|
| Minimum | 1.25% |
| Mean | 1.67% |
| Maximum | 2.50% |
| Number of Observations | 3 |

The range of royalty rates extends from 1.25 percent to 2.50 percent, with a mean of 1.67 percent.[28]

### 4.3.3   Step 3: Selection of a Discount Rate

Under the royalty scenario, it is presumed that the intangible property owner would earn a cash stream related to future royalty payments received from the licensee (i.e., ADT US). Alternatively, the intangible property owner could receive a lump-sum payment that is equivalent to the present value of the future royalty payments less any costs associated with managing the intangible property ("net royalty payment"). Economic theory suggests that intangible property owner would be indifferent to receiving a stream of future income, or a lump-sum payment, provided the present value of the two types of payment are equivalent. To calculate the present value of a future income

---

[28]   With only three observations, it is not possible to calculate an interquartile range. The interquartile range is typically used to increase the reliability of the results when there are differences between the controlled and uncontrolled transactions for which reliable adjustments cannot be made.

stream, a discount rate must be applied to account for the inherent risk and the time value of money associated with receiving future versus current income.

Ceteris used the estimated weighted average cost of capital ("WACC") for ADT's US residential security business as the discount rate,[29] as this represents the discount rate applied to future cash flows that inure to a firm's capital investors.[30] WACC is determined by the general equation:

$$WACC = (Kd * D\%) + (Ke * E\%)$$

Where:

Kd = After-tax required return on debt capital;

D% = Debt capital as percentage of total invested capital;

Ke = Required return on equity capital; and

E% = Equity capital as a percentage of total invested capital.

Duff & Phelps determined a WACC of 8.9 percent as a required return on the invested capital of ADT US's residential business. After reviewing this analysis (see **Appendix 5**), Ceteris relied upon Duff & Phelps' calculation of the WACC. Ceteris chose to use the identified discount rate for the entire business (instead of an adjusted intangible ownership rate) based on the longevity of the ADT brand and the stability of its commercial use over time. In other words, it is reasonable to assume that the risk associated with the future development and maintenance of the ADT NA Marks and the required return on this investment would be equal to that of the North American business as a whole.

### 4.3.4   Step 4: Calculation of Intangible Value

The final step in the application of the income method is the calculation of an arm's length payment under the royalty scenario. The present value represents an arm's length price that ADT

---

[29]   Duff & Phelps did not develop a separate WACC for the Canadian and Puerto Rico markets. Given the relatively immaterial size of these markets compared to the US, Ceteris determined that applying the WACC that was developed for the US ADT business to the combined projections for the ADT North American business was reasonable.

[30]   Copeland, Tom, Tim Koller, and Jack Murrin. McKinsey & Co., Inc. Valuation Measuring and Managing the Value of Companies. Third Edition. John Wiley & Sons, Inc., 2000. Page 201.

GmbH would be indifferent to receiving when compared to earning that same stream of future income from the continued license of the ADT NA Marks. The present value of net royalty payments established using this methodology represents both the value of expected net cash flows that will be foregone by virtue of the transfer of the ADT NA Marks to ADT US, as well as the value of the savings that ADT US will realize by not having to make royalty payments. Conceptually, if the price of the ADT NA Marks was established at something outside the range of present values established using this methodology, at least one of the parties would be unwilling to participate in the transaction. Therefore, this range of present values represents the arm's length range of prices for which the ADT NA Marks could be sold.

## 5.  Conclusion and Recommendations

Ceteris was engaged by Duff & Phelps to determine an appropriate arm's length value for the exclusive North American rights to the ADT NA Marks in accordance with the Section 482 Regulations. Through the application of an unspecified method using an income approach method to valuation, and specifically a relief from royalty analysis, Ceteris determined that the arm's length range of royalties ADT GmbH would be expected to earn (and ADT US would be expected to pay) under the royalty scenario is 1.25 percent to 2.5 percent.

Under the Section 482 Regulations, any royalty rate within this range would be considered arm's length; however, Tyco management has requested guidance from Ceteris on the price ADT US should pay for the ADT NA Marks. Since none of the comparable agreements represents an "exact" comparable (and it was not possible to narrow the range through the use of an interquartile range), it would be prudent for Tyco to refer to a mid-point within the range when setting an arm's-length price. More specifically, although each of the agreements provides a meaningful data point with which to calculate an arm's-length range of royalty rates, none of the agreements represents and exact match to the royalty scenario

For instance, all three of the agreements relate to geographic regions with different profit potential than the North American market. Specifically, the first two agreements license marks for use in Puerto Rico and the British Virgin islands which are much smaller and less developed regions than the North American territory. The third agreement involves the license of marks for use throughout the world and, as such, covers the territories specified in the royalty scenario but has a broader reach.

In addition, the scope of the intangible property being licensed in the comparable agreements is different than the scope of intangible property being licensed in the royalty scenario. While the first two agreements license a subset of the NA ADT Marks conveyed under the royalty scenario, they do not include the license of the secondary marks. The third agreement licenses marks that are similar but not identical to the marks being licensed under the royalty scenario.

Given the differences between the controlled and uncontrolled transactions, it would be reasonable to look to the mean of the range, which provides equal weighting to all three comparable observations. Further, under ADT's  transfer pricing policy, the ADT North American operating

entities (i.e., the US and Canada) have licensed the rights to use the ADT NA Marks in their respective markets for a royalty of 1.65 percent of net sales (net sales includes product and service revenue). Given that this royalty rate is virtually identical to the mean of 1.67 percent established by the three comparable transactions (i.e., the average of 1.25 percent, 1.25 percent and 2.50 percent), it would be reasonable to set a price for the ADT NA Marks that is equal to the present value of the future payments ADT US would make at the 1.65 percent royalty rate (less additional costs incurred) which is consistent with its historic policy.

Table 6 calculates the present value of the expected income related to the ADT NA Marks under the royalty scenario using the financial projections identified in Section 4.3.1, 1.65 percent as the recommended royalty rate within the arm's length range of royalty rates identified in Section 4.3.2.6, and the discount rate determined in Section 4.3.3. This payment equals **$987.349 million**.

**Table 6: Arm's Length Price for NA ADT Marks Using 1.65% Royalty**

| | | 08/31/12 - 9/30/2012 | 09/30/13 | 09/30/14 | 09/30/15 | 09/30/16 | 09/30/17 | 09/30/18 | 09/30/19 | 09/30/20 | 09/30/21 | 09/30/22 | 09/30/23 | 09/30/24 | Terminal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a | Discount Rate 8.90% | | | | | | | | | | | | | | |
| | Date | 08/31/12 - 9/30/2012 | 09/30/13 | 09/30/14 | 09/30/15 | 09/30/16 | 09/30/17 | 09/30/18 | 09/30/19 | 09/30/20 | 09/30/21 | 09/30/22 | 09/30/23 | 09/30/24 | Terminal |
| b | Period | 0.04 | 0.59 | 1.59 | 2.59 | 3.59 | 4.59 | 5.59 | 6.59 | 7.59 | 8.59 | 9.59 | 10.59 | 11.59 | 11.59 |
| c | US Residential Revenue | 257,090 | 3,174,330 | 3,367,497 | 3,543,196 | 3,715,043 | 3,884,735 | 4,060,083 | 4,239,093 | 4,421,840 | 4,599,407 | 4,769,189 | 4,928,166 | 5,021,822 | 73,103,380 |
| d | Canada Residential Revenue | 18,012 | 204,176 | 207,165 | 210,289 | 213,551 | 216,957 | 220,512 | 224,222 | 228,091 | 232,127 | 236,335 | 240,722 | 245,296 | 3,570,809 |
| e | Puerto Rico Residential Revenue | 961 | 13,108 | 14,887 | 16,735 | 18,616 | 20,492 | 22,317 | 24,045 | 25,625 | 27,009 | 28,153 | 29,017 | 29,568 | 430,426 |
| f = c+d+e | Total Revenue | 276,063 | 3,391,613 | 3,589,549 | 3,770,220 | 3,947,210 | 4,122,184 | 4,302,912 | 4,487,360 | 4,675,556 | 4,858,543 | 5,033,677 | 5,197,925 | 5,296,686 | 77,104,615 |
| g | *Royalty Rate - Primary & Secondary Marks* | *1.65%* | *1.65%* | *1.65%* | *1.65%* | *1.65%* | *1.65%* | *1.65%* | *1.65%* | *1.65%* | *1.65%* | *1.65%* | *1.65%* | *1.65%* | *1.65%* |
| h = f*g | Total Royalties Paid | 4,555 | 55,962 | 59,228 | 62,209 | 65,129 | 68,016 | 70,998 | 74,041 | 77,147 | 80,166 | 83,056 | 85,766 | 87,395 | 1,272,226 |
| i | Salaries | 13 | 153 | 156 | 159 | 162 | 165 | 168 | 171 | 174 | 178 | 181 | 185 | 188 | 2,737 |
| j | Advice/Counsel | 15 | 178 | 182 | 185 | 189 | 192 | 196 | 200 | 203 | 207 | 211 | 215 | 219 | 3,193 |
| k | Promotion | 13 | 160 | 164 | 167 | 170 | 173 | 176 | 180 | 183 | 187 | 190 | 194 | 197 | 2,874 |
| l | Maintenance | 2 | 20 | 21 | 21 | 22 | 22 | 22 | 23 | 23 | 24 | 24 | 25 | 25 | 365 |
| m | Procurement | 2 | 20 | 21 | 21 | 22 | 22 | 22 | 23 | 23 | 24 | 24 | 25 | 25 | 365 |
| n | Litigation | 6 | 76 | 78 | 79 | 81 | 82 | 84 | 86 | 87 | 89 | 91 | 92 | 94 | 1,368 |
| o = i:n | Total Trademark Maintenance Costs | 51 | 609 | 620 | 632 | 644 | 656 | 669 | 682 | 695 | 708 | 721 | 735 | 749 | 10,902 |
| p = h-o | Total Royalty Income | 4,504 | 55,353 | 58,607 | 61,576 | 64,485 | 67,360 | 70,329 | 73,360 | 76,452 | 79,458 | 82,334 | 85,031 | 86,646 | 1,261,324 |
| q = 1 / (1+a) | PV Factor | 0.996 | 0.951 | 0.873 | 0.802 | 0.737 | 0.676 | 0.621 | 0.570 | 0.524 | 0.481 | 0.442 | 0.406 | 0.372 | 0.372 |
| r = p*q | PV Royalty Income | 4,488 | 52,654 | 51,193 | 49,391 | 47,497 | 45,559 | 43,680 | 41,839 | 40,039 | 38,213 | 36,360 | 34,482 | 32,265 | 469,689 |
| s = sum(r) | NPV of Payment | 987,349 | | | | | | | | | | | | | |

ATTORNEYS' EYES ONLY

## Appendix 1: Summary of US Transfer Pricing Regulations

### 1.1   Introduction

The United States Internal Revenue Code section 482 ("section 482") governs the pricing of controlled transactions to ensure that taxpayers clearly reflect income attributable to these transactions and to prevent the avoidance of taxes with respect to such transactions. The US Department of the Treasury issued regulations under section 1.482 (the "final US Regulations") that set forth the general principles and guidelines to be followed under section 482 of the Internal Revenue Code. Under section 482 and the final US Regulations, tangible property, intangible property, and services that are transferred (or where use is transferred) between related, or controlled parties must be priced on an "arm's length" basis, or as if the related parties to the transaction were dealing with each other as independent, unrelated parties.

### 1.2   Final US Regulations

The final US Regulations affirm the arm's length standard as the governing principle of section 482. Under this standard, the results of a controlled transaction should be "consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances."[31] Because identical uncontrolled transactions do not exist in most cases, a transaction is considered "comparable" as long as it is sufficiently similar to provide a reliable measure of an arm's length result.[32]

### 1.3   Determining Comparability

When evaluating the comparability of an uncontrolled transaction to a controlled transaction, all of the factors that could affect prices or profits must be considered. Treas. Reg. § 1.482-1(d)(1) lists specific factors that must be considered, including functions, contractual terms, risks, economic conditions, and property (e.g. embedded intangibles) or services involved in the transaction. If material differences exist between the controlled and uncontrolled transactions, then "adjustments must be made if the effect of such differences on prices or profits can be ascertained with sufficient

---

[31]   § 1.482-1(b)(1).

[32]   § 1.482-1(d)(2).

accuracy to improve the reliability of the results."[33] The uncontrolled transaction can still be used even if it is not possible to make adjustments, but the reliability of the analysis will be reduced. Moreover, the final US Regulations state that, "in any event, unadjusted industry average returns themselves cannot establish arm's length results."[34]

## 1.4   Best Method Rule

The final US Regulations present several methods for evaluating whether a controlled transaction meets the arm's length standard. They give taxpayers substantial flexibility in choosing among these methods by stipulating a "best method rule," whereby one must use "the method that, under the facts and circumstances, provides the most reliable measure of an arm's length result."[35] There is no strict priority of methods and, as long as a method remains the most reliable, it may be used "without establishing the inapplicability of another method."[36] When selecting a method of analysis, the two most important factors to consider are the degree of comparability between the controlled and uncontrolled transactions, and the quality of the data and assumptions used.[37] In addition, it may be relevant to consider whether the results of an analysis are consistent with those that would have been obtained under another method.[38]

## 1.5   Arm's Length Range

In some cases, the application of a pricing method will produce a single reliable arm's length result. The final US Regulations recognize, however, that the "application of a method may produce a number of results from which a range of reliable results may be derived."[39] To avoid income adjustments, the results of the controlled party should fall within this "arm's length range." Such a range is ordinarily determined by "applying a single pricing method selected under the best method rule to two or more uncontrolled transactions of similar comparability and reliability."[40] To qualify for inclusion in the range, an uncontrolled comparable must have data that is sufficiently

---

[33]   § 1.482-1(d)(2).
[34]   § 1.482-1(d)(2).
[35]   § 1.482-1(c)(1).
[36]   § 1.482-1(c)(1).
[37]   § 1.482-1(c)(2).
[38]   § 1.482-1(c)(2).
[39]   § 1.482-1(e)(1).
[40]   § 1.482-1(e)(2)(i).

complete so that it is likely that all material differences between the controlled and uncontrolled transactions can be identified and eliminated. If such comparables do not exist, then the reliability of the analysis must be increased (when possible) through the establishment of a new range wherein there is a 75 percent probability that a result falls above the lower end of the range, and an equal probability that a result falls below the upper end of the range. The final US Regulations specify the interquartile range as generally suitable for this purpose.

Data from a controlled transaction ordinarily should be compared with data from an uncontrolled transaction during the taxable year under review. It may also be appropriate to consider controlled or uncontrolled data from one or more years before or after the year under review. The appropriateness of using multiple year data depends upon the transfer pricing method being applied and the specific issue being addressed. Examples of situations that might warrant the use of multiple year data include the lack of available data for the taxable year under review or the existence of business, product or intangible life cycles. When using multiple years of data, the same years ordinarily must be considered for both the controlled and uncontrolled transactions. Furthermore, the average results of a controlled taxpayer over a multiple year period may also be compared with the average results of uncontrolled transactions over the same period if such a comparison is deemed to reduce the effects of short-term variations unrelated to transfer pricing.[41]

## 1.6   Intangible Property

Like transfers of tangible goods, the transfer or licensing of intangible property must also adhere to the arm's length standard. The US Tax Reform Act of 1986 placed an additional requirement on intangible property transfers by amending Internal Revenue Code Section 482 to state that the income received from the transfer or licensing of intangible property should be commensurate with the income earned from its use. This rule, known as the "commensurate with income" standard, requires an evaluation of the income attributable to design, development, production, marketing, or other intangibles developed by entities in the United States but used by entities outside the United States (and vice versa). Additionally, with certain exceptions, income attributable to intangibles that are transferred under a multiple year arrangement may be adjusted periodically. That is, the

---

[41]   § 1.482-1(f)(2)(iii)(D).

determination that an intercompany payment for intangibles was arm's length in one year does not preclude the IRS from making adjustments to that payment in subsequent years.[42]

Regarding ownership, the final US Regulations recognize the legal owner of a right to exploit an intangible as the sole owner of that intangible unless such ownership is inconsistent with the economic substance of the underlying transactions. If no owner of the intangible property is identified under the intellectual property law of the relevant jurisdiction, or pursuant to contractual terms (including imputed terms) or other legal provision, then the controlled taxpayer who has control of the intangible property, based on all the facts and circumstances, will be considered the sole owner of the intangible property.[43]

The final US Regulations present four methods for testing arm's length pricing for the transfer and use of intangible property. These methods, discussed below, are the Comparable Uncontrolled Transaction ("CUT") method, the CPM, the Profit Split method, and unspecified methods.

### 1.6.1   Comparable Uncontrolled Transaction Method

The CUT method evaluates the arm's length nature of an intercompany charge by reference to the amount charged in comparable uncontrolled transactions. If an uncontrolled transaction involves the transfer of the same intangible under the same (or substantially the same) circumstances as the controlled transaction, then this method will ordinarily provide the most reliable measure of an arm's length charge.[44] Circumstances are considered substantially the same if only minor, quantifiable differences exist for which appropriate adjustments can be made.

Factors that are particularly relevant in determining comparability under the CUT method include contractual terms and economic conditions. In order for the intangible involved in the uncontrolled transaction to be considered comparable to the controlled intangible, both must have a similar profit potential and must be used in connection with similar products or processes within the same general industry or market. Other factors to be considered are the terms of the transfer, the stage of development, rights to receive updates, revisions, or modifications, uniqueness of the property,

---

[42]   § 1.482-4(f)(2)(i).

[43]   § 1.482-4(f)(3)(i)(A).

[44]   § 1.482-4(c)(2)(ii).

duration of the license, economic and product liability risks, existence of collateral transactions, and functions performed by the transferor and transferee.

### 1.6.2    Comparable Profits Method

The CPM evaluates a transfer price by referring to "objective measures of profitability (profit level indicators) derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances" as the controlled taxpayer.[45] Profit level indicators, which measure the relationship between profits and costs incurred or resources employed, should be derived from a period covering a sufficient number of years of data from the uncontrolled comparables. Examples of profit level indicators include the ratio of operating profit to operating assets and financial ratios such as the ratio of operating profit to sales, the ratio of gross profit to operating expenses, and other reliable ratios.

The determination of an arm's length result according to the CPM is based on the operating profits that would have been earned by the "tested party" if its profit level indicators were the same as those of the uncontrolled comparables. The tested party refers to the controlled party whose operating profit attributable to the controlled transaction can be verified using the most reliable data and requiring the fewest adjustments, and for which the most reliable uncontrolled data can be located. Usually, the tested party will not own valuable intangible property or unique assets that distinguish it from uncontrolled comparables and will be the least complex among the controlled group.[46]

Under this method, comparability is especially dependent upon resources employed, risks assumed, and functions undertaken. The degrees of both functional comparability and product comparability required between the controlled and uncontrolled taxpayer, however, are not generally as great as those mandated under the Resale Price or Cost Plus methods. Other factors influencing comparability might include varying cost structures and differences in management efficiency.

---

[45]    § 1.482-5(a).

[46]    § 1-482-5(b)(2)(i).

### 1.6.3   Profit Split Method

The Profit Split method evaluates whether the allocation of the combined operating profit or loss attributable to one or more controlled transactions is arm's length by reference to the relative value of each controlled party's contribution to that combined operating profit or loss. Contributions to operating profit (or loss) are determined according to the functions performed, risks assumed, and resources employed by each party.

The final US Regulations specify two methods for allocating operating profit (or loss) among controlled parties: the Comparable Profit Split method and the Residual Profit Split method. The Comparable Profit Split method divides profits (or losses) from a controlled transaction according to the percentage of combined operating profit contributed by uncontrolled taxpayers involved in a similar transaction. The Residual Profit Split employs a two step process to allocate combined operating profits (or losses) among controlled parties. The first step provides a market return to each party's routine contributions to the relevant business activity. Routine contributions are defined as "contributions of the same or a similar kind to those made by uncontrolled taxpayers involved in similar business activities for which it is possible to identify market returns."[47] Thus, the first step of the process references the returns earned by uncontrolled taxpayers engaged in similar activities and applies these returns to the controlled parties. Next, where the controlled group makes nonroutine contributions, the residual profit should be divided among the controlled taxpayers "based upon the relative value of their nonroutine contributions to the relevant business activity."[48] Relative value may be measured one of the following ways: based on external market benchmarks; based on the capitalized cost of developing the intangible (less amortization), and related improvements and updates; or, under certain conditions, based on the amount of actual expenditures in recent years.

### 1.6.4   Unspecified Method

Other methods may be used to analyze intercompany transfers of intangible property, provided they satisfy the best method rule. All unspecified methods "should take into account the general principle that uncontrolled taxpayers evaluate the terms of a transaction by considering the realistic

---

[47]   § 1.482-6(c)(3)(i)(A).

[48]   § 1.482-6(c)(3)(i)(B)(1).

alternatives to that transaction, and only enter into a particular transaction if none of the alternatives is preferable to it."[49]

---

[49]   § 1.482-4(d)(1).

## Appendix 2: List of Relevant Trademarks and Service Marks

| Country | Owner | Trademark | File Date | App Number | Reg Number | Case Number | Status | Class |
|---------|-------|-----------|-----------|-----------|-----------|-------------|--------|-------|
| USA | ADT SERVICES AG | 1-800-ADT-ASAP | 9/13/2002 | 78/163922 | 2734955 | FZ-1157 | Registered | 37 Int. |
| USA | ADT SERVICES AG | 1-800-ADT-ASAP | 9/13/2002 | 78/163922 | 2734955 | FZ-1157 | Registered | 45 Int. |
| USA | ADT SERVICES AG | 1-800-ADT-GOLD | 4/25/2005 | 78/615630 | 3228693 | T-F-AT-00048 | Registered | 35 Int. |
| USA | ADT SERVICES AG | ADT | 12/1/1959 | 72/086389 | 710708 | FZ-353 | Registered | 35 Int. |
| USA | ADT SERVICES AG | ADT | 12/1/1959 | 72/086390 | 710507 | FZ-350 | Registered | 09 Int. |
| USA | ADT SERVICES AG | ADT | 8/24/2006 | 78/959450 | 3251836 | T-F-AT-00155 | Registered | 44 Int. |
| USA | ADT SERVICES AG | ADT | 9/7/2006 | 78/969026 | 3352491 | T-F-AT-00231 | Registered | 09 Int. |
| USA | ADT SERVICES AG | ADT | 6/22/2007 | 77/212865 | 3421797 | T-F-AT-00537 | Registered | 42 Int. |
| USA | ADT SERVICES AG | ADT | 12/7/2007 | 77/346309 | 3515266 | T-F-AT-00565 | Registered | 37 Int. |
| USA | ADT SERVICES AG | ADT | 12/7/2007 | 77/346309 | 3515266 | T-F-AT-00565 | Registered | 38 Int. |
| USA | ADT SERVICES AG | ADT | 12/7/2007 | 77/346309 | 3515266 | T-F-AT-00565 | Registered | 42 Int. |
| USA | ADT SERVICES AG | ADT | 12/7/2007 | 77/346309 | 3515266 | T-F-AT-00565 | Registered | 44 Int. |
| USA | ADT SERVICES AG | ADT | 12/7/2007 | 77/346309 | 3515266 | T-F-AT-00565 | Registered | 45 Int. |
| USA | ADT SERVICES AG | ADT | 12/11/2007 | 77/348668 | 3511263 | T-F-AT-00569 | Registered | 37 Int. |
| USA | ADT SERVICES AG | ADT | 12/11/2007 | 77/348668 | 3511263 | T-F-AT-00569 | Registered | 38 Int. |
| USA | ADT SERVICES AG | ADT | 12/11/2007 | 77/348668 | 3511263 | T-F-AT-00569 | Registered | 45 Int. |
| USA | ADT SERVICES AG | ADT | 12/20/2007 | 77/356446 | 3909665 | T-F-AT-00570 | Registered | 09 Int. |
| USA | ADT SERVICES AG | ADT | 12/20/2007 | 77/356446 | 3909665 | T-F-AT-00570 | Registered | 42 Int. |
| USA | ADT SERVICES AG | ADT | 12/20/2007 | 77/356446 | 3909665 | T-F-AT-00570 | Registered | 45 Int. |
| USA | ADT SERVICES AG | ADT | 11/6/2007 | 79/046998 | 3485321 | T-F-AT-00549 | Registered | 38 Int. |
| USA | ADT SERVICES AG | ADT ALWAYS THERE | 1/31/2001 | 76/202590 | 2586569 | FZ-33 | Registered | 42 Int. |
| USA | ADT SERVICES AG | ADT ALWAYS THERE | 8/24/2006 | 78/959477 | 3253803 | T-F-AT-00160 | Registered | 44 Int. |
| USA | ADT SERVICES AG | ADT ALWAYS THERE | 6/22/2007 | 77/212883 | 3483310 | T-F-AT-00539 | Registered | 42 Int. |
| USA | ADT SERVICES AG | ADT ALWAYS THERE | 1/4/2008 | 77/363959 | 3902450 | T-F-AT-00571 | Registered | 09 Int. |
| USA | ADT SERVICES AG | ADT ALWAYS THERE | 1/4/2008 | 77/363959 | 3902450 | T-F-AT-00571 | Registered | 38 Int. |
| USA | ADT SERVICES AG | ADT ALWAYS THERE | 1/4/2008 | 77/363959 | 3902450 | T-F-AT-00571 | Registered | 42 Int. |
| USA | ADT SERVICES AG | ADT ALWAYS THERE | 1/4/2008 | 77/363959 | 3902450 | T-F-AT-00571 | Registered | 45 Int. |
| USA | ADT SERVICES AG | ADT ALWAYS THERE EVEN WHEN YOU CAN'T BE | 9/11/2006 | 78/971074 | 3.703.680 | T-F-AT-00161 | Registered | 45 Int. |
| USA | ADT SERVICES AG | ADT BEL-AIR PATROL | 8/22/2003 | 78/291124 | 3232338 | FZ-1182 | Registered | 45 Int. |
| USA | ADT SERVICES AG | ADT CUSTOM HOME SERVICES & OCTAGON DEVICE | 12/10/2007 | 77/347639 | 3533400 | T-F-AT-00566 | Registered | 37 Int. |
| USA | ADT SERVICES AG | ADT CUSTOM HOME SERVICES & OCTAGON DEVICE | 12/10/2007 | 77/347639 | 3533400 | T-F-AT-00566 | Registered | 38 Int. |
| USA | ADT SERVICES AG | ADT CUSTOM HOME SERVICES & OCTAGON DEVICE | 12/10/2007 | 77/347639 | 3533400 | T-F-AT-00566 | Registered | 42 Int. |
| USA | ADT SERVICES AG | ADT CUSTOM HOME SERVICES & OCTAGON DEVICE | 12/10/2007 | 77/347639 | 3533400 | T-F-AT-00566 | Registered | 44 Int. |

ATTORNEYS' EYES ONLY

| Country | Owner | Trademark | File Date | App Number | Reg Number | Case Number | Status | Class |
|---|---|---|---|---|---|---|---|---|
| USA | ADT SERVICES AG | ADT CUSTOM HOME SERVICES & OCTAGON DEVICE | 12/10/2007 | 77/347639 | 3533400 | T-F-AT-00566 | Registered | 45 Int. |
| USA | ADT SERVICES AG | ADT CUSTOM HOME SERVICES (stylized and/or with design) | 8/11/2006 | 78/950285 | 3414668 | T-F-AT-00132 | Registered | 09 Int. |
| USA | ADT SERVICES AG | ADT CUSTOM HOME SERVICES (stylized and/or with design) | 8/11/2006 | 78/950285 | 3414668 | T-F-AT-00132 | Registered | 37 Int. |
| USA | ADT SERVICES AG | ADT CUSTOM HOME SERVICES (stylized and/or with design) | 8/11/2006 | 78/950285 | 3414668 | T-F-AT-00132 | Registered | 42 Int. |
| USA | ADT SERVICES AG | ADT CUSTOM HOME SERVICES (stylized and/or with design) | 8/11/2006 | 78/950285 | 3414668 | T-F-AT-00132 | Registered | 44 Int. |
| USA | ADT SERVICES AG | ADT CUSTOM HOME SERVICES (stylized and/or with design) | 8/11/2006 | 78/950285 | 3414668 | T-F-AT-00132 | Registered | 45 Int. |
| USA | ADT SERVICES AG | ADT MANAGEHEALTH | 3/14/2007 | 77/130513 | 3343479 | T-F-AT-00520 | Registered | 44 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM | 8/27/1975 | 73/061512 | 1034716 | FZ-337 | Registered | 09 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM | 4/19/1965 | 72/216777 | 803247 | FZ-352 | Registered | 37 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM | 8/31/1966 | 72/253479 | 846966 | FZ-349 | Registered | 09 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM BLOCK | 8/24/2006 | 78/959496 | 3253804 | T-F-AT-00156 | Registered | 44 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM BLOCK | 9/7/2006 | 78/969059 | 3348663 | T-F-AT-00232 | Registered | 09 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM BLOCK | 1/4/2008 | 77/363960 | 3991449 | T-F-AT-00572 | Registered | 09 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM BLOCK | 1/4/2008 | 77/363960 | 3991449 | T-F-AT-00572 | Registered | 38 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM BLOCK | 1/4/2008 | 77/363960 | 3991449 | T-F-AT-00572 | Registered | 42 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM BLOCK | 1/4/2008 | 77/363960 | 3991449 | T-F-AT-00572 | Registered | 45 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM BLOCK BLUE | 8/24/2006 | 78/959524 | 3335239 | T-F-AT-00157 | Registered | 44 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM BLOCK BLUE | 9/7/2006 | 78/969079 | 3335298 | T-F-AT-00233 | Registered | 09 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM BLOCK BLUE | 10/10/2006 | 79/035630 | 3427081 | T-F-AT-00144 | Registered | 35 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM BLOCK BLUE | 10/10/2006 | 79/035630 | 3427081 | T-F-AT-00144 | Registered | 37 Int. |
| USA | ADT SERVICES AG | ADT MONOGRAM BLOCK BLUE | 10/10/2006 | 79/035630 | 3427081 | T-F-AT-00144 | Registered | 45 Int. |
| USA | ADT SERVICES AG | ADT PULSE | 11/3/2010 | 85/167897 | | T-W-ADTCH-00189 | Published | 09 Int. |
| USA | ADT SERVICES AG | ADT PULSE | 11/3/2010 | 85/167818 | | T-W-ADTCH-00190 | Published | 38 Int. |
| USA | ADT SERVICES AG | ADT PULSE | 11/4/2010 | 85/168780 | | T-W-ADTCH-00191 | Published | 42 Int. |
| USA | ADT SERVICES AG | ADT PULSE | 10/20/2010 | 85/156605 | | T-W-ADTCH-00192 | Published | 45 Int. |
| USA | ADT SERVICES AG | ADT SELECT | 3/25/2011 | 85/276726 | 4044849 | T-W-ADTCH-00232 | Registered | 42 Int. |
| USA | ADT SERVICES AG | ADT SELECT | 3/25/2011 | 85/276726 | 4044849 | T-W-ADTCH-00232 | Registered | 45 Int. |
| USA | ADT SERVICES AG | ADT SELECT LINK | 10/23/2007 | 77310664 | 3737494 | T-F-AT-00545 | Registered | 38 Int. |
| USA | ADT SERVICES AG | ADT VITALHEALTH | 3/14/2007 | 77/130525 | 3343480 | T-F-AT-00519 | Registered | 44 Int. |
| USA | ADT SERVICES AG | ADT WELLHEALTH | 3/14/2007 | 77978543 | 3746843 | T-F-AT-00517 | Registered | 09 Int. |
| USA | ADT SERVICES AG | ADT WELLHEALTH | 3/14/2007 | 77978543 | 3746843 | T-F-AT-00517 | Registered | 44 Int. |
| USA | ADT SERVICES AG | AWARE | 9/20/1994 | 74-575993 | 2018644 | FZ-610 | Registered | 37 Int. |
| USA | ADT SERVICES AG | AWARE | 9/20/1994 | 74-575993 | 2018644 | FZ-610 | Registered | 42 Int. |
| USA | ADT SERVICES AG | BEL-AIR PATROL | 8/22/2003 | 78/291110 | 3232337 | FZ-1181 | Registered | 45 Int. |
| USA | ADT SERVICES AG | CLEAR WARNING | 1/26/2007 | 77/092201 | 3,673,425 | T-F-AT-00458 | Registered | 09 Int. |

ATTORNEYS' EYES ONLY

| Country | Owner | Trademark | File Date | App Number | Reg Number | Case Number | Status | Class |
|---|---|---|---|---|---|---|---|---|
| USA | ADT SERVICES AG | FADE | 8/29/1996 | 75157656 | 2119310 | FZ-688 | Registered | 41 Int. |
| USA | ADT SERVICES AG | FOCUS DESIGN | 1/24/1983 | 73410625 | 1269031 | FZ-631 | Registered | 09 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 6/25/2002 | 78/138611 | 2857796 | FZ-1056 | Registered | 37 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 6/25/2002 | 78/138611 | 2857796 | FZ-1056 | Registered | 45 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 8/24/2006 | 78/959565 | 3335240 | T-F-AT-00159 | Registered | 44 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 6/22/2007 | 77/212882 | 3421798 | T-F-AT-00538 | Registered | 42 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 12/11/2007 | 77/348669 | 3511264 | T-F-AT-00568 | Registered | 37 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 12/11/2007 | 77/348669 | 3511264 | T-F-AT-00568 | Registered | 38 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 12/11/2007 | 77/348669 | 3511264 | T-F-AT-00568 | Registered | 45 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 1/4/2008 | 77/363962 | 3906116 | T-F-AT-00574 | Registered | 09 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 1/4/2008 | 77/363962 | 3906116 | T-F-AT-00574 | Registered | 38 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 1/4/2008 | 77/363962 | 3906116 | T-F-AT-00574 | Registered | 42 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 1/4/2008 | 77/363962 | 3906116 | T-F-AT-00574 | Registered | 45 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 10/10/2006 | 79/031007 | 3324938 | T-F-AT-00146 | Registered | 35 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 5/10/2002 | 76/405666 | 2927154 | FZ-1055 | Registered | 37 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 5/10/2002 | 76/405666 | 2927154 | FZ-1055 | Registered | 42 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 5/10/2002 | 76/405666 | 2927154 | FZ-1055 | Registered | 45 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 8/24/2006 | 78/959543 | 3329547 | T-F-AT-00158 | Registered | 44 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 12/11/2007 | 77/348587 | 3511262 | T-F-AT-00567 | Registered | 37 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 12/11/2007 | 77/348587 | 3511262 | T-F-AT-00567 | Registered | 38 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 12/11/2007 | 77/348587 | 3511262 | T-F-AT-00567 | Registered | 45 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 1/4/2008 | 77/363961 | 3902451 | T-F-AT-00573 | Registered | 09 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 1/4/2008 | 77/363961 | 3902451 | T-F-AT-00573 | Registered | 38 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 1/4/2008 | 77/363961 | 3902451 | T-F-AT-00573 | Registered | 42 Int. |
| USA | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 1/4/2008 | 77/363961 | 3902451 | T-F-AT-00573 | Registered | 45 Int. |
| USA | ADT SERVICES AG | PULSE | 8/6/2009 | 77/798980 | | T-W-ADTCH-00081 | Published | 45 Int. |
| USA | ADT SERVICES AG | PULSE | 8/6/2009 | 77/798996 | | T-W-ADTCH-00082 | Published | 09 Int. |
| USA | ADT SERVICES AG | PULSE | 8/6/2009 | 77/798984 | | T-W-ADTCH-00083 | Published | 42 Int. |
| USA | ADT SERVICES AG | PULSE | 8/20/2009 | 77/808981 | | T-W-ADTCH-00084 | Published | 38 Int. |
| USA | ADT SERVICES AG | QUICK KEY | 6/9/1997 | 75/305281 | 2425441 | FZ-729 | Registered | 09 Int. |
| USA | ADT SERVICES AG | SafePass | 7/7/2008 | 77/517556 | | T-W-ADTCH-00006 | Published | 09 Int. |
| USA | ADT SERVICES AG | SAFEWATCH | 3/25/1986 | 73589914 | 1446049 | FZ-644 | Registered | 09 Int. |
| USA | ADT SERVICES AG | SAFEWATCH | 3/25/1986 | 73/589913 | 1447861 | FZ-643 | Registered | 35 Int. |
| USA | ADT SERVICES AG | SAFEWATCH CELLGUARD | 5/27/1999 | 75/714582 | 2747570 | FZ-409 | Registered | 42 Int. |
| USA | ADT SERVICES AG | SECURED BY ADT & Octagon Design | 4/19/1999 | 75684890 | 2399377 | FZ-90 | Registered | 42 Int. |

ATTORNEYS' EYES ONLY

| Country | Owner | Trademark | File Date | App Number | Reg Number | Case Number | Status | Class |
|---------|-------|-----------|-----------|------------|------------|-------------|--------|-------|
| USA | ADT SERVICES AG | SECURVISION | 7/24/1990 | 74081959 | 1891971 | WF-6 | Registered | 09 Int. |
| USA | ADT SERVICES AG | SURE PASS | 11/20/2009 | 77877617 | 3896210 | T-W-ADTCH-00094 | Registered | 45 Int. |
| USA | ADT SERVICES AG | UNIMODE | 3/3/2009 | 77681911 | 3809093 | T-W-ADTCH-00062 | Registered | 09 Int. |
| USA | ADT SERVICES AG | VIDEOVIEW | 7/23/1998 | 75524045 | 2456494 | FZ-772 | Registered | 09 Int. |
| USA | ADT SERVICES AG | VIDEOVIEW | 7/23/1998 | 75524045 | 2456494 | FZ-772 | Registered | 42 Int. |
| USA | ADT SERVICES AG | VIDEOVIEW | 4/8/2011 | 85289964 | 4045516 | T-W-ADTCH-00245 | Registered | 09 Int. |
| USA | ADT SERVICES AG | VIDEOVIEW | 4/8/2011 | 85289964 | 4045516 | T-W-ADTCH-00245 | Registered | 45 Int. |
| USA | ADT SERVICES AG | VIEWPRO | 4/4/2008 | 77/439911 | 3625578 | T-F-AT-00618 | Registered | 45 Int. |

| Country | Owner | Trademark | File Date | App Number | Reg Number | Case Number | Status | Class |
|---------|-------|-----------|-----------|------------|------------|-------------|--------|-------|
| Canada | ADT SERVICES AG | 1-800-ADT-ASAP | 3/12/2003 | 1170817 | 618238 | FZ-1170 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | ADT | 12/12/1961 | 266562 | 129982 | FZ-4 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT | 12/12/1961 | 266562 | 129982 | FZ-4 | Registered | 37 Int. |
| Canada | ADT SERVICES AG | ADT | 12/12/1961 | 266562 | 129982 | FZ-4 | Registered | 42 Int. |
| Canada | ADT SERVICES AG | ADT | 12/12/1961 | 266562 | 129982 | FZ-4 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | ADT | 10/27/2006 | 1321928 | 766702 | T-F-AT-00459 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT | 10/27/2006 | 1321928 | 766702 | T-F-AT-00459 | Registered | 35 Int. |
| Canada | ADT SERVICES AG | ADT | 10/27/2006 | 1321928 | 766702 | T-F-AT-00459 | Registered | 37 Int. |
| Canada | ADT SERVICES AG | ADT | 10/27/2006 | 1321928 | 766702 | T-F-AT-00459 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | ADT | 11/15/2007 | 1372178 | 775882 | T-F-AT-00562 | Registered | 38 Int. |
| Canada | ADT SERVICES AG | ADT | 5/30/2008 | 1397638 | 802193 | T-W-ADTCH-00001 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT | 5/30/2008 | 1397638 | 802193 | T-W-ADTCH-00001 | Registered | 38 Int. |
| Canada | ADT SERVICES AG | ADT | 5/30/2008 | 1397638 | 802193 | T-W-ADTCH-00001 | Registered | 42 Int. |
| Canada | ADT SERVICES AG | ADT | 5/30/2008 | 1397638 | 802193 | T-W-ADTCH-00001 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | ADT ALWAYS THERE | 10/27/2006 | 1321940 | 766584 | T-F-AT-00460 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT ALWAYS THERE | 10/27/2006 | 1321940 | 766584 | T-F-AT-00460 | Registered | 35 Int. |
| Canada | ADT SERVICES AG | ADT ALWAYS THERE | 10/27/2006 | 1321940 | 766584 | T-F-AT-00460 | Registered | 37 Int. |
| Canada | ADT SERVICES AG | ADT ALWAYS THERE | 10/27/2006 | 1321940 | 766584 | T-F-AT-00460 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | ADT ALWAYS THERE | 5/30/2008 | 1397637 | 801740 | T-W-ADTCH-00002 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT ALWAYS THERE | 5/30/2008 | 1397637 | 801740 | T-W-ADTCH-00002 | Registered | 38 Int. |
| Canada | ADT SERVICES AG | ADT ALWAYS THERE | 5/30/2008 | 1397637 | 801740 | T-W-ADTCH-00002 | Registered | 42 Int. |
| Canada | ADT SERVICES AG | ADT ALWAYS THERE | 5/30/2008 | 1397637 | 801740 | T-W-ADTCH-00002 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM | 11/13/1975 | 391440 | 218594 | FZ-3 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM | 11/13/1975 | 391440 | 218594 | FZ-3 | Registered | 37 Int. |

ATTORNEYS' EYES ONLY

| Country | Owner | Trademark | File Date | App Number | Reg Number | Case Number | Status | Class |
|---------|-------|-----------|-----------|-----------|-----------|-------------|--------|-------|
| Canada | ADT SERVICES AG | ADT MONOGRAM | 9/13/1968 | 316053 | 163015 | FZ-2 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM | 9/13/1968 | 316053 | 163015 | FZ-2 | Registered | 37 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM | 9/13/1968 | 316053 | 163015 | FZ-2 | Registered | 42 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM | 4/17/1968 | 312506 | 162931 | FZ-1 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM | 4/17/1968 | 312506 | 162931 | FZ-1 | Registered | 37 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM | 4/17/1968 | 312506 | 162931 | FZ-1 | Registered | 42 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK | 10/27/2006 | 1321936 | 766703 | T-F-AT-00461 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK | 10/27/2006 | 1321936 | 766703 | T-F-AT-00461 | Registered | 35 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK | 10/27/2006 | 1321936 | 766703 | T-F-AT-00461 | Registered | 37 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK | 10/27/2006 | 1321936 | 766703 | T-F-AT-00461 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK | 5/30/2008 | 1397639 | 802192 | T-W-ADTCH-00003 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK | 5/30/2008 | 1397639 | 802192 | T-W-ADTCH-00003 | Registered | 38 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK | 5/30/2008 | 1397639 | 802192 | T-W-ADTCH-00003 | Registered | 42 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK | 5/30/2008 | 1397639 | 802192 | T-W-ADTCH-00003 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK BLUE | 10/27/2006 | 1321937 | 766704 | T-F-AT-00462 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK BLUE | 10/27/2006 | 1321937 | 766704 | T-F-AT-00462 | Registered | 35 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK BLUE | 10/27/2006 | 1321937 | 766704 | T-F-AT-00462 | Registered | 37 Int. |
| Canada | ADT SERVICES AG | ADT MONOGRAM BLOCK BLUE | 10/27/2006 | 1321937 | 766704 | T-F-AT-00462 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | ADT PULSE | 9/8/2009 | 1450925 | | T-W-ADTCH-00091 | Published | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | ADT PULSE | 9/8/2009 | 1450925 | | T-W-ADTCH-00091 | Published | C2 Canadian Class - Unknown No. |
| Canada | ADT SERVICES AG | ADT SELECT | 4/29/2011 | 1525706 | | T-W-ADTCH-00236 | Pending | 42 Int. |
| Canada | ADT SERVICES AG | ADT SELECT | 4/29/2011 | 1525706 | | T-W-ADTCH-00236 | Pending | 45 Int. |
| Canada | ADT SERVICES AG | ADT TOUJOURS LÀ | 10/15/2007 | 1367565 | 750225 | T-F-AT-00544 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | ADT TOUJOURS LÀ | 10/15/2007 | 1367565 | 750225 | T-F-AT-00544 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | ADT WELLHEALTH | 4/3/2008 | 1389923 | | T-F-AT-00621 | Published | 09 Int. |
| Canada | ADT SERVICES AG | ADT WELLHEALTH | 4/3/2008 | 1389923 | | T-F-AT-00621 | Published | 44 Int. |
| Canada | ADT SERVICES AG | AERO | 9/13/1968 | 316054 | 167247 | FZ-505 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | AERO (STYLIZED) | 5/23/1968 | 313392 | 161979 | FZ-506 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | AWARE | 4/24/1997 | 843149 | 502813 | FZ-719 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | CENTRASCAN | 4/6/1979 | 438062 | 275120 | FZ-509 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | CLEAR WARNING | 1/22/2007 | 1332196 | TMA757,148 | T-F-AT-00575 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | CUSTOMER LINK | 12/23/1991 | 696083 | 470814 | FZ-510 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | DVERS | 1/29/1992 | 697856 | 407587 | FZ-511 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | FOCUS & DESIGN | 2/25/1983 | 499375 | 297800 | FZ-514 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | FOCUS 48 (STYLIZED) | 8/17/1982 | 490966 | 293111 | FZ-515 | Registered | CA Canadian Class-Unknown No. |

ATTORNEYS' EYES ONLY

| Country | Owner | Trademark | File Date | App Number | Reg Number | Case Number | Status | Class |
|---------|-------|-----------|-----------|------------|------------|-------------|--------|-------|
| Canada | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 8/19/2002 | 1150181 | 634527 | FZ-1160 | Registered | 37 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 8/19/2002 | 1150181 | 634527 | FZ-1160 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 10/27/2006 | 1321939 | 766899 | T-F-AT-00463 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 10/27/2006 | 1321939 | 766899 | T-F-AT-00463 | Registered | 35 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 10/27/2006 | 1321939 | 766899 | T-F-AT-00463 | Registered | 37 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 10/27/2006 | 1321939 | 766899 | T-F-AT-00463 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 5/30/2008 | 1397640 | 802191 | T-W-ADTCH-00005 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 5/30/2008 | 1397640 | 802191 | T-W-ADTCH-00005 | Registered | 38 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 5/30/2008 | 1397640 | 802191 | T-W-ADTCH-00005 | Registered | 42 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 5/30/2008 | 1397640 | 802191 | T-W-ADTCH-00005 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 8/19/2002 | 1150182 | 611525 | FZ-1161 | Registered | 37 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 8/19/2002 | 1150182 | 611525 | FZ-1161 | Registered | 42 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 10/27/2006 | 1321938 | 766898 | T-F-AT-00464 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 10/27/2006 | 1321938 | 766898 | T-F-AT-00464 | Registered | 35 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 10/27/2006 | 1321938 | 766898 | T-F-AT-00464 | Registered | 37 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 10/27/2006 | 1321938 | 766898 | T-F-AT-00464 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 5/30/2008 | 1397648 | 802194 | T-W-ADTCH-00004 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 5/30/2008 | 1397648 | 802194 | T-W-ADTCH-00004 | Registered | 38 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 5/30/2008 | 1397648 | 802194 | T-W-ADTCH-00004 | Registered | 42 Int. |
| Canada | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 5/30/2008 | 1397648 | 802194 | T-W-ADTCH-00004 | Registered | 45 Int. |
| Canada | ADT SERVICES AG | PREMISEPRO | 3/5/2007 | 1337856 | TMA762,421 | T-F-AT-00515 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | PRIDE IN EXCELLENCE | 5/20/1988 | 607390 | 364814 | FZ-520 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | SAFEWATCH | 8/10/1978 | 428369 | 233784 | FZ-521 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | SAUVER | 1/29/1992 | 697855 | 407586 | FZ-523 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | TELABREAK (STYLIZED) | 10/28/1980 | 460735 | 279930 | FZ-527 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | TELAPPROACH | 9/13/1968 | 316055 | 164341 | FZ-528 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | TELAPPROACH | 4/26/1968 | 312746 | 161313 | FZ-529 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | TELASONICS | 9/19/1984 | 528676 | 303941 | FZ-530 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | TELATTACK | 9/13/1968 | 316058 | 167248 | FZ-532 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | TELATTACK | 4/26/1968 | 312747 | 161314 | FZ-531 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | TELERAIL | 7/9/1979 | 441852 | 271866 | FZ-536 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | TELETHERM | 9/13/1968 | 316059 | 167914 | FZ-537 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | TRANSGARD | 10/6/1978 | 430688 | 243581 | FZ-538 | Dropped | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | UNIMODE | 4/19/1979 | 438508 | 240048 | FZ-540 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | UNIMODE SYSTEM & DESIGN | 2/19/1979 | 435995 | 263167 | FZ-428 | Registered | CA Canadian Class-Unknown No. |

ATTORNEYS' EYES ONLY

| Country | Owner | Trademark | File Date | App Number | Reg Number | Case Number | Status | Class |
|---------|-------|-----------|-----------|------------|------------|-------------|--------|-------|
| Canada | ADT SERVICES AG | VIBRALARM | 9/13/1968 | 316057 | 166219 | FZ-429 | Registered | CA Canadian Class-Unknown No. |
| Canada | ADT SERVICES AG | VIDEOVIEW | 12/4/2007 | 1374672 | TMA786089 | T-F-AT-00563 | Registered | 09 Int. |
| Canada | ADT SERVICES AG | VIDEOVIEW | 12/4/2007 | 1374672 | TMA786089 | T-F-AT-00563 | Registered | 42 Int. |

| Country | Owner | Trademark | File Date | App Number | Reg Number | Case Number | Status | Class |
|---------|-------|-----------|-----------|------------|------------|-------------|--------|-------|
| Puerto Rico | ADT SERVICES AG | ADT MONOGRAM | 3/20/1969 | | 15923 | FZ-264 | Registered | 09 Int. |
| Puerto Rico | ADT SERVICES AG | ADT MONOGRAM | 12/1/1987 | | 28199 | FZ-263 | Registered | 16 Int. |
| Puerto Rico | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 9/30/2002 | 55154 | 55154 | FZ-1166 | Registered | 45 Int. |
| Puerto Rico | ADT SERVICES AG | OCTAGON SIGN WITH ADT STYLIZED BRAND THEREIN | 9/30/2002 | 55155 | 55155 | FZ-1165 | Registered | 37 Int. |
| Puerto Rico | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 9/30/2002 | 55157 | 55157 | FZ-1167 | Registered | 37 Int. |
| Puerto Rico | ADT SERVICES AG | OCTAGON SIGN WITHOUT TEXT - CLAIMING THE COLOR BLU | 9/30/2002 | 55158 | 55158 | FZ-1168 | Registered | 45 Int. |

ATTORNEYS' EYES ONLY

## Appendix 3: Search for Comparable External Agreements

| # | Filing Company | Effective Date | Accept/Reject | Notes on Rejection/Acceptance |
|---|---|---|---|---|
| 1 | SMITH & WESSON CORP. | 05/31/96 | Accept | ACCEPT - none of the rejection criteria applicable |
| 2 | COLEMAN CO.. INC. | 03/24/98 | Reject | Exhibit is not a comparable agreement |
| 3 | YOUKU.COM INC. | 08/16/10 | Reject | Transaction is between related parties |
| 4 | YOUKU.COM INC. | 08/16/10 | Reject | Transaction is between related parties |
| 5 | CHARM COMMUNICATIONS INC. | 01/20/10 | Reject | Exhibit is not a comparable agreement |
| 6 | CHARM COMMUNICATIONS INC. | 01/20/10 | Reject | Exhibit is not a comparable agreement |
| 7 | AGILENT TECHNOLOGIES INC | 06/01/06 | Reject | Exhibit is not a comparable agreement |
| 8 | AKORN INC | 09/22/04 | Reject | Transaction is between related parties |
| 9 | ALLMARINE CONSULTANTS CORP | 08/15/05 | Reject | Exhibit is not a comparable agreement |
| 10 | MWI VETERINARY SUPPLY, INC. | 07/01/08 | Reject | Exhibit is not a comparable agreement |
| 11 | INTELECT COMMUNICATIONS INC | 01/27/98 | Reject | Transaction is between related parties |
| 12 | AT&T LATIN AMERICA CORP | 11/18/99 | Reject | Transaction is between related parties |
| 13 | FARMSTEAD TELEPHONE GROUP INC | 10/28/03 | Reject | Exhibit is not a comparable agreement |
| 14 | FARMSTEAD TELEPHONE GROUP INC | 10/28/03 | Reject | Exhibit is not a comparable agreement |
| 15 | BLACK BOX CORP | 07/01/95 | Reject | Transaction is between related parties |
| 16 | WATCHDATA TECHNOLOGIES LTD. | 09/06/04 | Reject | Exhibit is not a comparable agreement |
| 17 | TRIPLE-S MANAGEMENT CORP | N/A | Reject | Exhibit is not a comparable agreement |
| 18 | WELLPOINT INC | 07/01/09 | Reject | Exhibit is not a comparable agreement |
| 19 | WELLPOINT INC | 11/19/09 | Reject | Exhibit is not a comparable agreement |
| 20 | WELLPOINT INC | 06/11/98 | Reject | Transaction is between related parties |
| 21 | WELLPOINT INC | 09/21/00 | Reject | Transaction is between related parties |
| 22 | WELLPOINT INC | 03/16/01 | Reject | Transaction is between related parties |
| 23 | WELLPOINT INC | 06/15/01 | Reject | Transaction is between related parties |
| 24 | TRIPLE-S MANAGEMENT CORP | 06/15/01 | Reject | Transaction is between related parties |
| 25 | TRIPLE-S MANAGEMENT CORP | 11/17/05 | Reject | Transaction is between related parties |
| 26 | WELLPOINT INC | 11/17/05 | Reject | Transaction is between related parties |
| 27 | WELLPOINT INC | 01/04/99 | Reject | Transaction is between related parties |
| 28 | TRIPLE-S MANAGEMENT CORP | 01/04/99 | Reject | Transaction is between related parties |
| 29 | TRIPLE-S MANAGEMENT CORP | 11/17/05 | Reject | Transaction is between related parties |
| 30 | TRIPLE-S MANAGEMENT CORP | 03/16/01 | Reject | Transaction is between related parties |
| 31 | TRIPLE-S MANAGEMENT CORP | 07/01/09 | Reject | Transaction is between related parties |
| 32 | TRIPLE-S MANAGEMENT CORP | 11/18/08 | Reject | Transaction is between related parties |
| 33 | TRIPLE-S MANAGEMENT CORP | 11/19/09 | Reject | Transaction is between related parties |
| 34 | TRIPLE-S MANAGEMENT CORP | 11/19/09 | Reject | Transaction is between related parties |
| 35 | TRIPLE-S MANAGEMENT CORP | 11/19/09 | Reject | Transaction is between related parties |
| 36 | WELLPOINT HEALTH NETWORKS INC | 10/04/02 | Reject | Transaction is between related parties |
| 37 | COBALT CORP | N/A | Reject | Transaction is between related parties |
| 38 | COBALT CORP | N/A | Reject | Transaction is between related parties |
| 39 | WELLPOINT HEALTH NETWORKS INC | 03/15/01 | Reject | Transaction is between related parties |
| 40 | WELLPOINT HEALTH NETWORKS INC | 03/15/01 | Reject | Transaction is between related parties |
| 41 | WELLPOINT HEALTH NETWORKS INC | 03/15/01 | Reject | Transaction is between related parties |
| 42 | WELLPOINT HEALTH NETWORKS INC | 03/15/01 | Reject | Transaction is between related parties |
| 43 | WELLPOINT HEALTH NETWORKS INC | 03/15/01 | Reject | Transaction is between related parties |
| 44 | WELLPOINT HEALTH NETWORKS INC | 03/15/01 | Reject | Transaction is between related parties |
| 45 | WELLPOINT HEALTH NETWORKS INC | 01/01/97 | Reject | Transaction is between related parties |
| 46 | WELLPOINT HEALTH NETWORKS INC | 08/04/97 | Reject | Transaction is between related parties |
| 47 | DENTAL MEDICAL DIAGNOSTIC SYSTEMS INC | 10/28/96 | Reject | Exhibit is not a comparable agreement |
| 48 | BRINKS CO | 10/31/08 | Reject | Transaction is between related parties |
| 49 | BRINKS CO | 10/31/08 | Reject | Transaction is between related parties |
| 50 | BRINK'S HOME SECURITY HOLDINGS, INC. | 10/31/08 | Reject | Transaction is between related parties |
| 51 | BRINK'S HOME SECURITY HOLDINGS, INC. | 06/30/05 | Reject | Transaction is between related parties |
| 52 | EMPOWER HEALTH CORP | 01/05/99 | Reject | Exhibit is not a comparable agreement |
| 53 | EMPOWER HEALTH CORP | 01/05/99 | Reject | Exhibit is not a comparable agreement |
| 54 | ORTEC INTERNATIONAL INC | 10/18/04 | Reject | Exhibit is not a comparable agreement |
| 55 | U S REMODELERS INC | 03/01/97 | Reject | Exhibit is not a comparable agreement |
| 56 | EVANS SYSTEMS INC | 06/01/07 | Reject | Exhibit is not a comparable agreement |
| 57 | VISIONCHINA MEDIA INC. | 02/15/07 | Reject | Transaction is between related parties |
| 58 | ASCENDANT SOLUTIONS INC | 10/23/02 | Reject | Transaction is between related parties |
| 59 | CTPARTNERS EXECUTIVE SEARCH LLC | 04/01/07 | Reject | Transaction is between related parties |
| 60 | CURTIS MATHES HOLDING CORP | 01/10/97 | Reject | Transaction is between related parties |
| 61 | INTERNATIONAL COMMERCIAL TELEVISION INC | 08/08/01 | Reject | Exhibit is not a comparable agreement |
| 62 | DIJJI CORP | 08/14/02 | Reject | Transaction is between related parties |
| 63 | SHOPPING COM | 02/10/98 | Reject | Transaction is between related parties |
| 64 | METABASIS THERAPEUTICS INC | 07/14/09 | Reject | Transaction is between related parties |
| 65 | FIRST AMERICAN FINANCIAL CORP | 11/01/97 | Reject | Exhibit is not a comparable agreement |
| 66 | FIRST AMERICAN CORP | 11/01/97 | Reject | Exhibit is not a comparable agreement |
| 67 | FIRST AMERICAN FINANCIAL CORP | 11/01/97 | Reject | Exhibit is not a comparable agreement |
| 68 | WILSHIRE TECHNOLOGIES INC | 06/01/98 | Reject | Exhibit is not a comparable agreement |
| 69 | FAMOUS DAVE S OF AMERICA INC | 03/04/96 | Reject | Exhibit is not a comparable agreement |
| 70 | FBL FINANCIAL GROUP INC | 01/01/05 | Reject | Transaction is between related parties |
| 71 | MARKETWATCH COM INC | 01/06/00 | Reject | Exhibit is not a comparable agreement |
| 72 | FTD INC | 06/01/99 | Reject | Exhibit is not a comparable agreement |

| # | Filing Company | Effective Date | Accept/Reject | Notes on Rejection/Acceptance |
|---|---|---|---|---|
| 73 | FTD INC | 06/01/99 | Reject | Exhibit is not a comparable agreement |
| 74 | MIRENCO INC | 05/01/03 | Reject | Transaction is between related parties |
| 75 | MMH HOLDINGS INC | 03/30/98 | Reject | Exhibit is not a comparable agreement |
| 76 | MORRIS MATERIAL HANDLING INC | 03/30/98 | Reject | Exhibit is not a comparable agreement |
| 77 | VALESC INC | 07/02/00 | Reject | Exhibit is not a comparable agreement |
| 78 | HISPANIC TELEVISION NETWORK INC | 05/01/01 | Reject | Exhibit is not a comparable agreement |
| 79 | I3 MOBILE INC | 12/28/99 | Reject | Exhibit is not a comparable agreement |
| 80 | KMART CORP | 10/26/00 | Reject | Transaction is between related parties |
| 81 | KONGZHONG CORP | 05/10/04 | Reject | Exhibit is not a comparable agreement |
| 82 | KONGZHONG CORP | 05/10/04 | Reject | Exhibit is not a comparable agreement |
| 83 | KONGZHONG CORP | 03/31/04 | Reject | Exhibit is not a comparable agreement |
| 84 | KOSS CORP | 06/30/03 | Reject | Exhibit is not a comparable agreement |
| 85 | MARINER HEALTH CARE INC | 05/13/02 | Reject | Exhibit is not a comparable agreement |
| 86 | FORWARD INDUSTRIES INC | 10/01/04 | Reject | Exhibit is not a comparable agreement |
| 87 | FORWARD INDUSTRIES INC | 10/01/04 | Reject | Exhibit is not a comparable agreement |
| 88 | FORWARD INDUSTRIES INC | 10/01/04 | Reject | Exhibit is not a comparable agreement |
| 89 | FORWARD INDUSTRIES INC | 12/18/08 | Reject | Exhibit is not a comparable agreement |
| 90 | NUWAVE TECHNOLOGIES INC | 10/01/03 | Reject | Exhibit is not a comparable agreement |
| 91 | ULTRASTRIP SYSTEMS INC | 07/17/00 | Reject | Exhibit is not a comparable agreement |
| 92 | ULTRASTRIP SYSTEMS INC | 07/17/00 | Reject | Exhibit is not a comparable agreement |
| 93 | ULTRASTRIP SYSTEMS INC | 07/17/00 | Reject | Exhibit is not a comparable agreement |
| 94 | DATAMEG CORP | 05/01/04 | Reject | Exhibit is not a comparable agreement |
| 95 | ORGANIC SOILS COM INC | 01/24/00 | Reject | Transaction is between related parties |
| 96 | ORGANIC SOILS COM INC | 01/24/00 | Reject | Transaction is between related parties |
| 97 | ORGANIC SOILS COM INC | 01/24/00 | Reject | Transaction is between related parties |
| 98 | ORGANIC SOILS COM INC | 01/24/00 | Reject | Transaction is between related parties |
| 99 | ORGANIC SOILS COM INC | 01/24/00 | Reject | Transaction is between related parties |
| 100 | ORGANIC SOILS COM INC | 01/24/00 | Reject | Transaction is between related parties |
| 101 | ORGANIC SOILS COM INC | 01/24/00 | Reject | Transaction is between related parties |
| 102 | ORGANIC SOILS COM INC | 01/24/00 | Reject | Transaction is between related parties |
| 103 | MEDIBUY COM INC | 10/01/99 | Reject | Transaction is between related parties |
| 104 | PROINVEST REALTY FUND LLC | 09/01/07 | Reject | Transaction is between related parties |
| 105 | PROINVEST REALTY FUND LLC | 11/01/07 | Reject | Transaction is between related parties |
| 106 | VIDEOLAN TECHNOLOGIES INC | 06/14/96 | Reject | Exhibit is not a comparable agreement |
| 107 | HYDRON TECHNOLOGIES INC | 05/31/96 | Reject | Exhibit is not a comparable agreement |
| 108 | INTERTAN INC | 11/09/00 | Reject | Exhibit is not a comparable agreement |
| 109 | VISTA LASER CENTERS OF THE PACIFIC INC | 02/05/96 | Reject | Exhibit is not a comparable agreement |
| 110 | VISTA LASER CENTERS OF THE PACIFIC INC | 02/05/96 | Reject | Exhibit is not a comparable agreement |
| 111 | S2 GOLF INC | 08/01/99 | Reject | Exhibit is not a comparable agreement |
| 112 | H&R BLOCK INC | 08/01/07 | Reject | Consideration not in form of royalty on sales |
| 113 | H&R BLOCK INC | 06/30/04 | Reject | Exhibit is not a comparable agreement |
| 114 | SMITH & WESSON HOLDING CORP | 11/01/95 | Reject | Exhibit is not a comparable agreement |
| 115 | SMITH & WESSON HOLDING CORP | 11/01/95 | Reject | Exhibit is not a comparable agreement |
| 116 | SMITH & WESSON HOLDING CORP | 08/01/96 | Reject | Transaction is between related parties |
| 117 | SMITH & WESSON HOLDING CORP | 08/01/96 | Reject | Transaction is between related parties |
| 118 | SAF T HAMMER CORP | 08/01/96 | Reject | Exhibit is not a comparable agreement |
| 119 | SAF T HAMMER CORP | 08/01/96 | Reject | Transaction is between related parties |
| 120 | SMITH & WESSON HOLDING CORP | 11/01/95 | Reject | Exhibit is not a comparable agreement |
| 121 | VALUEVISION INTERNATIONAL INC | 09/13/99 | Reject | Exhibit is not a comparable agreement |
| 122 | R H DONNELLEY CORP | 09/01/04 | Reject | Transaction is between related parties |
| 123 | VIRGIN MOBILE USA, INC | 01/01/08 | Reject | Exhibit is not a comparable agreement |
| 124 | VIRGIN MOBILE USA, INC. | 01/01/08 | Reject | Transaction is between related parties |
| 125 | SOTHEBYS | 02/17/04 | Reject | Exhibit is not a comparable agreement |
| 126 | REALOGY CORP | 02/17/04 | Reject | Exhibit is not a comparable agreement |
| 127 | REALOGY CORP | 02/17/04 | Reject | Exhibit is not a comparable agreement |
| 128 | DIGITAL DATA NETWORKS INC | 10/04/96 | Reject | Exhibit is not a comparable agreement |
| 129 | SMITH & WOLLENSKY RESTAURANT GROUP INC | 08/16/96 | Reject | Exhibit is not a comparable agreement |
| 130 | SMITH & WOLLENSKY RESTAURANT GROUP INC | 01/01/06 | Reject | Exhibit is not a comparable agreement |
| 131 | SMITH & WOLLENSKY RESTAURANT GROUP INC | 01/01/06 | Reject | Exhibit is not a comparable agreement |
| 132 | LAMPERD LESS LETHAL INC | 08/02/05 | Reject | Exhibit is not a comparable agreement |
| 133 | INTERTAN INC | 01/25/99 | Reject | Exhibit is not a comparable agreement |
| 134 | INTERTAN INC | 01/25/99 | Reject | Exhibit is not a comparable agreement |
| 135 | INTERTAN INC | 01/25/99 | Reject | Exhibit is not a comparable agreement |
| 136 | INTERTAN INC | 01/25/99 | Reject | Exhibit is not a comparable agreement |
| 137 | INTERTAN INC | 01/25/99 | Reject | Exhibit is not a comparable agreement |
| 138 | INTERTAN INC | 01/25/99 | Reject | Exhibit is not a comparable agreement |
| 139 | MICRO LINEAR CORP | 01/01/02 | Reject | Exhibit is not a comparable agreement |
| 140 | NATIONSRX INC | 08/29/03 | Reject | Exhibit is not a comparable agreement |
| 141 | AMERINET GROUP COM INC | 02/09/00 | Reject | Exhibit is not a comparable agreement |
| 142 | US HOME SYSTEMS INC | 03/03/97 | Reject | Exhibit is not a comparable agreement |
| 143 | U S HOME SYSTEMS INC | 03/03/97 | Reject | Exhibit is not a comparable agreement |
| 144 | AMRE INC | 01/01/96 | Reject | Exhibit is not a comparable agreement |

| # | Filing Company | Effective Date | Accept/Reject | Notes on Rejection/Acceptance |
|---|---|---|---|---|
| 145 | INTERTAN INC | 05/01/01 | Reject | Transaction is between related parties |
| 146 | INTERTAN INC | 05/01/01 | Reject | Transaction is between related parties |
| 147 | INTERTAN INC | 05/01/01 | Reject | Transaction is between related parties |
| 148 | INTERTAN INC | 05/01/01 | Reject | Transaction is between related parties |
| 149 | SPORTS AUTHORITY INC NEW | 04/02/04 | Reject | Exhibit is not a comparable agreement |
| 150 | SPORTS AUTHORITY INC NEW | 04/02/04 | Reject | Exhibit is not a comparable agreement |
| 151 | SPORTS AUTHORITY INC | 04/02/04 | Reject | Exhibit is not a comparable agreement |
| 152 | SPORTS AUTHORITY INC | 04/02/04 | Reject | Exhibit is not a comparable agreement |
| 153 | SMITH & WESSON HOLDING CORP | 07/01/00 | Reject | Exhibit is not a comparable agreement |
| 154 | SMITH & WESSON HOLDING CORP | 07/01/00 | Reject | Exhibit is not a comparable agreement |
| 155 | SAF T HAMMER CORP | 07/01/00 | Reject | Exhibit is not a comparable agreement |
| 156 | NTL INC | 04/03/06 | Reject | Exhibit is not a comparable agreement |
| 157 | VIRGIN MOBILE USA, INC | 04/03/06 | Reject | Exhibit is not a comparable agreement |
| 158 | VIRGIN MOBILE USA, INC | 06/29/05 | Reject | Transaction is between related parties |
| 159 | VIRGIN MOBILE USA, INC | 01/01/07 | Reject | Transaction is between related parties |
| 160 | NTL INC | 01/01/07 | Reject | Transaction is between related parties |
| 161 | VIRGIN MOBILE USA, INC. | 06/05/09 | Reject | Transaction is between related parties |
| 162 | EGLOBE INC | 03/23/00 | Reject | Transaction is between related parties |
| 163 | WADDELL & REED FINANCIAL INC | 10/20/08 | Reject | Exhibit is not a comparable agreement |
| 164 | ZONE 4 PLAY INC | 01/08/04 | Reject | Exhibit is not a comparable agreement |

## Appendix 4: Summary of Accepted Agreements

| # | Licensor | Licensee | Effective Date | Term | License | Trademarks / Service Marks Licensed | Products / Services | Licensed Territory | Exclusivity | Consideration Used in Analysis |
|---|----------|----------|----------------|------|---------|-------------------------------------|---------------------|--------------------|-------------|-------------------------------|
| 1 | ADT Services AG | ADT Security Systems, Puerto Rico, Inc. | 12/27/94 | 3 year initial term with automatic renewal | Grant the right to use the licensed trademarks in association with the sale of goods and services and to use the mark "ADT" as a trade name and as part of its corporate name. | ADT, ADT Monogram | Electronic security services and equipment | Puerto Rico | Exclusive | 1.25% |
| 2 | ADT Services AG | ADT Security Systems, Virgin Islands, Inc. | 10/01/08 | 5 year initial term with option for two further 5 year renewals | Grant the right to use the licensed trademarks in association with the sale of goods and services and to use the mark "ADT" as a trade name and as part of its corporate name. | ADT, ADT Always There, ADT Monogram, ADT Monogram Block, ADT Monogram Block Blue, Octagon Sign With ADT Stylized Brand Therein | Electronic security services and equipment | U.S. Virgin Islands, St. Maarten, and Saint Martin | Exclusive | 1.25% |
| 3 | Smith & Wesson Corp. | Canadian Security Agency, Inc. | 05/31/96 | 10 years and 7 months initial term with automatic renewal | Grant the right to use the licensed trademarks in connection with the retail sale of licensed articles and services in the private and proprietary security industry. | Smith & Wesson, S&W Monogram, S&W | Electronic security products and systems; and security services | Worldwide | Exclusive | 2.50% |

| Statistics | Royalty Rate |
|------------|--------------|
| Minimum | 1.25% |
| Mean | 1.67% |
| Maximum | 2.50% |
| Number of Observations | 3 |

ATTORNEYS' EYES ONLY

## Appendix 5: Determination of the WACC Prepared by Duff & Phelps

# Determination of the Weighted Average Cost of Capital

The following describes the methodology and assumptions used in calculating the discount rate used in our valuation of the ADT Security Services, Inc. – US Residential business as of March 31, 2012. Please see the accompanying schedule for the detailed calculation.

When applying the Income Approach, the cash flows expected to be generated by a business are discounted to their present value equivalent using a rate of return that reflects the relative risk of the investment, as well as the time value of money. This return is an overall rate based upon the individual rates of return on both equity and interest-bearing debt. This return, known as the weighted average cost of capital ("WACC"), is calculated by weighting the required returns on interest-bearing debt and equity capital in proportion to their estimated percentages in an expected industry capital structure.

The general formula for calculating the WACC is:

$$\text{WACC} = (K_d * D\%) + (K_e * E\%)$$

where:

| | | |
|---|---|---|
| $K_d$ | = | After-tax required return on debt capital; |
| D% | = | Debt capital as percentage of total invested capital; |
| $K_e$ | = | Required return on equity capital; and |
| E% | = | Equity capital as a percentage of total invested capital. |

### Required Return on Debt Capital

The required return on debt capital is the representative industry rate an unrelated debt investor would require on interest-bearing debt. Since the interest expense on debt capital is deductible for income tax purposes, we used the after-tax required return in our calculation. The income tax rate is based on the local statutory tax rate as provided by Management.

The after-tax required return on debt capital is calculated using the formula:

$$K_d = (K) * (1 - t)$$

where:

| | | |
|---|---|---|
| $K_d$ | = | After-tax required return on debt capital; |
| K | = | Pre-tax required return on debt capital; and |
| t | = | Statutory tax rate. |

Accounting for interest deductibility, the after-tax required return on debt capital is estimated to be approximately 2.9 percent.

---

[1] Cost of debt is equal to the 20 year Composite S&P Rates US BBB rated Industrial Bond.

ATTORNEYS' EYES ONLY

**Required Return on Equity Capital**

We used the Capital Asset Pricing Model ("CAPM") to determine the required return on equity.  This method is described in the following section.

Capital Asset Pricing Model

The rate of return on equity capital is estimated using the CAPM. CAPM has been empirically tested and is widely accepted for the purpose of estimating a company's required return on equity capital.[2]  In applying the CAPM, the required return on equity capital is estimated as the risk-free rate, plus an equity risk premium expected over the risk-free rate of return multiplied by the estimated beta for the type of investment.  To this result, a size premium may be added.  .

The CAPM rate of return on equity capital is calculated using the formula:

$$K_e \quad = \quad R_f + (\beta * R_p) + SP$$

where:

| | | |
|---|---|---|
| $R_f$ | = | Risk-free rate of return; |
| $\beta$ | = | Beta or systematic risk for this type of equity investment; |
| $R_p$ | = | Market risk premium; the expected return on a broad portfolio of stocks in the market ($R_m$) less the risk-free rate ($R_f$); and |
| SP | = | Size premium. |

*Risk Free Rate of Return*

The average yield on the long-term (20-year) U.S. Treasury Bond over the one year period prior to the Valuation Date was rounded up to 4.00 percent.  Government Bond yields are "risk-free" only in nominal terms (i.e., if they are held to maturity, default risk is assumed to be negligible).

*Beta*

Beta is a statistical measure of the volatility of the price of a specific stock relative to the movement of a general group.  Generally, beta is considered to be indicative of the market's perception of the relative risk of the specific stock.  Practical application of the CAPM for private firms and standalone divisions or legal entities of publicly traded companies, such as ADT Security Services, Inc. – US Residential, requires the identification of publicly traded companies that have similar risk profiles to derive meaningful measures of the subject company's beta.

---

[2] Investments, W.F. Sharpe, Prentice Hall. Englewood Cliffs, New Jersey (1985).

Betas reported in public sources are "leveraged," which incorporates the added risk to a stockholder due to the debt financing or capital structure of the guideline company. To derive a beta applicable to the company, the guideline companies' reported levered betas must first be unlevered and then relevered at assumed industry average debt levels.

*Market Risk Premium*

Quantification of the general market risk premium has been the subject of much research by security analysts. Since the expectations of the average investor are not directly observable, the Market Risk Premium ("$R_i$") must be inferred using one of several methods. One approach is to use premiums that investors have historically earned over and above the returns on long-term Treasury bonds. The premium obtained using the historical approach is sensitive to the time period over which one calculates the average. Depending on the time period chosen, the historical approach yields an average premium in a range of 5 to 8 percent. Another approach is to look at projected rates of return obtained from analysts who follow the stock market. Again, this approach will lead to differing estimates depending upon the source. A survey of several widely followed sources indicates a premium in a range of 3 to 5 percent. A consideration of both historical and forward-looking sources suggests an expected Market Risk Premium of approximately 5.5 percent in this analysis.

*Size Premium*

The CAPM rate of return can be adjusted by a premium, which reflects the extra risk of an investment based on the size of the relevant company. This premium is derived from historical differences in returns between small companies and large companies, using the Ibbotson SBBI Valuation Yearbook. For purposes of this analysis, we considered whether a size premium would be appropriate to add in the estimation of the cost of equity. Given the size of the ADT Security Services, Inc. – US Residential business, a size premium of 0.78 percent was applied, which corresponds to the 2nd decile or companies with a market capitalization of $6.9 billion to $15.4 billion.

*Estimation of Capital Structure*

Our estimate of the appropriate capital structure was based on observing typical proportions of interest-bearing debt and equity of publicly traded companies in similar lines of business as the subject company. Since the premise of value is that of a controlling interest, the industry-average capital structure was used because a control buyer would have the ability to change the capital structure to reflect that of the average of the same group of guideline companies from which the cost of equity was derived. Based on the

ATTORNEYS' EYES ONLY

median capital structure of the guideline companies, a weighting of 79.0 percent equity and 21.0 percent debt was applied.

**WACC Conclusion**

Based on the methods considered and utilized, we concluded that typical investors would require a WACC of 8.9 percent for an investment in the invested capital of ADT Security Services, Inc. – US Residential as of March 31, 2012.

**TYCO INTERNATIONAL LTD.**  **Exhibit III**
Valuation of ADT Security Services, Inc. – US Residential
Estimation Of The Weighted Average Cost Of Capital
Valuation Date: March 31, 2012
(In Local Currency 000S)  Confidential Draft

| Assumptions | | Assumptions | Source: |
|---|---|---|---|
| Risk-free Rate | Rf = | 4.00% | Federal Reserve Statistical Release (20 year Treasury) 1 Year Average as of March 30, 2012 |
| Pretax Required Rate on Debt Capital | I = | 4.79% | BBB Bond Rate |
| Equity Risk Premium | Rp = | 5.50% | Per various studies |
| Size Premium | Sp = | 0.78% | Ibotson 2011 SBBI Valuation Yearbook - Decile 2 |
| Assumed Tax Rate | t = | 38.7% | Selected Tax Rate per Tyco Tax Department |
| Beta | B = | 1.03 | Industry Median (Relevered) |
| Book Value of Debt as a % of Total Capitalization | D = | 21.0% | Industry Median (Rounded) |
| Market Value of Equity as a % of Total Capitalization | E = | 79.0% | Industry Median (Rounded) |

**Comparable Company Analysis**

| | | Barra Beta (1) | Book Value of Debt (2) | Stock Price as of 3/30/2012 | Number of Common Shares Outstanding | Market Value of Equity | Non Controlling Interest | Total Capital | Equity/ Capital | Debt/ Capital | Tax Rate ($) | Unlevered Beta |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Company Name | | | | | | | | | | | |
| 1 CATS:PSG | Prosegur Compañía de Seguridad, S.A. | 1.06 | 430,774 | 43.90 | 59,379 | 2,606,729 | 571 | 3,038,074 | 85.8% | 14.2% | 31.5% | 0.95 |
| 2 HON | Honeywell International Inc. | 1.06 | 7,555,000 | 61.05 | 776,278 | 47,391,772 | 96,000 | 55,042,772 | 86.3% | 13.7% | 24.2% | 0.94 |
| 3 OM:SECU B | Securitas AB | 1.37 | 13,374,900 | 63.80 | 365,059 | 23,290,758 | 4,900 | 36,670,558 | 63.5% | 36.5% | 28.3% | 0.97 |
| 4 TYC | Tyco International Ltd. | 0.93 | 4,174,000 | 56.18 | 460,965 | 25,897,023 | 99,000 | 30,170,023 | 86.2% | 13.8% | 20.3% | 0.83 |
| 5 DTV | DIRECTV, Inc. | 0.85 | 13,464,000 | 49.34 | 676,609 | 33,383,874 | 265,000 | 47,112,874 | 71.4% | 28.6% | 35.0% | 0.68 |
| 6 TWC | Time Warner Cable Inc. | 0.96 | 26,742,000 | 81.50 | 314,086 | 25,598,043 | 7,000 | 52,347,043 | 48.9% | 51.1% | 40.0% | 0.59 |
| | Median | 1.01 | | | | | | | 79.0% | 21.0% | | 0.88 |

**Relevered Beta Analysis**

| | | |
|---|---|---|
| Beta (Unlevered) | 0.88 | |
| Industry Debt-to-Equity Ratio (4) | 26.6% | |
| Tax Rate | 38.7% | |
| Beta (Relevered) | 1.03 | |

**Relevering Calculations**

Unlevered Beta = Beta (Observed) / [ 1 + D/E ( 1 - t )]
Relevered Beta = Unlevered Beta * [ 1 + D/E ( 1 - t )]

**Weighted Average Cost of Capital - Capital Asset Pricing Model**

| | | | Weighting | | WACC |
|---|---|---|---|---|---|
| Required Return on Debt Capital [ I * ( 1 - t )] = | 2.9% | x | 21.0% | = | 0.6% |
| Required Return on Adjusted Equity Capital [Rf + (B * Rp) + Sp] = | 10.4% | x | 79.0% | = | 8.2% |
| | | | WACC (Rounded) | | 8.9% |

**Notes:**
(1) Barra's monthly projected betas as of the Valuation Date.
(2) Debt includes preferred stock, capital leases, and short term and long term interest-bearing debt.
(3) Tax Rates per Capital IQ. Reflects five year historical average effective tax rate.
(4) Represents ratio of interest bearing debt as a % of total capitalization to equity as a % of total capitalization.

## Appendix 6: Summary of Trademark Ownership Agreement between ADT GmbH and ADT US

ADT GmbH and ADT US will enter into a Trademark Ownership Agreement and related agreements that will govern each party's use of certain trademarks, including the ADT NA Marks, and pursuant to which ADT GmbH will transfer to ADT US all of its rights in the ADT NA Marks and ADT GmbH will retain rights to the ADT brand name, trademarks and service marks elsewhere in the world. ADT US and ADT GmbH will agree that they and their affiliates will not register or use (subject to a "phase out" transitional license to ADT GmbH affiliates in North America) the ADT brand for any good or services in the other party's territory. The parties are not restricted from competing with each other under other brands.

The Trademark Ownership Agreement will allocate the ownership of, and the parties' rights and obligations with respect to, the ADT brand online.  In general, each party will have the right to register domain names containing the ADT brand in domain names ending in country codes in it respective territory. The Trademark Ownership Agreement will contain provisions for allocating ownership, rights and obligations in other domains.  The agreement will also contain provisions regarding the redirection of Internet traffic to the appropriate website of each party.

The Trademark Ownership Agreement will contain other provisions, including quality control provisions, compliance with applicable laws, and security, system and data protection measures.

Neither ADT US nor ADT GmbH may assign the Trademark Ownership Agreement without the consent of the other party, except under certain circumstances to an affiliate, or in connection with a merger, change of control, reorganization or equity or asset sale relating to the business to which the agreement related, and in each case the assignee must assume in writing all of the assigning party's obligations under the agreement.